United States District Court
Southern District of Texas
FILED

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUN 2 5 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| AMERICA CANTU, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **B-01-109** |
| | § | |
| AFC ENTERPRISES, INC. d/b/a | § | |
| CHURCHS CHICKEN, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT

Pursuant to the Federal Arbitration Act ("FAA"), *9 U.S.C. §§ 1 et seq.*, Defendant AFC Enterprises, Inc. d/b/a Churchs Chicken ("AFC") moves to dismiss this action to permit an arbitration to proceed in accordance with the parties' written arbitration agreement, or in the alternative, to affirmatively compel Plaintiff to participate in an arbitration proceeding between the parties.

## BACKGROUND FACTS

Plaintiff alleges that she was injured in the scope of her employment with AFC on May 29, 1999 at one of AFC's Churchs Chicken restaurants in Brownsville, Texas. *See Plaintiff's Original Petition at ¶¶7-8.* AFC is, and was at all pertinent times, a nonsubscriber to the Texas Workers' Compensation Act. *Id. at ¶15.* Instead, AFC has established the AFC Enterprises, Inc. Texas Employee Injury Benefit Plan (the "AFC Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA") to provide medical, wage-replacement and death benefits to its

Texas employees injured or killed in the course and scope of their AFC employment. *Affidavit of Gary D. Sarles ("Sarles Affidavit", attached hereto as Exhibit "A") at ¶2, Exhibit 1 thereto.*

All Texas employees of AFC are required to sign an arbitration agreement to be eligible for the benefits provided by the AFC Plan for an on-the-job injury. *Id. at ¶3.* The arbitration agreement required as a condition precedent to participation in the AFC Plan is called the "Value Deal Agreement." *Id.* The Value Deal Agreement is mutually binding on both AFC and the employee. *Id. at ¶5.* AFC pays the entire cost of the benefits provided by the AFC Plan, pays the entire cost of administering the AFC Plan, and pays all but $350 of the fees and expenses of any arbitration initiated under the Value Deal Agreement. *Id.* The Value Deal Agreement does not waive or release any of an AFC employee's rights or remedies under Texas or federal law, except for the right to a judicial forum and jury trial. *Id. at ¶6.* The Value Deal Agreement is simply a mutual arbitration agreement. *Id.*

On September 30, 1998, Plaintiff signed the Value Deal Agreement. *Sarles Affidavit at Exhibit 4.* Since Plaintiff's alleged injury on May 29, 1999, the AFC Plan has paid Plaintiff $5,429.14 in medical benefits due to the alleged injury. *Id. at ¶8.*

## SUMMARY OF ARGUMENT

AFC contends that the Value Deal Agreement signed by Plaintiff is a valid and enforceable arbitration agreement and that Plaintiff's claims in this lawsuit are within the scope of that agreement. Moreover, any dispute about the enforceability of the Value Deal Agreement signed by Plaintiff is itself a dispute that is subject to binding arbitration under the Agreement. Even if Plaintiff were to argue that the agreement is voidable because it is somehow unconscionable or violates public policy, AFC would not only show that Plaintiff's argument

would be for the arbitrator decide, but would further show that Plaintiff ratified the agreement by accepting and retaining medical benefits from the AFC Plan prior to initiating these claims.

## ARGUMENT

The Value Deal Agreement provides that the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (the "FAA"), governs "the interpretation, enforcement, and all judicial proceedings under and/or with respect to this Agreement." Under the FAA and Fifth Circuit precedent, courts adjudicating a motion to compel arbitration under the FAA generally conduct a two-step inquiry, with the first step being to determine whether the parties agreed to arbitrate the dispute in question. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996).[1] This first step itself involves two determinations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that agreement.

Taking these two determinations in reverse order in the following argument, Plaintiff's claims in this lawsuit fall squarely within the scope of the Value Deal Agreement signed by Plaintiff, and the Value Deal Agreement is a valid and enforceable arbitration agreement under the Federal Arbitration Act.

---

[1] The second step of the Fifth Circuit's two-step analysis is to determine "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Webb*, 89 F.3d at 257-58*(quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). AFC submits that this step is not at issue here, since there is no federal statute precluding the Value Deal Agreement's enforcement. Moreover, although the Texas General Arbitration Act, Tex. Civ. Prac. & Rem. Code, §171.001, makes arbitration agreements covering personal injury actions enforceable only if signed by counsel for each party, the Fifth Circuit and Texas Supreme Court have both expressly held that this state statute is preempted by the FAA. *Miller v. Public Storage Mgmt., Inc.*, 121 F.3d 215, 219 (5th Cir. 1997); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex. 1996). In fact, an identical Value Deal Agreement has previously been held to be enforceable by the Fifth Circuit. *Strawn v. AFC Enterprises Inc. d/b/a Churchs Chicken*, No. 99-41384 slip op. at 9 (5th Cir. Nov. 29, 2000)(per curiam)(attached hereto at Exhibit "B" pursuant to Fifth Circuit Rule 47.5.4).

## I.  PLAINTIFF'S CLAIMS ARE CLEARLY WITHIN THE SCOPE OF THE ARBITRATION AGREEMENT.

Of course, federal policy favors arbitration and requires ambiguities as to the scope of the arbitration clause to be resolved in favor of arbitration. *Webb*, 89 F.3d at 258 (*citing Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989)). In fact, the Fifth Circuit has held that a motion to compel arbitration should not be denied "unless it can be said with positive assurance than an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Neal v. Hardee's Food Systems, Inc.*, 918 F.2d 34, 37 (5th Cir. 1990)(*quoting Commerce Park at DFW Freeport v. Mardian Const. Co.*, 729 F.2d 334, 338 (5th Cir. 1984)).

The Value Deal Agreement Plaintiff signed provides in relevant part:

CLAIMS COVERED BY THIS AGREEMENT:  Claims and disputes covered by this Agreement include all claims and disputes Employee may presently have or may in the future have against AFC . . . and all claims that AFC may presently have or may in the future have against Employee, whether or not arising out of Employee's employment or termination.  The claims covered by this Agreement include, but are not limited to, claims . . . for bodily injury or physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of Employee's employment . . . .

*Sarles Affidavit at Exhibits 2, 4.*  The only claims excluded from the agreement's coverage are criminal proceedings and claims for restitution from criminal acts by Employee. *Id.*

Given the broad scope of the Value Deal Agreement, there can be no dispute that Plaintiff's common-law bodily injury claims that are the subject of this lawsuit are within the agreement's scope. *See Neal*, 918 F.2d at 38 (holding that "any and all disputes" language of license agreement meant parties intended clause to reach "all aspects" of their relationship).

## II.   THE VALUE DEAL AGREEMENT IS VALID AND ENFORCEABLE.

The only issue appearing to AFC to be potentially disputed is whether the Value Deal Agreement signed by Plaintiff is enforceable.  It clearly is under federal law.

### A.   The Value Deal Agreement Merely Substitutes an Arbitral Forum for a Judicial One--Substantive Legal Rights Are Not Waived or Released.

The only right waived or released by Plaintiff by signing the Value Deal Agreement was the right to a judicial forum and jury trial.  Plaintiff's agreement to an arbitral rather than judicial forum for hearing her on-the-job injury negligence claim against AFC is not a waiver of even a substantive right.   _See_ _Gilmer v. Interstate/Johnson Lane Corp._, 111 S. Ct. 1647, 1652 (1991)("'by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum'")(quoting _Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc._, 473 U.S. 614, 628 (1985)); _Kinnebrew v. Gulf Ins. Co._, 67 FEP (BNA) 189, 1994 WL 803508 (N.D. Tex. Nov. 28, 1994)(Buchmeyer, J.)(compelling arbitration even where arbitration agreement prevented recovery of punitive damages; holding that "substantive rights" of plaintiff-employee were not waived by the unilaterally-imposed arbitration policy in employee handbook).

The only anticipated attack by Plaintiff against her signed Value Deal Agreement might be that it is unconscionable because the benefits provided by the AFC Plan are somehow not equivalent to the benefits under the Texas Workers' Compensation Act, relying on _Reyes v. Storage & Processors, Inc._, 995 S.W.2d 722 (Tex. App.--San Antonio 1999, pet. denied), _abrogated, Lawrence v. CDB Servs., Inc._, 44 Tex. Sup. Ct. J. 554, 2001 Tex. LEXIS 21 (Mar. 29, 2001).  In _Reyes_, a panel of the San Antonio Court of Appeals held that a nonsubscriber's **waiver** agreement -- not an arbitration agreement -- was void as against public policy.  _Id._ at 728.

CVisPDF - www.texisi.com

Storage & Processors, Inc. ("S&P") required that its employees sign a <u>waiver</u> of claims against the company in order to participate in its occupational injury benefit plan. The waiver prohibited an injured employee who signed it from suing for occupational injuries, even including "death claims arising out of S&P's intentional and grossly negligent conduct." *Id.* The San Antonio Court of Appeals panel held the S&P benefit plan's "waiver" void because the S&P plan's benefits were not as extensive as those offered by a Texas workers' compensation insurance policy, and the waiver was broader than the Texas Workers' Compensation Act statutory bar. *Id.*

As previously pointed out, however, the Value Deal Agreement Plaintiff signed does <u>not</u> <u>waive</u> the employee's right to seek unlimited actual and even punitive damages. The Value Deal Agreement is simply an arbitration agreement promulgated under the Federal Arbitration Act.

Despite this distinction, Judge Kent in the Southern District of Texas attempted to invalidate an identical Value Deal Agreement -- relying in part on the *Reyes* opinion regarding <u>waiver</u> agreements -- on the basis that an <u>arbitration</u> agreement was void as against Texas public policy where the benefit plan did not provide benefits as extensive as provided under the Texas Workers' Compensation Act. On appeal, however, the Fifth Circuit vacated Judge Kent's opinion and remanded "with instructions to refer the case to arbitration." *Strawn v. AFC Enterprises Inc. d/b/a Churchs Chicken*, 70 F. Supp. 2d 717 (S.D. Tex. 1999), *vacated without published opinion*, 240 F.3d 1074, No. 99-41384 slip op. at 9 (5th Cir. 2000)(per curiam)(pursuant to Fifth Circuit Rule 47.5.4, slip op. attached at Exhibit B).

**B.     <u>Arbitrability Is for the Arbitrator To Decide.</u>**

The Value Deal Agreement in the *Strawn* opinion, as in this case, was a "condition precedent" to the employee's employment. *Strawn,* slip op. at 2. The district court had found that "where employers offer minimal benefits and unilaterally impose an arbitral forum on their

injured employees, such a forum is sufficiently dissimilar to a judicial forum as to undermine Texas public policy with respect to the workers' compensation system." *Id.* at 2-3 (quoting district court opinion, 70 F. Supp. 2d at 725-26). The Fifth Circuit, however, found that under *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967), the district court should not have addressed the public policy issue at all. *Strawn*, slip op. at 5-6. Since Ms. Strawn had attacked not only the arbitration agreement, but also the benefits provided by a corresponding employee injury benefit plan, under *Prima Paint* the issue was for an arbitrator, not the district court, to decide. *Id.* at 8-9. *See also Rojas v. TK Communications, Inc.*, 87 F.3d 745, 749 (5th Cir. 1996)(unconscionability attack on entire agreement, not arbitration clause, for the arbitrator); *R.M. Perez & Assoc., Inc. v. Welch*, 960 F.2d 534, 538 (5th Cir. 1992)(fraud in inducement to entire agreement, rather than arbitration clauses only, for the arbitrator).[2]

In short, Defendant is not aware of any authority for the proposition that a mere arbitration agreement, required as a condition of participation in a nonsubscriber's occupational injury benefit plan, is unconscionable, unenforceable or void. Moreover, Plaintiff cannot argue that the Value Deal Agreement is voidable since she subsequently ratified the Agreement.

C.    **Plaintiff Ratified the Value Deal Agreement by Accepting and Retaining Benefits Paid Under It.**

There is nothing per se unconscionable about an arbitration agreement. *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996). Even adhesion contracts requiring arbitration are not automatically unconscionable or void. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

---

[2] The Fifth Circuit also found that "[s]tanding alone, neither the benefit plan nor the arbitration clause violate Texas law or public policy." *Strawn*, slip op. at 8. Since then, the Texas Supreme Court, expressly disapproving of *Reyes*, more recently held that even a waiver of the employee's claims does not violate Texas public policy and is enforceable regardless of the benefits made available to the employee. *Lawrence v. CDB Servs., Inc.*, 44 Tex. Sup. Ct. J. 554, 2001 Tex. LEXIS 21 (Mar. 29, 2001). The Northern District reached that same decision in 1995 in *Brito v. Intex Aviation Services*, 879 F. Supp. 650, 654 (N.D. Tex. 1995)(McBryde, J.).

*Security Pacific Corp.*, 961 F.2d 1148, 1154 (5th Cir. 1992), *cert. denied,* 506 U.S. 1079 (1993). The unequal bargaining power of the employer-employee relationship does not establish grounds for defeating an arbitration agreement under the FAA. *EZ Pawn*, 934 S.W.2d at 90; see *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996)(employer does not breach fiduciary duties under ERISA by conditioning receipt of ERISA plan benefits on the participants' outright waiver of employment-related claims). Moreover, under Texas law, a plaintiff "must prove both substantive and procedural unconscionability to avoid the arbitration provision." *Morrison v. Amway Corp.*, 49 F. Supp. 2d 529 (S.D. Tex. 1998)(Harmon, J.)(citing *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988)). Even the existence of duress does not render a contract void, but only voidable, under Texas law, and therefore subject to ratification. *Bustos v. Intex Aviation Services, Inc.*, 1996 U.S. Dist. LEXIS 14475 at \*21 (N.D. Tex. Aug. 26, 1996)(Buchmeyer, C.J.)(citing *Country Cupboard, Inc. v. Texstar Corp.*, 570 S.W.2d 70, 74 (Tex. Civ. App.--Dallas 1978, writ ref'd n.r.e.).[3]

Plaintiff has benefited from medical treatment from medical providers paid nearly $5,500 by the AFC Plan since her alleged May 29, 1999 occupational injury. *Sarles Affidavit ¶8.* Defendant contends that Plaintiff's actions constitute ratification of the Value Deal Agreement as a matter of law. *See Bustos*, at \*\*21-22 (holding that acceptance of $3,000 in plan benefits constituted ratification of nonsubscriber's benefit plan's waiver agreement by employee as a matter of law); *Duran v. Intex Aviation Services, Inc.*, CA 3:95-CV-0403-R slip op. at p.6 (N.D. Tex. 1995)(Buchmeyer, J.)(same; $14,000 in plan benefits), *affirmed,* 98 F.3d 1339 (5th Cir. 1996)(table); *Goff v. Howmet Corporation*, CA 7:94-CV-90-X slip op. at p.6 (N.D. Tex.

---

[3] Pursuant to Fifth Circuit Rule 47.5.4, a copy of the unpublished *Bustos* opinion is attached hereto at Exhibit "B."

1995)(Kendall, J.)(summary judgment for nonsubscriber based on employee's ratification by failing to challenge waiver and accepting benefits on a second injury).[4]

WHEREFORE, Defendant requests that the Court either dismiss this lawsuit to allow Plaintiff to pursue arbitration before the American Arbitration Association in accordance with the terms of the parties' Value Deal Agreement[5] or stay this litigation pending arbitration of Plaintiff's claims pursuant to the Value Deal Agreement, that the Court award Defendant its attorneys' fees incurred in presenting this motion to the Court, and such other and further relief, either at law or in equity, to which it is entitled.

Respectfully submitted,

Gary D. Sarles
Texas Bar No. 17651100
Douglas C. Bracken
Texas Bar No. 00783697
**SARLES & OUIMET, L.L.P.**
370 Founders Square
900 Jackson Street
Dallas, Texas 75202-4436
Telephone: (214) 573-6300
Telecopier: (214) 573-6306

**ATTORNEYS FOR DEFENDANT**

---

[4] Pursuant to Fifth Circuit Rule 47.5.4, copies of *Duran* and *Goff* opinions are attached hereto at Exhibit "B."
[5] A case may properly be dismissed with prejudice when all issues raised in the district court must be arbitrated. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *Colorado v. Pacificare of Texas, Inc.*, 77 FEP (BNA) 1179, 1998 U.S. Dist. LEXIS 15876 (W.D. Tex. 1998)(Garcia, J.).

## CERTIFICATE OF CONFERENCE

This is to certify that in compliance with Local Rule 6.A.4., no conference is required for this Motion to Dismiss.

Douglas C. Bracken

## CERTIFICATE OF SERVICE

I hereby certify that on this *22* day of June 2001, a true and correct copy of this Defendant's Motion to Dismiss and Brief in Support was forwarded via Federal Express delivery to Plaintiff's counsel of record, Louis A. Sorola, Sorola & Garcia, P.L.L.C., 2355 Barnard Road, Suite A, Brownsville, Texas 78523.

Douglas C. Bracken

CVisPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 2 5 2001

Michael N. Milby
Clerk of Court

| | |
|---|---|
| AMERICA CANTU, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| AFC ENTERPRISES, INC. d/b/a | § |
| CHURCHS CHICKEN, | § |
| | § |
| Defendant. | § |

Civil Action No. **B-01-109**

## AFFIDAVIT OF GARY D. SARLES

On this day Gary D. Sarles personally appeared before me, the undersigned notary public, and after first being sworn, testified as follows:

1.     My name is Gary D. Sarles. I am over 21 years of age, have never been convicted of a felony, and am otherwise competent to make this Affidavit. The statements made herein are true and correct and based upon my own personal knowledge.

2.     I am counsel of record in this lawsuit for the Defendant, AFC Enterprises, Inc. ("AFC"). AFC is, and was at all relevant times, a nonsubscriber to the Texas Workers' Compensation Act. In 1995, I assisted AFC, then known as America's Favorite Chicken Company, in drafting and implementing an occupational injury benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA") to provide medical, wage-replacement and death benefits to its Texas employees injured or killed in the course and scope of their AFC employment ("the AFC Plan"), a true and correct copy of which is attached hereto as Exhibit 1.

3.     In order to participate in the AFC Plan and to be eligible for benefits from it in the event of an occupational injury, AFC's Texas employees are required to sign a mutual arbitration

**EXHIBIT "A"**

agreement known as the "Value Deal Agreement."  Because AFC did not want to require existing employees who did not want to agree to the Value Deal Agreement either to be without benefits if injured or to resign, the AFC Plan offered to AFC's existing employees in June 1995 two levels of benefits.  Basic benefits were provided to existing employees who rejected the Value Deal Agreement, and existing employees as of June 1995 who agreed to sign the Value Deal Agreement were offered more comprehensive benefits.  AFC employees hired after June 1, 1995 were required to execute the Value Deal Agreement if they wished to accept employment at AFC, but those who chose to do so were provided the AFC Plan's more comprehensive benefits. A true and correct copy of the English version of the Value Deal Agreement presented to new hires between June 1, 1995 and June 1, 1999 is attached hereto as Exhibit 2.

4.       In order to explain the AFC Plan's benefits, procedures and requirements to its Texas employees, AFC provides, in compliance with ERISA, each AFC Texas employee a copy of the AFC Plan's Summary Plan Description.  Employees acknowledge receipt of the Summary Plan Description by signing the Value Deal Agreement.  See Exhibit 2 at page 1.  Attached hereto as Exhibit 3 is a true and correct copy of the AFC Enterprises, Inc. Texas Employee Injury Benefit Plan Summary Plan Description.

5.       The Value Deal Agreement is mutually binding on both AFC and the AFC Texas employee who signs it.  The benefits provided by the AFC Plan are paid entirely by AFC, and AFC pays the entire cost of administering the AFC Plan.  In order to prevent the cost of arbitration under the Value Deal Agreement from financially prohibiting its Texas employees from pursuing claims, AFC pays all but $350 of the fees and expenses of any arbitration initiated under the Value Deal Agreement.

CitiPDF - www.fastio.com

6.      The Value Deal Agreement is a mutual arbitration agreement.  AFC's Texas employees do not waive or release any of their claims against AFC by executing the Value Deal Agreement.  There is no provision in the Value Deal Agreement that limits the damages, actual or punitive, or other remedies that an employee can recover in an arbitration.  Rather, an AFC Texas employee who executes the Value Deal Agreement simply agrees to pursue any claims and remedies against AFC in arbitration before the American Arbitration Association rather than in a judicial forum.  The second substantive paragraph on page one of the Value Deal Agreement expressly states that the employee who signs it acknowledges and understands that by doing so he or she gives up the right to a jury trial on the claims covered by the Value Deal Agreement.

7.      In the course of defending this lawsuit, I obtained from AFC records from AFC's personnel file for Plaintiff, America Cantu.  Attached hereto as Exhibit 4 is a true and correct copy of the Value Deal Agreement contained in her AFC personnel records.

8.      Also in the course of defending this lawsuit, I obtained from AFC and its agents information regarding the benefits paid by the AFC Plan to Plaintiff or on her behalf to medical providers for treatment to her in connection with her alleged May 29, 1999 injury.  As of today, AFC's records indicate that the AFC Plan has paid medical providers $5,429.14 in medical benefits for treatment regarding Plaintiff's alleged injuries.

Gary D. Sarles

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned notary public, on this _____ day of June, 2001.

Notary Public in and for the State of Texas

KELLY MCMURRAY
Notary Public, State of Texas
My Commission Expires 08-28-01

- 3 -

# AMERICA'S FAVORITE CHICKEN COMPANY

# TEXAS EMPLOYEE

# INJURY BENEFIT PLAN

CNJPDF - www.fastio.com

# TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.1   Accident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.2   Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.3   Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.4   Combined Single Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.5   Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
1.6   Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
1.7   Covered Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
1.8   Covered Employee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
1.9   Custodial Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
1.10  Death Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
1.11  Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
1.12  Emergency Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
1.13  Employee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1.14  Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1.15  Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1.16  First Aid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1.17  Home Health Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1.18  Home Health Care Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1.19  Illness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.20  Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.21  Medical Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
1.22  Medically Necessary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
1.23  Medical Rehabilitation Hospital . . . . . . . . . . . . . . . . . . . . . . . . . 13
1.24  Medicare . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.25  Participant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.26  Physician . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.27  Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.28  Plan Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.29  Plan Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.30  Preexisting Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.31  Pre-Injury Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
1.32  Short-Term Disability Benefits . . . . . . . . . . . . . . . . . . . . . . . . . 15
1.33  Skilled Nursing Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
1.34  Skilled Nursing Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
1.35  Transitional Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
1.36  Usual, Customary and Reasonable . . . . . . . . . . . . . . . . . . . . . . 16
1.37  Value Deal Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Page

ARTICLE II - ELIGIBILITY AND NATURE OF PAYMENT . . . . . . . . . . . . . . . . . 16

    2.1    Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    2.2    Nature of Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE III - BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    3.1    Short-Term Disability Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    3.2    Death Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    3.3    Medical Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE IV - ADDITIONAL REQUIREMENTS AND
                LIMITATIONS ON BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . 18

    4.1    Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    4.2    Medical Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    4.3    Time For Submitting Medical Claims . . . . . . . . . . . . . . . . . . . . . . . . 20
    4.4    Second Medical Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    4.5    Earnings After The Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    4.6    Acceleration of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    4.7    Suspension Of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    4.8    Final Compromise And Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    4.9    Reduction For Prior Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE V - ADMINISTRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    5.1    Plan Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    5.2    Funding Policy And Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    5.3    Claims Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    5.4    Professional Medical Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE VI - COORDINATION OF BENEFITS AND SUBROGATION . . . . . . . 25

    6.1    Coordination Of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    6.2    Recovery From Third Parties And
             Excess Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    6.3    Notice Of Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    6.4    Assignment Of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARTICLE VII - TERMINATION AND AMENDMENT . . . . . . . . . . . . . . . . . . . . 27

**ARTICLE VIII - GENERAL PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    8.1     Inability to Make Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    8.2     Committee Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    8.3     Spendthrift Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    8.4     Taxation of Benefit Payments . . . . . . . . . . . . . . . . . . . . . . . . . 28
    8.5     Employment Noncontractual . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    8.6     Discharge for Benefit Payments . . . . . . . . . . . . . . . . . . . . . . . . 28
    8.7     Participation By Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    8.8     Plan Documents Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    8.9     Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    8.10    Separability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    8.11    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**EXHIBIT A: VALUE DEAL AGREEMENT**

# AMERICA'S FAVORITE CHICKEN COMPANY
# TEXAS EMPLOYEE INJURY BENEFIT PLAN

This AMERICA'S FAVORITE CHICKEN COMPANY TEXAS EMPLOYEE INJURY BENEFIT PLAN (the "Plan"), is made and executed at Atlanta, Georgia, by AMERICA'S FAVORITE CHICKEN COMPANY, a Minnesota corporation (the "Company").

## WITNESSETH THAT:

**WHEREAS**, the Company rejected coverage for its Texas employees under the Texas Workers' Compensation Act, effective as of September 21, 1991; and

**WHEREAS**, the Company established an employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), effective as of September 21, 1991, to provide a means by which the Company and other adopting employers can protect themselves from certain liabilities as nonsubscribers to the Texas workers' compensation insurance system by providing non-fringe disability, death, and medical benefits with respect to any personal injury sustained by an employee in the course and scope of employment; and

**WHEREAS**, the Company now desires to amend and restate said plan in its entirety, effective as of June 1, 1995;

**NOW, THEREFORE**, in consideration of the premises, the Company hereby amends and restates the Plan to provide benefits and be administered in accordance with the following:

## ARTICLE I

## DEFINITIONS

1.1    **"Accident"** means a sudden, unexpected, unusual, specific event which occurs at an identifiable time and place.

1.2    **"Beneficiary"** means the person or persons determined in the following priority:

(a)    If there is no Eligible Child, all Death Benefits shall be paid to the Eligible Spouse.

(b)    If there is no Eligible Spouse, Death Benefits shall be paid in equal shares to the Eligible Children.  If an Eligible Child has predeceased the Participant, Death Benefits that would have been paid to that child if he or she

1

CMPDF - www.fesvia.com

had survived the Participant shall be paid in equal shares per stirpes to the children of such deceased child.

(c)     If there is an Eligible Child and an Eligible Spouse, half of any Death Benefits shall be paid to the Eligible Spouse and the other half shall be paid in equal shares to the Eligible Children.  If an Eligible Child has predeceased the Participant, Death Benefits that would have been paid to that child if he or she had survived the Participant shall be paid in equal shares per stirpes to the children of such deceased child.

(d)     If the Employee is not survived by an Eligible Spouse or Eligible Child, any Death Benefits shall be paid to a surviving dependent (as determined in accordance with the support criteria set forth in section 152 of the Internal Revenue Code and such other rules as the Committee may prescribe) of the Participant who is a parent, sibling, or grandparent of the deceased Participant. If more than one of those dependents survives the Participant, any Death Benefits shall be divided among them in equal shares.

(e)     If the Participant is not survived by an Eligible Spouse, Eligible Child, or dependent who is a parent, sibling, or grandparent, no Death Benefits shall be payable with respect to such Participant.

(f)     For purposes of this Section:

(1)     "Eligible Spouse" means the surviving spouse of the deceased Participant.

(2)     "Eligible Child" means a surviving child of the deceased Participant, whether by blood, marriage, or legal adoption, if the child is:

(A)     a minor;

(B)     enrolled as a full-time student in an accredited educational institution and is less than 25 years of age; or

(C)     because of a physical or mental handicap, a dependent (as determined in accordance with the support criteria set forth in section 152 of the Internal Revenue Code and such other rules as the Committee may prescribe) of the deceased Participant at the time of the Participant's death.

**1.3     "Cause"** means the Employee's gross misconduct within the meaning of Section 4980B of the Internal Revenue Code, or any successor provision of law.

**1.4     "Combined Single Limit"** means the total amount of all benefits payable to or with respect to any Participant under the Plan with respect to an Accident. Payments made for each of these forms of benefits shall be counted towards the

Combined Single Limit amount. If a Participant has signed a Value Deal Agreement, the Combined Single Limit shall be $75,000. If a Participant has not signed a Value Deal Agreement, the Combined Single Limit shall be $25,000. Anything foregoing to the contrary notwithstanding, the aggregate amount of the Combined Single Limits with respect to all claims arising out of a single Accident shall not exceed $500,000. Such aggregate amount may proportionally reduce the Combined Single Limit applicable to each Participant involved in an Accident.

**1.5** **"Committee"** means the individual or individuals appointed by the Company pursuant to Section 5.1 to administer the Plan on behalf of the Company and all other Employers.

**1.6** **"Company"** means AMERICA'S FAVORITE CHICKEN COMPANY, a Minnesota corporation whose principal place of business is located in Atlanta, Georgia, or any successor thereto.

**1.7** **"Covered Charge"** means the cost to a Participant of a service or supply described in this Plan, which is reasonably required by the nature of the Injury as and when provided and which (i) cures or relieves the effects naturally resulting from the Injury; (ii) promotes recovery; or (iii) enhances the ability of the Participant to return to or retain employment.

(a)     Such service and supplies must be Medically Necessary. No cost shall be a Covered Charge to the extent that it exceeds the charge specified in any fee schedule adopted by the Committee. In the event such charge is not listed in such a fee schedule, the charge shall not be considered a Covered Charge to the extent it exceeds the Usual, Customary and Reasonable charge. The Committee shall be entitled to otherwise reduce the dollar amount of any otherwise Covered Charge by contract, through negotiation, or pursuant to Section 5.4.

(b)     A cost shall be a Covered Charge only if it is provided in accordance with the medical treatment requirements of Section 4.2.

(c)     Any provision of this Plan to the contrary notwithstanding:

(1)     The first Covered Charge must be incurred within 30 days following the date of the Injury; and

(2)     No further amount shall be considered a Covered Charge if the Participant does not receive medical treatment from a Physician for a period of more than 60 days.

(d)     Covered Charges shall include the cost of the following:

(1)     Physician visits - at the hospital, Physician's office or, in the case of Home Health Care, at the Participant's home, including second

3

opinion services requested by the Committee in accordance with Section 4.4;

(2)    Medical supplies, including the following:

(A)    Prescription drugs (generic unless trade name drugs are requested by a Physician);

(B)    Blood and other fluids (other than allergy, insulin, and similar drugs) injected into the circulatory system;

(C)    Oxygen and its administration;

(D)    Upon the written advice or prescription of a Physician, rental or purchase of a wheelchair, iron lung, or other mechanical equipment necessary for the treatment of respiratory paralysis, and similar internal or external durable medical equipment designed primarily for therapeutic purposes;

(E)    Surgical dressings, bandages, splints, casts, crutches, syringes, needles, artificial limbs and eyes, trusses, braces, prostheses, special bras and girdles dispensed by a Physician; and

(F)    Other items according to guidelines approved by the Committee as Medically Necessary;

(3)    Outpatient services and supplies, including ambulatory day surgery, x-ray examinations, laboratory tests, diagnostic services, and nuclear medicine;

(4)    Occupational and physical therapy provided by a Physician or a licensed occupational therapist or licensed physical therapist; provided, however, that such services (and any provider of such services) must be approved in advance and in writing by the Committee and recommended by the attending Physician; and provided, further, that such services shall be subject to case management approval regarding the number of visits and the types and amount of services provided during such visits;

(5)    Inpatient rehabilitation services provided in a Medical Rehabilitation Hospital; provided, however, that such services must be approved in advance and in writing by the Committee and recommended by the attending Physician; and provided, further, that such services shall be subject to continued stay review by the Committee and case management approval regarding the types and amount of services provided;

4

CWPDF - www.foxis.com

(6)   Room and board (semi-private) as an inpatient at a Facility;

(7)   Home Health Care up to 75 visits per Plan Year and up to eight hours per visit for the first two weeks of Home Health Care and up to four hours per visit thereafter;

(8)   Skilled Nursing Care, provided that a Physician monitors the progress of the Participant at least once during each 30-day period of confinement;

(9)   Blood and blood plasma (but only to the extent not available through any refund or allowance by a blood bank or similar organization);

(10)   Anesthesia and its administration;

(11)   Radiology and pathology, including interpretive services of a Physician;

(12)   Ambulance services - professional ground ambulance service or, if no other means of transportation can reasonably suffice to deliver the individual to the closest appropriate Facility, air ambulance, regularly scheduled railroad, or airlines;

(13)   Surgery, including surgery which restores a reasonable, normal functioning (subject to the exclusions in Subsection (e)(17) below);

(14)   Services of licensed oral surgeons - services for treatment of fractures and dislocations of the jaw or the replacement of sound natural teeth (excluding temporomandibular junction dysfunction services) when the injured Participant seeks treatment within 72 hours after the Injury;

(15)   Eyeglasses or contact lenses - one pair per Injury up to $125, inclusive of professional office visit charges;

(16)   External hearing aid - up to $600, inclusive of professional office visit charges;

(17)   Orthotics, arch supports, corrective shoes, corrective appliances, or any similar item, if approved in advance and in writing by the Committee or recommended by the treating Physician;

(18)   Organ and tissue transplant services, including kidney, heart, heart/lung, liver, pancreas and bone marrow, excluding the donor's transportation costs, organ procurement costs and the donor's surgical expenses; and

5

(19)    Mental health services, but only when approved in advance and in writing by the Committee and such services are provided for mental or emotional damage or harm resulting from a Participant's being the victim of a criminal act occurring while such Participant is engaged in furthering the business of an Employer and which arises from the course and scope of such Participant's employment by an Employer. Any such mental health services (including any provider of such services) must be approved in advance and in writing by the Committee.

(e)    Any provision of this Plan to the contrary notwithstanding, Covered Charges shall not include the cost of the following:

(1)    Services or supplies payable by any government or subdivision or agency thereof;

(2)    Services or supplies which are experimental, investigative, or for the purposes of research;

(3)    Services or supplies performed or provided while the Participant is not covered by the Plan;

(4)    Services or supplies for which the Participant is not legally obligated to pay or for which no charge would be made in the absence of the Plan;

(5)    Services or supplies for personal comfort or convenience, such as a private room, television, telephone, radio, guest trays, and similar items;

(6)    Fraudulent claims or claims not filed in good faith as determined by the Committee;

(7)    Canceled appointment charges;

(8)    Self-administered services;

(9)    Services in which the Participant's condition is persistently nonresponsive to treatment;

(10)    Services or supplies relating to Preexisting Conditions;

(11)    Acupuncture, behavior modification, or biofeedback, except to the extent approved in advance and in writing by the Committee and recommended by the treating Physician;

6

(12)   Services rendered primarily for training, testing, evaluation, counseling, or educational purposes, except to the extent approved in advance and in writing by the Committee;

(13)   Chiropractic or spinal manipulation services, except to the extent approved in advance and in writing by the Committee <u>and</u> recommended by the treating Physician;

(14)   Substance abuse services;

(15)   Custodial Care;

(16)   Any travel or lodging expenses that are not incurred pursuant to the direction of a Physician and approved in advance and in writing by the Committee;

(17)   Any services or supplies related to any of the following: a prior cosmetic surgery; surgical excision or reformation of any sagging skin of or on any part of the body such as the eyelids, face, neck, abdomen, arms, legs, or buttocks; any services performed in connection with the enlargement, reduction, or change in appearance of a portion of the body such as the breasts, lips, jaw, chin, nose, ears, or genitals; hair transplantation; chemical face peels or abrasions of the skin; or

(18)   The cost of any other service or supply not specified in Subsection (d) above.

**1.8**   **"Covered Employee"** means an Employee whose employment with the Employer is principally located within the State of Texas.

**1.9**   **"Custodial Care"** means care consisting of services and supplies provided to an individual in or out of an institution primarily to assist him in daily living activities, whether or not he is disabled, and no matter by whom recommended or furnished. Room and board and Skilled Nursing Care are not, however, considered Custodial Care if provided during confinement in a Facility, and if combined with other necessary therapeutic services, under accepted medical standards, which can reasonably be expected to substantially improve the individual's medical condition which resulted from an Injury.

**1.10**   **"Death Benefits"** means any benefit payable under Section 3.2.

**1.11**   **"Disability"** means the inability, commencing within 90 days from the date of the Accident causing the Injury, to attend to the material duties normally performed by the Participant on behalf of an Employer because of an Injury.

**1.12**   **"Emergency Care"** means a service or supply provided with respect to a medical condition manifesting itself by a sudden and unexpected onset of acute

7

CVbPDF - www.fesisa.com

symptoms of sufficient severity that in the absence of immediate medical attention could reasonably be expected to (i) result in death, disfigurement, or permanent disability, (ii) place the individual's health in serious jeopardy, or (iii) result in serious impairment of any bodily organ, part, or function.

**1.13** "**Employee**" means each employee of an Employer who is not an independent contractor or covered as a worker under any State's workers' compensation laws.

**1.14** "**Employer**" means the Company and any other related trade or business that adopts the Plan pursuant to Section 8.7.

**1.15** "**Facility**" means a hospital or other medical care facility either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a Participant.

**1.16** "**First Aid**" means on-site primary medical care rendered in accordance with Employer policy.

**1.17** "**Home Health Care**" means the following care provided to the Participant on the recommendation of a Physician at the Participant's home or a Home Health Care Agency:

    (a)    intermittent nursing care by a(n):

        (1)    Registered Nurse ("R.N.");
        (2)    Licensed Practical Nurse ("L.P.N.");
        (3)    Home Health Aide;
        (4)    Occupational Therapist;
        (5)    Physical Therapist; or
        (6)    Licensed Vocational Nurse ("L.V.N.");

    (b)    private duty nursing services of a R.N., L.V.N., or L.P.N.;

    (c)    social work; and

    (d)    nutrition services, including special meals;

provided, however, that Home Health Care services shall not include services provided by persons who ordinarily live in the same household as the Participant or who are related by blood, marriage, or legal adoption to the Participant or the Participant's spouse.

**1.18** "**Home Health Care Agency**" means any of the following: (i) a home health care agency licensed by the State in which it is located, or (ii) a home health agency as defined by the Social Security Administration, or (iii) an organization which is certified by the Participant's Physician as an appropriate provider of Home Health

8

Care, and which: (x) has a full-time administrator, (y) keeps written medical records, and (z) has at least one R.N. on staff, or the services of an R.N. available.

**1.19** **"Illness"** means any abnormal condition or disorder caused by exposure to environmental factors and defined as an "Occupational Illness" by the Occupational Health and Safety Administration (OSHA).

**1.20** **"Injury"** means damage or harm to the physical structure of the body incurred solely as the result of an Accident, and independently of any other cause. Such damage or harm must be incurred in the course and scope of employment by an Employer and in furtherance of the business of such Employer; provided, however, that the term "Injury" shall also include such damage or harm incurred solely as a result of on-site participation in "Habitat For Humanity" or "Day of Dreams" program sponsored by an Employer or such other program specifically covered by written decision of the Chief Executive Officer of the Company (or his or her designee), and independently of any other cause. Any provision of this Plan to the contrary notwithstanding, in order to be subject to this restated plan document, the date of such Injury must be on or after June 1, 1995. For all purposes of this Plan, the date of Injury shall be the date of the Accident resulting in the Injury.

    (a)    Any provision of this Plan to the contrary notwithstanding, the term Injury shall <u>not</u> include:

        (1)    any damage or harm to, or infection of, the eye or musculoskeletal structure resulting from use of a video display terminal, poor or inappropriate posture, or similar circumstances prescribed by the Committee which are of a chronic nature;

        (2)    any asbestos-related poisoning;

        (3)    except as otherwise covered within the definition of a Covered Charge, any mental injury, emotional distress, mental trauma or similar injury to the mental or emotional state of an employee, including without limitation, any mental or emotional damage or harm that arises primarily from a legitimate personnel action, including a transfer, promotion, demotion or termination of employment;

        (4)    damage or harm to the physical structure of the body, such as carpel tunnel syndrome, occurring as a result of repetitious, physically traumatic activities that occur over time;

        (5)    any Illness or disease, howsoever acquired and whatsoever named;

        (6)    ptomaine or bacterial infection, except when resulting from accidental ingestion or accidental inhalation of poisonous food substances,

9

and except pyogenic infection which occurs with and as a result of an accidental cut or wound; or

    (7)    any heart attack, stroke, or aneurysm (an "attack"), unless --

        (A)    the attack can be identified as --

            (i)    occurring at a definite time and place; and

            (ii)    caused by a specific event occurring in the course, scope and furtherance of employment;

        (B)    the preponderance of the medical evidence regarding the attack indicates that the Participant's work rather than the natural progression of a preexisting heart condition or disease was a substantial contributing factor of the attack; and

        (C)    the attack was not triggered solely by emotional or mental stress factors, unless it was precipitated by a sudden work-related stimulus; or

    (8)    hernia, unless inguinal hernia that --

        (A)    appeared suddenly and immediately following the Injury;

        (B)    did not exist in any degree prior to the Injury; and

        (C)    was accompanied by pain.

    (b)    Furthermore, and any provision of this Plan to the contrary notwithstanding, no benefits (other than First Aid and Emergency Care provided in accordance with Section 3.3) shall be payable under the Plan if:

    (1)    the Injury occurred while the Participant was in a state of intoxication, or had otherwise lost the normal use of his or her mental or physical faculties as a result of the use of a drug or alcohol. For this purpose, the Participant shall be deemed to have been in a state of intoxication at the time of the Injury if the drug and alcohol test required by the Employer following the Injury finds --

        (A)    an alcohol concentration of 0.04 or more, where the terms "alcohol" and "alcohol concentration" have the meaning assigned in the Texas Alcoholic Beverage Code;

        (B)    any level of a controlled substance or controlled substance analog, as defined by the Controlled Substance Act,

Texas Health and Safety Code; a dangerous drug, as defined by the Texas Health and Safety Code; an abusable glue or aerosol paint, as defined by the Texas Health and Safety Code; or any similar substance regulated under the laws of the State of Texas;

provided, however, that intoxication does not include the loss of normal use of mental or physical faculties resulting from the introduction into the body of a substance taken under and in accordance with a prescription written for the Participant by the Participant's doctor (unless the Participant should have reasonably known, due to prescription warnings or otherwise, that such loss of normal use might occur) or a substance listed above by inhalation or absorption incidental to the Participant's work for an Employer;

(2)     the Injury was caused by the Participant's willful intention and attempt to injure himself or herself or to injure another person, whether the Participant was sane or insane;

(3)     the Participant's horseplay, scuffling, fighting, or similar inappropriate behavior was a producing cause of the Injury;

(4)     the Injury was incurred while the Participant was "on suspension" or "laid off" by his or her Employer due to misconduct;

(5)     the Injury arose out of an act of a third person intended to injure the Participant because of personal reasons and not directed at the Participant as an Employee of or because of his or her employment by an Employer;

(6)     the Injury arose out of voluntary participation in an off-duty recreational, social or athletic activity not constituting part of the Participant's work-related duties, except where these activities are expressly covered by written decision of the Chief Executive Officer of the Company (or his or her designee), as provided above in this Section 1.21;

(7)     the Injury arose out of an act of God, unless the Participant's employment by an Employer exposes such Participant to a greater risk of Injury from an act of God than ordinarily applies to the general public;

(8)     the alleged Injury is feigned or an attempt to defraud the Employer;

(9)     the Injury occurred, in whole or in part, in connection with the Participant's (i) violation of his or her Employer's employment policies or safety rules (including, but not limited to, willful disregard of express direction by a supervisor), or (ii) failure to obtain available assistance

11

provided for his or her benefit to accomplish a particular task or to properly utilize available appropriate equipment or appliances;

(10)   the Injury occurred during commuting travel to or from work for an Employer.   However, if one of the essential functions of the employee's position with an Employer require him or her to travel in the furtherance of the affairs or business of the Employer, an Injury occurring in the normal course of such travel will be covered under this Plan; provided, however, that if a particular trip is also in furtherance of personal or private affairs of the Participant, no coverage will be provided under this Plan for such an Injury, unless:

(A)   the trip to the place where the Accident occurred would have been made even if there had been no personal or private affairs of the Participant involved in the trip; and

(B)   the trip would not have been made had there been no affairs of the Employer involved in the trip;

(11)   the Injury arose out of a declared or undeclared act of war, armed invasion, or aggression;

(12)   the Injury arose out of an atomic explosion or other release of nuclear energy (except when nuclear energy is being used solely for medical treatment of an illness), whether in peacetime or at time of war, and whether intended or accidental;

(13)   the Injury arose out of the injured Participant's participation in the commission of any crime;

(14)   the Participant receives benefits with respect to the Injury from any workers' compensation or occupational disease law, whether or not any coverage for such benefits is actually in force;

(15)   the Participant has been untruthful in regard to any aspect of the required information supplied as part of the injury reporting or employment process, particularly with regard to misinformation as to physical or mental abilities to perform the essential functions of the job; or

(16)   the Participant is untruthful or otherwise fails to fully cooperate with the Committee or demonstrates bad faith in connection with the administration of the Plan, including, but not limited to, subrogation or coordination of benefits procedures.

(c)   Any provision of this Plan to the contrary notwithstanding, if a Participant suffers a Disability due to an Injury, is certified by the treating Physician as able to return to work (whether to such Participant's pre-Disability

12

duty or Transitional Duty and without regard to whether such Participant actually returns to work), and again becomes Disabled as the result of the same Injury, then the subsequent period of Disability shall be deemed to be part of the prior period of Disability and attributable to the same Injury for purposes of applying any applicable limitation on benefits, unless the subsequent period of Disability results from an Injury sustained in a separate Accident.

1.21    **"Medical Benefits"** means any benefit payable under Section 3.3.

1.22    **"Medically Necessary"** means the services or supplies which are required to identify or treat a Participant's Injury and which are:

(a)    consistent with the symptom or diagnosis and treatment of the Participant's Injury;

(b)    appropriate with regard to standards of sound medical practice;

(c)    not primarily Custodial Care;

(d)    services that could not have been omitted without adversely affecting the Participant's condition or the quality of medical care rendered;

(e)    not solely for the convenience of a Participant, Physician, or Facility; and

(f)    the most appropriate supply or level of service which can be safely provided to the Participant.

For an inpatient, the Participant's medical symptoms or condition require that the services cannot be safely provided to the Participant as an outpatient. Even though a Physician may have prescribed a particular treatment, such treatment may not be considered Medically Necessary within this definition.

1.23    **"Medical Rehabilitation Hospital"** means a Facility that:

(a)    is licensed;

(b)    provides facilities for the diagnosis and inpatient rehabilitative treatment of disease or injury with the objective of restoring physical function to the fullest extent possible. Examples of conditions treated in a rehabilitation hospital are: amputations, spinal cord injuries, head injuries, paraplegia and quadriplegia, cerebrovascular accident, severe arthritis, paralysis;

(c)    has facilities or a contractual agreement with another hospital in the area for emergency treatment, surgery, and any other diagnostic or therapeutic services that might be required during a confinement;

CSNPDF - www.fesisa.com

(d)     provides all normal infirmary level medical services required for the treatment of any disease or injury occurring during confinement;

(e)     has a staff of physicians specializing in physical medicine and rehabilitation directly involved in the treatment program, one of whom is present at all times during the treatment day;

(f)     is accredited as a medical inpatient rehabilitation hospital by the Joint Commission on Accreditation of Rehabilitation Facilities;

(g)     is not a place for rest, the aged, drug addicts or alcoholics, a chronic disease facility, a nursing home or sheltered workshop; and

(h)     does not provide as its primary purpose custodial care, treatment of mental disorders, special education, vocational counseling, job training, or social adjustment services.  Note: any identifiable charges for educational, vocational or social adjustment services are not covered, unless otherwise provided as a Covered Charge.

1.24    "**Medicare**" means Title XVIII of the Social Security Act, as amended, and the regulations promulgated thereunder.

1.25    "**Participant**" means a Covered Employee who satisfies the eligibility requirements of Article II.

1.26    "**Physician**" means a person duly licensed under Texas law as a Medical Doctor or Doctor of Osteopathy and either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a Participant.

1.27    "**Plan**" means AMERICA'S FAVORITE CHICKEN COMPANY TEXAS EMPLOYEE INJURY BENEFIT PLAN as herein set forth and as it may from time to time be amended.

1.28    "**Plan Administrator**" means the Company.

1.29    "**Plan Year**" means a 12 calendar month period beginning each January 1 and ending the following December 31; provided, however, that the first Plan Year shall be the short period beginning September 21, 1991 and ending December 31, 1991.

1.30    "**Preexisting Condition**" means any illness, injury, disease, or other physical or mental condition, whether or not work-related, which originated or existed prior to the Accident.

1.31    "**Pre-Injury Pay**" means --

(a)     for salaried Participants, regular weekly salary from an Employer as of the date he or she becomes Disabled;

14

   (b) for hourly Participants, the average regular straight-time rate of pay from an Employer for the four consecutive weeks immediately preceding the date the Disability begins; provided, however, that if an hourly employee has worked for an Employer for fewer than four weeks immediately preceding the date the Disability begins, or if such four consecutive week period included any vacation time, sick leave, or other approved leave of absence, or if his or her earnings as of such date have not been fixed or cannot otherwise be reasonably determined (in the judgment of the Committee), such four-week average shall be based upon the earnings received over such period by a similar employee of such Employer.

"Pre-Injury Pay" shall not include any overtime, bonuses, commissions, benefits or other extraordinary remuneration. "Pre-Injury Pay" shall include amounts excludible from the Participant's gross income that are contributed by an Employer, at the Participant's election, to a 401(k) arrangement or cafeteria plan.

  **1.32** **"Short-Term Disability Benefits"** means any benefit payable under Section 3.1.

  **1.33** **"Skilled Nursing Care"** means service provided in a Skilled Nursing Facility by a R.N., L.P.N., or licensed vocational nurse (L.V.N.), provided the care is Medically Necessary and the treating Physician has prescribed such care. However, no benefit will be payable under the Plan for the following expenses:

   (a) charges for food, housing, or homemaker's services;

   (b) charges for the services of a person licensed or unlicensed who ordinarily resides in the Participant's home or is a member of the family of either the Participant or the Participant's spouse;

   (c) charges for an illness or injury unrelated to the original Hospital confinement; or

   (d) charges that do not follow a Hospital stay or are incurred when the Participant could otherwise receive services from private duty nursing at home.

  **1.34** **"Skilled Nursing Facility"** means an institution which is a Facility and (i) is duly licensed as an extended care facility, skilled nursing facility, or convalescent facility, and operates in accordance with governing laws and regulations; (ii) regularly provides inpatient Skilled Nursing Care for payment during the active or convalescent stage of an injury or illness; (iii) is staffed with a Physician or registered nurse on duty 24 hours a day; (iv) operates in accordance with medical policies supervised and established by a Physician other than the patient's own Physician; (v) regularly maintains a daily medical record for each patient; (vi) is not, other than incidentally, a place for the aged, a place for individuals addicted to drugs or alcohol, or a place for Custodial Care; and (vii) is recognized as an extended care facility or a skilled nursing facility under Medicare.

**1.35** **"Transitional Duty"** means work that the Participant is capable of performing in accordance with the America's Favorite Chicken Company Transitional Return-To-Work Program.

**1.36** **"Usual, Customary and Reasonable"** means a charge which is not more than the amount charged when there is no insurance, and is not more than the prevailing charge in the locality for a like service or supply. A like service is one of the same in nature and duration, requiring the same skill and performed by one of similar training and experience. A like supply is one which is the same or substantially equivalent. Locality is the city or town where the service or supply is obtained, if it is large enough so that a representative cross-section of like services or supplies can be obtained. In large cities, it may be a section or sections of the city, if the above criteria can be met. In smaller urban or rural areas, locality may have to be expanded to include surrounding areas to arrive at a representative cross-section.

**1.37** **"Value Deal Agreement"** means a written agreement between an Employer and a Participant, agreeing to resolve disputes through arbitration, substantially in the form of Exhibit A attached hereto. For purposes of this Plan, where higher benefits are payable to a Participant who has signed a Value Deal Agreement, such agreement must be in full force and effect as of the date of the Injury and the date of benefit payment.

## ARTICLE II

## ELIGIBILITY AND NATURE OF PAYMENTS

**2.1** **Eligibility.** Each Covered Employee shall become a Participant in this Plan, as herein amended and restated, as of the later of (i) 12:01 a.m., June 1, 1995, or (ii) the time and date of his or her employment as a Covered Employee. Except to the limited extent provided under Article III regarding the continuation of certain benefit payments, if a Participant ceases to be a Covered Employee, he or she shall thereupon cease to participate in this Plan; provided, however, that if such Participant is thereafter reemployed as a Covered Employee, he or she shall resume participating in the Plan as of the time and date of such reemployment.

**2.2** **Nature of Payments.**

(a) **No Admission of Liability:** The Plan has been established and is maintained by the Employers to protect themselves from certain liabilities as nonsubscribers to the Texas workers' compensation insurance system. Payments made under this Plan by an Employer shall not in any way constitute an admission of liability or responsibility by an Employer for an Injury and any such liability or responsibility is specifically denied.

(b) **No Collateral Source:** Benefit payments under the Plan shall be considered to be made by the Employer of a Participant and shall not be

16

considered payment from a "collateral source" as that term has been defined under any applicable rule, statute, judicial decision, or directive. All benefits paid under this Plan shall be offset against any alleged liability of the Employer, its officers, directors, or agents to a Participant or Participant's beneficiaries, heirs, or assigns due to an Injury.

## ARTICLE III

## BENEFITS

Participants shall be entitled to receive under this Plan the benefits described in this Article III with respect to any Injury incurred (i) in the course and scope of such Participant's employment by an Employer, (ii) in the furtherance of the business of such Employer, and (iii) during his or her participation in this Plan.

3.1    **Short-Term Disability Benefits.** From the first day (or the 8th day if the Participant has not signed a Value Deal Agreement) following the later of (i) the date of an Injury, or (ii) the date an injured Participant's Disability begins, the Plan shall pay Short-Term Disability Benefits equal to 85% (or 70% if the Participant has not signed a Value Deal Agreement) of an injured Participant's Pre-Injury Pay, minus such Participant's earnings from any employer after such Disability begins.

(a)    Short-Term Disability Benefits are calculated on a weekly basis, and paid on regular paydays. Payments for portions of a week shall be prorated. Only the Participant's normal, scheduled workdays shall be considered in calculating benefits.

(b)    Short-Term Disability Benefits shall continue until the earliest of (i) the expiration of 104 weeks (or 26 weeks if the Participant has not signed a Value Deal Agreement) from the date such benefits begin to accrue, (ii) the date the Participant is released by the treating Physician to return to work for an Employer, whether to such Participant's pre-Disability duty or Transitional Duty and without regard to whether such Participant actually returns to work on that date, (iii) the date that the Combined Single Limit is met, or (iv) termination of both the Participant's status as a Covered Employee and all other employment of the Participant with an Employer.

3.2    **Death Benefits.** In the event that a Participant dies as the direct and sole result of, and within 365 days of, an Injury, **and** has signed a Value Deal Agreement, then the Plan shall pay such Participant's Beneficiary a Death Benefit equal to two times the Participant's annualized Pre-Injury Pay (such dollar amount is referred to herein as the "Principal Sum"). The Principal Sum shall be reduced to the extent necessary to avoid exceeding the Combined Single Limit. The Death Benefit shall be paid to the Participant's Beneficiary as follows: (i) 20% of the Death Benefit shall be paid in a lump sum cash payment as soon as administratively possible following the death of the Participant and the determination of the proper Beneficiary; and (ii) the remainder of the

CRNPDF - www.fwviso.com

Death Benefit shall be paid in 59 equal monthly installments (without interest), commencing on the first day of the month following the initial lump sum payment. Death Benefits payable under this Plan shall be in addition to Short-Term Disability Benefits and Medical Benefits payable with respect to any one Accident; provided, however, that the Combined Single Limit shall not be exceeded.

**3.3    Medical Benefits.**  The Plan shall pay Medical Benefits to or with respect to an injured Participant in an amount equal to all Covered Charges; provided, however, that the Combined Single Limit shall not be exceeded, and Medical Benefits shall cease upon the earlier of (i) the expiration 104 weeks (or 26 weeks if the Participant has not signed a Value Deal Agreement) from the date of an Injury, or (ii) termination of both the Participant's status as a Covered Employee and all other employment of the Participant with an Employer for Cause.

## ARTICLE IV

## ADDITIONAL REQUIREMENTS AND LIMITATIONS ON BENEFITS

**4.1    Reporting.**  The Participant must report every incident or fact that the Participant believes results or might reasonably be expected to result in an Injury in accordance with the following requirements:

(a) **Notice of Injury:**  The Participant must notify his or her restaurant manager or immediate supervisor then on duty immediately after being injured at work, no matter how minor the Injury appears to be.  This notice must be provided no later than the end of the workshift for the date of the Injury.  If the Participant is a driver or otherwise traveling for an Employer, and --

(1)    if the Injury occurs during office hours, as soon as the Participant can reach a telephone, he or she must call his or her immediate supervisor, or

(2)    if the Injury occurs after office hours, the Participant must call his or her immediate supervisor as soon as possible and within 24 hours after the Accident that caused the Injury.

No benefits will be payable under the Plan if notice is not provided as required above, unless (i) the Participant's restaurant manager or supervisor then on duty has actual knowledge of the Injury, or (ii) the Committee determines that good cause exists for failure to give notice in a timely manner.  In addition to the foregoing, the Participant must also notify his or her restaurant manager or supervisor of expected recovery time immediately after receiving primary medical treatment and after each succeeding appointment with the treating Physician.

(b) **Providing Required Information**:  An injured Participant (or a person acting on his or her behalf) and such Participant's restaurant manager or

18

supervisor then on duty (or such other person as the Committee may specify) must complete such Injury report forms, file such written statements, and provide such proof and demonstrations, in such manner and within such periods, as the Committee may from time-to-time direct. All such information must be provided (if possible) by the end of the workshift for the date of the Injury, but not later than three days following the date of the Injury. No benefits will be payable under the Plan if all required information is not provided as required above, unless the Committee determines that good cause exists for failure to provide such information in a complete and timely manner.

**4.2** **Medical Treatment.**

(a) **Use of Approved Providers:** A medical expense incurred with respect to a Participant shall be paid or subject to reimbursement under this Plan only if it is provided either:

(1) by or under the direction of a Physician or Facility, acting within the scope of the Physician's or Facility's license and area of specialization; or

(2) (i) as Emergency Care; and

(ii) transportation to a Physician or Facility is not available, or a Physician or Facility is not within reasonable proximity to the location of the Participant (taking into account the nature of the Injury); and

(iii) the Participant's restaurant manager (or immediate supervisor, if the Participant does not work in a restaurant) receives notification of such care no later than the next business day of the Participant's restaurant (or the next business day of the Company if the Participant does not work in a restaurant or earlier notice to the Participant's restaurant manager cannot be given due to interruption of the normal operation of Participant's restaurant); and

(iv) after receiving primary Emergency Care, subsequent treatments are provided by or at the direction of a Physician or Facility.

(b) **Medical Determinations and Treatment:** All determinations relating to the physical condition of a Participant, upon which the amount or duration of benefits is based (for example, inability to return to work or results of a prior injury), must be made by a Physician. The Participant must follow fully and completely the advice of, and the course of medical treatment prescribed by, the treating Physician, and must keep all scheduled appointments to fulfill the prescribed medical treatment plan. The Committee, treating Physician, or Emergency Care provider may require that the Participant present an

19

authorization and report form to, and submit to any form of drug and alcohol testing by, the treating Physician or Emergency Care provider at the time of primary medical treatment.  The Committee shall have the right to require the Participant to be examined or reexamined by a Physician (including, but not limited to an autopsy, where not forbidden by law) as often as they determine to be reasonably necessary or appropriate during the pendency of a claim for benefits under the Plan.  The Company reserves the right to add to, delete from, or otherwise amend its list of approved Physicians or Facilities, at any time. Although benefits under this Plan are conditioned on a Participant's use of only approved Physicians and Facilities, no Physician or Facility is an agent of any Employer and a Participant remains entitled to seek any medical care he or she deems appropriate from any provider of his or her choice at his or her expense.

**4.3     Time For Submitting Medical Claims.**  All requests for payment or reimbursement of Covered Charges must be filed with the Committee or its designated representative within 30 days from the date such expenses are incurred or, if later, the date such Participant receives an invoice from a Physician, Facility, or other health care provider (in the case of Emergency Care) for such expenses.

**4.4     Second Medical Opinions.**  The Plan reserves the right to require a second medical opinion from a Physician selected by the Committee.  If an injured Participant refuses to be examined by a Physician selected by the Committee for the second opinion, all benefits under the Plan will be suspended.  The Committee shall weigh the findings of the treating Physician and the Physician providing the second opinion and make a benefit determination under the Plan.  However, if the Participant is in disagreement with the diagnosis or treatment recommended by the Physician whose opinion is accepted by the Committee (the "Committee's Physician"), then the Participant shall have the right to be examined at his or her own expense by another Physician (the "Participant's Physician").  If the diagnosis and treatment recommended by the Participant's Physician is contrary to that of the Committee's Physician, then the Participant shall be examined by another Physician selected by the Committee's Physician and the Participant's Physician.  If the Participant refuses to be so examined, all benefits under the Plan shall be suspended.  The diagnosis and recommended treatment of the Physician so selected shall be controlling.  Such Physician's fees and related expenses shall be shared equally by the Plan and the Participant.

**4.5     Earnings After The Injury.**  If an injured Participant is offered, or with reasonable diligence could be offered, a bona fide position of employment with an employer (other than an Employer, as defined in this Plan) that he or she is capable of performing, given his or her physical condition and the geographic accessibility of the position to such Participant, then the Participant's "earnings from any employer after such Disability begins" (within the meaning of Section 3.1) shall be deemed at least equivalent to the weekly earnings for the position offered or available to such Participant, without regard to whether the Participant accepts the position; provided, however, that this reduction in Short-Term Disability Benefits shall only apply with respect to earnings for periods of time that the Participant, if not Disabled, would likely have (in the judgment of the Committee) been working for an Employer.

**4.6    Acceleration Of Benefits.**  A Participant or beneficiary may make application to the Committee for acceleration of benefits payable under Article III in accordance with such rules and procedures as the Committee may prescribe.

**4.7    Suspension Of Benefits.**  The Committee may deny a claim for or suspend the payment of Plan benefits otherwise due a Participant if:

(a)    the Participant refuses to submit to drug and alcohol testing;

(b)    the Participant fails to provide a complete statement, affidavit, or deposition concerning the incident that the Participant believes resulted in an Injury upon request by the Committee;

(c)    the Participant utilizes a non-designated physician or facility other than for Emergency Care;

(d)    the Participant fails to follow the directions or ceases to be under the care of a treating Physician;

(e)    the Participant fails to keep all scheduled appointments with health care providers;

(f)    the Participant engages in conduct following an Injury which is determined by the treating Physician to be an injurious practice that is hindering the Participant's recovery from the Injury;

(g)    the Participant fails or refuses to report in to the Participant's supervisor periodically as directed until able to return to work, including notice of expected recovery time after each appointment with the treating Physician;

(h)    the Participant's employment with an Employer is terminated <u>for Cause</u>;

(i)    the Participant fails to personally pick up his or her check for Short-Term Disability Benefits provided under the Plan.  This requirement may be waived by the Committee upon a showing that the Participant is physically or geographically unable to comply;

(j)    the Participant fails or refuses to comply with any of the provisions of the Plan or the rules and procedures adopted by the Committee for the administration of the Plan; or

(k)    the Participant fails to return to work for an Employer after:

(1)    the treating Physician has released the Participant to return to work for an Employer; and

21

(2)     the Participant is scheduled to return to work for an Employer.

**4.8     Final Compromise And Settlement.**  The Plan, a Participant, an Employer, and any other related parties may, at any time after the date of Injury and prior to the payment of all benefits relating to such Injury, enter into a final compromise and settlement of any remaining benefits payable to or with respect to such Participant.

**4.9     Reduction For Prior Injuries.**  Benefits shall be reduced to the extent an otherwise Covered Charge or Injury, or the Participant's inability to return to work is the result of (i) a prior injury, or (ii) a Preexisting Condition.  If the Committee is unable to determine an appropriate reduction of benefits, the Committee shall have the authority to completely deny any form of benefit under the Plan.

## ARTICLE V

## ADMINISTRATION

**5.1     Plan Administrator.**

**(a) Administrator:**  The Company shall be the Plan Administrator of the Plan.  The Plan shall be administered on behalf of the Company and all other Employers by a committee (the "Committee") composed of one or more individuals appointed by the Company.  Each member of the Committee so appointed shall serve in such office until his or her death, resignation, or removal by the Company.  The Company may remove any member of the Committee with or without cause at any time, and may fill any vacancies with respect to Committee membership or add additional members to the Committee at any time and from time to time.  The Committee shall act by a majority of its members at the time in office.  The Committee may by such majority action authorize any one or more of its members to execute any document or documents on behalf of the Committee.  The Committee shall keep such records of its proceedings and acts as it deems to be necessary or appropriate for the purposes of the Plan.  The Committee shall cause such information, documents or reports to be prepared, provided and/or filed as may be necessary to comply with the provisions of ERISA, or any other applicable law.  Members of the Committee shall receive no remuneration from the Plan for their services as Committee members.  The Plan shall operate and keep its records on the basis of the Plan Year.

**(b) Administrative Authority:**  The Committee shall have discretionary and final authority to interpret and implement the provisions of the Plan.  The Committee shall perform all of the duties and may exercise all of the powers and discretion that the Committee deems necessary or appropriate for the proper administration of the Plan, and shall do so in a uniform, nondiscriminatory manner.  Every interpretation, choice, determination or other exercise by the Committee of any power or discretion given either expressly or by implication to it shall be conclusive and binding upon all parties having or claiming to have an

CItilPDF - www.fasioo.com

interest under the Plan or otherwise directly or indirectly affected by such action, without restriction, however, on the right of the Committee to reconsider and redetermine such action. The Committee may adopt such rules and procedures for the administration of the Plan as are consistent with the terms hereof, and have such rules and procedures incorporated into the Summary Plan Description for this Plan.

(c) **Delegation of Responsibilities:**  The Committee's authority shall include, but not be limited to, the power to allocate or delegate fiduciary and non-fiduciary responsibilities or duties among the members of the Committee or to third persons, including any contract administrator, and, except as is otherwise provided by applicable law, those persons to whom such responsibilities and duties have not been allocated or delegated shall not be liable for any act or omission of those persons to whom such responsibilities and duties have been allocated or delegated.

**5.2     Funding Policy And Method.**  All benefits payable to or with respect to a Participant under this Plan shall be paid or provided for by the Employer who was the employer of such Participant at the time of his or her Injury. Unless provided by a trust established pursuant to the Plan, said benefits shall be paid by such Employer at the direction of the Committee or its designated representative solely out of the general assets of such Employer. The Employers shall have no obligation to establish any fund or trust for the payment of benefits under this Plan. An Employer shall have no obligation, but shall have the right, to obtain insurance contracts with one or more insurers to provide funds to the Employer that can be used, if the Employer so desires in its sole discretion, to pay all or any portion of a benefit payable under this Plan. Any such funds shall not be considered "plan assets" for purposes of ERISA and shall constitute a part of the general assets of the Employer. Any such insurance contract shall be owned by, and (unless contrary to legal requirements adhered to by the insurer) all amounts shall be payable thereunder to, the Employer that applied for the contract, and no Participant shall have any interest in, or right to, any amounts payable under the contract. As a condition to the receipt of benefits under this Plan, and unless otherwise prohibited by law, the Committee may require a Participant to sign a form prescribed by the Committee which will serve to assign all or a portion of any benefits payable under such an insurance contract to the Employer that applied for the contract.     If, notwithstanding the provisions of this Section 5.2, any insurance benefits are paid directly by an insurance company to a Participant or beneficiary with respect to an Injury covered under this Plan, such payments shall be deemed to be made under this Plan by an Employer or shall otherwise be subject to the coordination of benefits provisions of Section 6.1, as determined by the Committee.

**5.3     Claims Procedure.**

(a) **Filing of Claim:**  A claim for benefits under the Plan shall be initiated by or with respect to a Participant by (i) compliance with the reporting requirements set forth in Section 4.1, and (ii) the submission of such Participant

CMPDF - www.tevia.com

to such medical examination or evaluation as may be requested by the Committee.

**(b) Decision on Claim:** Within 90 days of the receipt of such claim (unless special circumstances require an extension of time for processing the claim), the Committee or its designated representative(s) shall determine and notify the requesting Participant or beneficiary (the "claimant") as to whether he or she is entitled to such benefit. If an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period. Such written notice shall specify the special circumstances requiring an extension and the date by which a final decision shall be reached (which date shall not be later than 180 days after the date on which the claim was filed).

**(c) Claim Denial and Request for Review:** Such benefit decision notification shall be in writing and, if denying the claim for benefit, shall set forth the reason or reasons for the denial, make reference to the pertinent provisions of the Plan, describe any additional material or information necessary for the claimant to perfect the claim, explain why such material or information is necessary, and advise the claimant that he or she may, within 60 days of the receipt of such notice, in writing request the Committee or its designated representative(s) to review such denial. In connection with such a request for review, the claimant and/or his or her duly authorized representative may examine any relevant Plan documents and submit issues and comments in writing to support the granting of the benefit being claimed.

**(d) Decision Upon Review:** The final decision of the Committee with respect to the claim being reviewed shall be made within 60 days following the claimant's request for review (unless special circumstances require an extension of time for processing the claim), and the Committee shall in writing notify the claimant of its final decision, again specifying the reasons therefor and the pertinent provisions of the Plan upon which such decision is based. If special circumstances require an extension of time for processing the review, written notice shall be given specifying such special circumstances and the date by which a final decision shall be reached (which date shall not be later than 120 days after the date on which the request for review was filed). If the decision on review is not made within such 60-day (or 120-day) period, the request for benefits shall be deemed denied.

**(e) Exhaustion of Administrative Remedies:** No legal action can be brought by or with respect to a Participant to recover benefits under the Plan before the foregoing claims procedure has been exhausted.

**5.4    Professional Medical Review.** The Committee shall have the discretion to assign Physicians and other healthcare personnel or firms to a Participant's case in order to (i) coordinate and expedite medical treatment of the Participant, in consultation

24

with the treating Physician; and (ii) review the propriety of any and all treatment, services, and supplies, including charges for such treatment, services, and supplies.

## ARTICLE VI

## COORDINATION OF BENEFITS AND SUBROGATION

**6.1   Coordination Of Benefits.** The benefits payable under the Plan shall be reduced by any amount paid with respect to the Participant's Injury under the Social Security Act, the Railroad Retirement Act, any workers' compensation, occupational disease, or similar law, or any other benefit plans, including, but not limited to, a policy or policies of automobile, disability, life, or health insurance purchased by the Participant or an Employer; provided, however, that the benefit reduction under this Plan shall be made only to the extent necessary to ensure that when the benefits under this Plan are added to the benefits of the other plan(s) or insurance coverages, the total amount paid to or with respect to the Participant will not exceed 100% of the Covered Charges and 100% of the Participant's Pre-Injury Pay for any week of coverage under this Plan. For example, if a Participant is covered under one or more such benefit plans, then (unless otherwise subject to Section 6.2) the medical benefits payable for Covered Charges under Section 3.3 will be either regular benefits or reduced benefits that, when added to the benefits of the other plan(s), will not exceed 100% of the Covered Charges. In the coordination of benefits, one of the plans (or insurance coverages) will be designated as the primary plan and the other plans (or insurance coverages) will be designated as the secondary plan. The primary plan will pay its full benefits first, then the secondary plan(s) will pay, but payments will be coordinated so that the total from all plans will not be more than the Covered Charges. If a person is covered by more than one plan to which this coordination of benefits provision applies, then the following rules will determine which plan will be primary:

(a)     When only one of the plans has a coordination of benefits provision, then the plan without such a provision will be the primary plan;

(b)     If both plans have such a provision, then the plan under which the person is covered as an employee will be the primary plan;

(c)     The provisions of subsection (b) above to the contrary notwithstanding, if both plans have such a coordination of benefits provision and the person is covered as an active employee under one of the plans and a former employee under the other plan, then the plan under which the person is covered as an active employee will be the primary plan;

(d)     If the above rules do not establish an order of benefit determination, and one of the plans is insured and the other plan is self-funded by an Employer (as described in Section 5.2), then the insured plan will be the primary plan; and

(e)    If none of these rules establish an order of benefit determination, then the plan that has covered the Participant for the longer period of time will be the primary plan.

Any provision herein to the contrary notwithstanding, Medical Benefits payable under this Plan to or with respect to any Participant who is not in "current employment status," as defined for purposes of Medicare, and who is eligible for benefits under Medicare, shall be secondary and reduced by the amount of all benefits payable to or with respect to such Participant under Medicare, which will be the primary plan.  Rules similar to all of those set forth above shall apply in order to ensure that the Short-Term Disability Benefits payable under the Plan, when added to the benefits of the other above-described plan(s) or insurance coverages, will not exceed 100% of the Participant's Pre-Injury Pay for any week of coverage under this Plan.  The Participant must cooperate with the Employer in furnishing to such Employer copies of other policies, coverages or plans which may be applicable to the Injury and in completing and returning to such Employer any questionnaire or forms inquiring about other insurance coverages or plans which may cover or be applicable to such Participant.

**6.2    Recovery From Third Parties And Excess Payments.**  If a Participant becomes entitled to or receives Plan benefits for any Injury caused by the negligence or other act or omission of any person or organization, and is (or later becomes) entitled to or otherwise collects any damages or other compensation in connection with such Injury, whether by insurance, litigation, settlement or other proceeding, the Participant shall (i) subrogate his or her right to and reimburse the Plan out of said damages or other compensation to the extent of the Plan benefits paid to the Participant, and (ii) execute any assignment, lien form or other document requested by the Committee to enable the Plan to recover such Plan benefits.  If (i) a Participant fails, refuses or neglects to reimburse the Plan or otherwise comply with the provisions of this Section, or (ii) payments are made under the Plan based on fraudulent information or otherwise in excess of the amount necessary to satisfy the provisions of the Plan, then, in addition to all other remedies and rights of recovery that the Plan may have against such Participant, the Plan shall have the right to recover the reimbursement due to the Plan by withholding, offsetting and recovering such amount out of any future Plan benefits or amounts otherwise due from the Plan to or with respect to such Participant.  Any reimbursement of Plan benefits obtained by the Plan shall be held in trust and used to provide benefits under the Plan in accordance with the provisions of such trust agreement established by an Employer as may be approved by the Committee.

**6.3    Notice Of Legal Proceedings.**  A Participant shall provide the Committee with prior written notice of the involvement of such Participant in any lawsuit, settlement discussion or other proceeding, one of the principal purposes of which is recovering, from any person or organization, damages or other compensation in any way related to any Injury for which such Participant has received (or may in the future file a claim to receive) Plan benefits.  The Plan shall have the right to intervene for itself and on behalf of a Participant in any such lawsuit, settlement discussion or other proceeding.  If a Participant neglects, fails or refuses to seek a recovery from any person or organization for any Injury caused by the negligence or other act or omission of such person or

CAMPDF - www.texia.com

organization for which such Participant has received Plan benefits, the Plan shall have the right to institute a lawsuit or other proceeding or do any other act that in the opinion of the Committee may be necessary or desirable to recover the Plan benefits paid (and to be paid in the future) to the Participant, plus any costs and expenses incurred by the Plan in pursuing such recovery.  Any provision of this Plan to the contrary notwithstanding, the Plan shall have no right to and shall not institute any lawsuit or other proceeding against an Employer to recover for the Plan any Plan benefits paid to or with respect to a Participant.

**6.4    Assignment Of Rights.**  Upon the request of the Committee, a Participant shall assign to the Plan the right to intervene in or institute any lawsuit, settlement discussion, or other proceeding described in Section 6.3, and to use the name of the Participant for such purpose.  The Plan shall have the right to select legal counsel of its own choice and such counsel shall have complete control over the conduct of any such lawsuit, settlement discussion, or other proceeding.  Whenever the Plan shall intervene in or institute any lawsuit or other proceeding as permitted by the provisions of this Section, the Plan may pursue same to a final determination and the Plan expressly reserves the right to appeal from any adverse judgment or decision.  The Participant shall give the Plan all reasonable aid in any such lawsuit, settlement discussion, or other proceeding in effecting settlement, in securing evidence, in obtaining witnesses, or as may otherwise be requested by the Committee.  The Participant shall release the Plan, the Employers, the Committee, and their respective directors, officers, agents, attorneys, and employees from all claims, causes of action, damages and liabilities of whatever kind or character that may directly or indirectly arise out of the pursuit or handling by the Plan of any such lawsuit, settlement discussion or other proceeding.

## ARTICLE VII

## TERMINATION AND AMENDMENT

The Company shall have the right and power at any time and from time to time to amend this Plan, in whole or in part, on behalf of all Employers, and at any time to terminate this Plan or any Employer's participation hereunder; provided, however, that no such amendment or termination shall reduce the amount of any benefit then due and payable to or with respect to a Participant under the Plan in connection with an Injury occurring prior to the date of such amendment or termination.  Any such amendment shall be adopted pursuant to formal action of the Company's board of directors and executed by an officer authorized to act on behalf of the Company.

## ARTICLE VIII

## GENERAL PROVISIONS

**8.1    Inability to Make Payment.**  In the event an individual becomes entitled to a payment under this Plan and such payment cannot be made (i) because the

address provided by the individual is incorrect, (ii) because the individual fails to respond to a notice sent to the address provided by the individual, (iii) because of conflicting claims to such payment, or (iv) because of any other reason, the amount of such payment, if and when made, shall be that determined under the provisions of ARTICLE III without interest thereon. If, within 180 days after any amount becomes payable hereunder to an individual, the same shall not have been claimed, provided the Committee has exercised reasonable diligence in attempting to make such payment, the amount thereof shall be forfeited and shall cease to be a liability of this Plan.

**8.2      Committee Indemnity.** The Employers shall indemnify and hold harmless the Committee and each member thereof against any claim, cost, expense (including reasonable attorneys' fees), judgment or liability (including any sum paid in settlement of a claim with the approval of the Company) arising out of any act or omission to act of the Committee or a member thereof under this Plan, except in the case of willful misconduct. The Employers shall be jointly and severally liable for any amounts owed to the Committee or any member thereof pursuant to this Section.

**8.3      Spendthrift Provision.** No right or interest of any Participant or beneficiary under this Plan may be assigned, transferred or alienated, in whole or in part, either directly or by operation of law, and no such right or interest shall be liable for or subject to any debt, obligation or liability of such Participant or beneficiary.

**8.4      Taxation of Benefit Payments.** Benefit payments under this Plan shall be reduced by the amount of any applicable federal or state income, employment, or other taxes which are required by law to be withheld.

**8.5      Employment Noncontractual.** The establishment of this Plan shall not enlarge or otherwise affect an Employee's at will employment by an Employer, and an Employer may terminate the employment of any Employee at any time and/or modify the Employee's working relationship as desired, at will for any or no reason (with or without cause), as freely and with the same effect as if this Plan had not been established.

**8.6      Discharge for Benefit Payments.** If the Committee determines that a Participant is unable to apply a benefit payment under this Plan in furtherance of his or her own interest and advantage, the Committee may direct all or any portion of such payment to be made (i) to the guardian of the person or guardian of the estate of the Participant, (ii) to a relative or friend of the Participant, to be expended for the Participant's benefit, (iii) to a custodian for the Participant under any Uniform Gifts to Minors Act, or (iv) to a trust established for the Participant. The Committee shall not be obliged to see to the proper application or expenditure of any payment so made. Any payment made pursuant to the power herein conferred upon the Committee shall operate as a complete discharge of all obligations of the Plan and the Committee, to the extent of the payments so made.

**8.7      Participation By Affiliates.** With the consent of the Company, any incorporated or unincorporated trade or business which is a member of a control group

(within the meaning of Section 3(40) of ERISA) with respect to which the Company is also a member may adopt and become an Employer under this Plan.

**8.8    Plan Documents Control.**  This written Plan document constitutes the entire Plan, and no oral or written representation or promise concerning the Plan which is inconsistent with the provisions of this Plan document shall have any effect.  The provisions of this Plan document shall be the sole source of all legally enforceable rights with respect to the benefits herein provided.

**8.9    Construction.**  The titles to the Articles and the headings of the Sections in this Plan are placed herein for convenience of reference only and in case of any conflict the text of this instrument, rather than such titles or headings, shall control. Whenever a noun or pronoun is used in this Plan in plural form and there be only one person or entity within the scope of the word so used, or in singular form and there be more than one person or entity within the scope of the word so used, such word or pronoun shall have a plural or singular meaning as appropriate under the circumstance.

**8.10    Separability.**  If for any reason any provision of this Plan is determined to be invalid or contrary to applicable law, such invalidity shall not impair the operation of or otherwise affect the remaining provisions of this Plan.

**8.11    Applicable Law.**  This Plan shall be governed and construed in accordance with the provisions of ERISA and, except where superseded by federal law, the laws of the State of Texas.  Proper venue for any court proceeding relating in any way to this Plan shall be in the United States District Court for the Northern District of Texas, Dallas Division.

**IN WITNESS WHEREOF,** this Plan, as herein amended and restated, has been executed by the Company this _31st_ day of _May_, 1995, to be effective as of June 1, 1995.

AMERICA'S FAVORITE CHICKEN COMPANY

By_____

(Signature and Title)

r:plan ame

29

## Exhibit A
## VALUE DEAL AGREEMENT

Employee recognizes that differences may arise between America's Favorite Chicken Company ("AFC") and Employee during or following employment with AFC, and that those differences may or may not be related to employment. Employee understands and agrees that any such differences will be resolved by the terms of this Value Deal Agreement ("Agreement").

**OPPORTUNITY FOR INCREASED BENEFITS:** AFC has established the America's Favorite Chicken Company Texas Employee Injury Benefit Plan (the "Plan"). The Plan makes payments to AFC's Texas employees if they are injured while performing their job duties. Covered benefits can include medical, disability and death benefits. Employee agrees that, in exchange for signing this Agreement, Employee will be eligible to receive comprehensive benefits under this Plan. The benefits are explained in a Summary Plan Description which Employee acknowledges he or she has received and read or had the opportunity to read. Also, Employee understands and agrees that by entering into this Agreement, Employee anticipates gaining the benefits of a speedy, impartial dispute resolution procedure.

**MUTUAL PROMISES TO RESOLVE CLAIMS BY BINDING ARBITRATION:** In signing this Agreement, both AFC and Employee agree that all claims or disputes covered by this Agreement that cannot be otherwise resolved in accordance with the Employee Handbook must be submitted to binding arbitration and that this binding arbitration will be the sole and exclusive remedy for resolving any such claim or dispute. This promise to resolve claims by arbitration is equally binding upon AFC and Employee. Employee acknowledges and understands that by signing this Agreement, he or she is giving up the right to a jury trial on the claims covered by this Agreement.

**CLAIMS COVERED BY THIS AGREEMENT:** Claims and disputes covered by this Agreement include all claims and disputes Employee may presently have or may in the future have against AFC or against its affiliates, officers, directors, shareholders, employees or agents, or any AFC employee benefit program or its fiduciaries, in their personal or official capacity as such, and all claims that AFC may presently have or may in the future have against Employee, whether or not arising out of Employee's employment or termination. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation; claims for breach of any contract, covenant or warranty (express or implied); tort claims (including, but not limited to, claims for bodily injury or physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of Employee's employment); claims for wrongful termination (including, but not limited to, retaliatory discharge claims under Chapter 451 of the Texas Labor Code), sexual harassment, discrimination (including, but not limited to, claims based on race, sex, religion, national origin, age, medical condition or disability); claims for benefits under the Plan or any other employee benefit program sponsored by AFC (after exhausting administrative remedies under the terms of such plans); and claims for a violation of any other federal, state or other governmental law, statute, regulation or ordinance. The following matters are expressly not covered by this Agreement: (1) any criminal complaint or proceedings, and (2) claims for restitution from Employee for a criminal act for which Employee has been found guilty or has pleaded guilty or no contest or nolo contendere. Employee understands and agrees that neither Employee nor AFC has to submit items (1) and (2) above to arbitration under this Agreement and may seek and obtain relief from a court.

**REQUIRED NOTICE OF ALL CLAIMS:** AFC and Employee agree that the party seeking arbitration must give written notice of any claim to the other party within the applicable statute of limitations. Written notice to AFC or its affiliates, officers, directors, shareholders, employees, agents, benefit program or fiduciaries, will be sent to America's Favorite Chicken Company, c/o Prentice-Hall Corporation, 400 N. St. Paul Street, Dallas, Texas 75201 (or such other person or address as AFC may specify). If AFC wishes to invoke arbitration, it will give written notice to Employee at the last address recorded in Employee's personnel file. This notice shall be sent to the other party by certified or registered mail, return receipt requested.

**REPRESENTATION:** Any party may be represented during pre-hearing procedures (as defined below) or at the arbitration hearing by an attorney or other representative selected by the party. If Employee does not participate in the arbitration hearing with an attorney, AFC will also participate in such hearing without an attorney.

**NONBINDING DISPUTE RESOLUTION:** AFC and Employee agree that the arbitration procedure described in this Agreement shall not be invoked unless the party seeking arbitration has first utilized the other steps available under the Employee Handbook.

1

**ARBITRATION PROCEDURES:** AFC and Employee agree that any arbitration will be conducted by one arbitrator under the American Arbitration Association's Employment Dispute Resolution Rules for arbitrations before an arbitrator from the American Arbitration Association. The arbitrator will apply the substantive law (and the laws of remedies, if applicable), in the state in which the claim arose, or federal law, or both, depending upon the claims asserted. The arbitrator shall also apply the Federal Rules of Evidence. If the claim or dispute heard by the arbitrator is based on a statute, then the arbitrator will provide brief findings of fact and conclusions of law. In all other cases, the arbitrator will issue a decision which sets forth only the arbitrator's ultimate determination. All decisions rendered by an arbitrator under this agreement will be kept confidential.

The arbitrator will have jurisdiction to hear and rule on prehearing disputes and is authorized to hold prehearing conferences by telephone or in person as the arbitrator deems necessary. The arbitrator will have the authority to hear a motion to dismiss and/or a motion for summary judgment by any party and in doing so must apply the standards governing such motions under the Federal Rules of Civil Procedure. The arbitrator shall dismiss any claim for arbitration where the person or party seeking arbitration has not first utilized the internal claim procedures set out in the Employee Handbook.

**PRE-HEARING PROCEDURES:** Each party will have the right to take the deposition of one individual and any expert witness designated by another party. The subpoena rights specified below will be applicable to discovery pursuant to this paragraph. Additional discovery may be had only where the arbitrator selected under this Agreement so orders, upon a showing of substantial need. At least 30 days before the arbitration, the parties must exchange lists of witnesses, including any experts, and copies of all exhibits intended to be used at the arbitration.

**SUBPOENAS:** Each party will have the right to subpoena witnesses to the arbitration hearing in accordance with the Federal Arbitration Act, Title 9 of the United States Code.

**ARBITRATION FEES AND COSTS:** AFC and Employee acknowledge that there are two types of administrative fees and costs associated with an arbitration under this Agreement: a filing fee with the American Arbitration Association and payment to the arbitrator for his or her services. The parties agree that such fees and other expenses will be allocated as follows:

    (1)    filing fees required by the American Arbitration Association will be paid 80% by AFC and 20% by Employee;

    (2)    the fees and costs of the arbitrator shall be shared equally by AFC and Employee; provided, however, that Employee will not be required to pay more than $350 of such fees and costs. Each party will deposit funds or post other appropriate security for its share of the arbitrator's fees, in an amount and manner determined by the arbitrator, ten days before the first day of the arbitration hearing. Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of the proceedings.

**ATTORNEY'S FEES AND FORUM:** AFC and Employee further agree as follows:

    (1)    each party shall be responsible for their own attorney's fees, if any; however, if any party prevails on a statutory claim which allows the winning party to be awarded attorney's fees, or if there is a written agreement providing for fees, the arbitrator shall award reasonable fees to the prevailing party. The arbitrator shall determine the prevailing party in accordance with the meaning of "prevailing party" under the Civil Rights Attorney's Fees Awards Act of 1976;

    (2)    the arbitrator will assess attorney's fees against a party upon a showing that such party's claim, defense or position is frivolous, or unreasonable, or factually groundless;

    (3)    if either party pursues a claim covered by this Agreement by any means other than those set forth in this Agreement and the Employee Handbook, the responding party shall be entitled to dismissal of such action, and the recovery of all costs and attorney's fees and losses related to such action; and

    (4)    all suits challenging the validity or enforceability of this Agreement, and all suits seeking to compel arbitration under this Agreement, shall be brought in the United States District Court for the Northern District of Texas, Dallas Division.

**INTERSTATE COMMERCE:** Employee understands and agrees that AFC, a Minnesota corporation headquartered in Atlanta, Georgia, is involved in transactions involving interstate commerce (e.g., purchasing goods and services from outside Texas which are shipped to Texas; operating offices and restaurants in multiple states; and serving customers traveling interstate) and that Employee's employment involves such commerce. The Federal Arbitration Act, Title 9 of the United States Code, will govern the interpretation, enforcement, and all judicial proceedings under and/or with respect to this Agreement.

**REQUIREMENTS FOR MODIFICATION OR REVOCATION:** This Agreement to arbitrate will survive the termination of Employee's employment. It can only be revoked or modified by mutual consent evidenced by a writing signed by both parties which specifically states an intent to revoke or modify this Agreement. However, AFC retains the right to unilaterally modify, change, or delete any of the provisions of the Employee Handbook, except for those provisions addressing binding arbitration.

**SOLE AND ENTIRE AGREEMENT:** This Agreement is the complete agreement of the parties on the subject of arbitration of disputes. This Agreement takes the place of any other verbal or written understanding on this subject. No party is relying on any statements, oral or written, on the subject of arbitration or the effect, enforceability or meaning of this Agreement, except as specifically stated in this Agreement. If any provision of this Agreement is determined to be void or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of the Agreement.

**NOT AN EMPLOYMENT AGREEMENT:** This Agreement is not and shall not be construed to create any contract of employment, expressed or implied. Nor does this Agreement in any way alter the at-will status of the Employee's employment with AFC.

**VOLUNTARY AGREEMENT:** EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, THAT EMPLOYEE UNDERSTANDS ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN AFC AND EMPLOYEE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT EMPLOYEE HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY OTHER PROMISES OR REPRESENTATION BY AFC OTHER THAN THOSE IN THE AGREEMENT ITSELF.

You cannot begin work until this agreement is signed and returned. Have your parent or guardian also sign if you are under age 18.

X _____
Employee's Signature

X _____
Signature of Parent or Guardian if Employee
Under Age 18

_____
Print Parent or Guardian's Name and
Relationship to Employee

| | | YOU MUST COMPLETE THE FOLLOWING: |
| --- | --- | --- |
| _____ | _____ | Restaurant Number_____ |
| Print Employee Name | Date | Social Security Number_____ |
| _____ | _____ | |
| For America's Favorite Chicken Company (Signature and Title) | Date | |

radmew ame

3

# AMERICA'S FAVORITE CHICKEN COMPANY

# TEXAS EMPLOYEE

# INJURY BENEFIT PLAN

# <u>SUMMARY PLAN DESCRIPTION</u>

© Copyright 1995 PartnerSource Inc.

# TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| NOTICE TO EMPLOYEES CONCERNING WORKERS' COMPENSATION IN TEXAS | 1 |
| ELIGIBILITY FOR PLAN BENEFITS | 1 |
| HOW THE PLAN WORKS | 1 |
|     Procedure In Event Of Injury | 1 |
|     Overview Of Benefits | 2 |
|     Funding | 2 |
|     Excluded Injuries | 3 |
| SHORT-TERM DISABILITY BENEFITS | 3 |
| DEATH BENEFITS | 4 |
| MEDICAL BENEFITS | 4 |
|     Covered Medical Services | 4 |
|     Medical Services Not Covered | 5 |
|     Time To Request Payment Or Reimbursement | 6 |
|     Second Medical Opinions | 7 |
| CONTINUING BENEFITS | 7 |
| REQUESTING BENEFITS | 8 |
|     Notice Of Injury | 8 |
|     Providing Required Information | 8 |
|     Process For Benefit Payment And Return To Work | 9 |
|     Claims For Benefits And How To Appeal A Denial Of Benefits | 10 |
|     Administrative Authority | 10 |
| OFFSET, REIMBURSEMENT, AND RECOVERY OF BENEFITS | 10 |
|     Offset For Other Benefits | 10 |
|     Recovery From Third Parties | 10 |
|     Notice Of Legal Proceedings | 10 |
|     Assignment Of Rights | 10 |
|     Recovery Of Excess Payments | 11 |
|     Right To Receive And Release Necessary Information | 11 |
| AMENDMENT OR TERMINATION OF PLAN | 11 |
| DEFINITIONS | 11 |
|     Cause | 11 |
|     Combined Single Limit | 11 |
|     Committee | 11 |
|     Company | 11 |
|     Disabled or Disability | 11 |
|     Facility | 11 |
|     Injury | 12 |
|     Physician | 12 |
|     Plan | 12 |
|     Plan Administrator | 13 |
|     Pre-Injury Pay | 13 |
|     Value Deal Agreement | 13 |
| GENERAL INFORMATION | 13 |
|     Type Of Plan | 13 |
|     Name And Address Of Plan Sponsor | 13 |
|     Address Of Plan Administrator | 13 |
|     Name And Address Of Person Designated As Agent For Service Of Legal Process | 13 |
|     Employer And Plan Identification Numbers | 13 |
|     Plan Year | 14 |
| YOUR BENEFIT RIGHTS | 14 |

EXHIBIT A — Value Deal Agreement

© Copyright 1995 PartnerSource, Inc

i

# INTRODUCTION

AMERICA'S FAVORITE CHICKEN COMPANY (the "Company") is committed to providing loss of income protection and helping you pay medical expenses which might otherwise present a financial burden to you if you are injured on the job. To accomplish this, the Company has implemented a benefit program called the AMERICA'S FAVORITE CHICKEN COMPANY TEXAS EMPLOYEE INJURY BENEFIT PLAN (the "Plan"). This Plan covers employees of all divisions of the company, including Churchs Chicken, Popeyes Chicken & Biscuits, and Far West Products. This booklet has been prepared to help you understand your benefits under the Plan. Please read it carefully.

If any conflict arises between the information contained in this booklet and the provisions of the formal Plan document, such Plan document will control. Certain terms used herein are capitalized and defined in the DEFINITIONS section of this booklet

Benefits described in this booklet are effective June 1, 1995.

# NOTICE TO EMPLOYEES
# CONCERNING WORKERS' COMPENSATION IN TEXAS

**The following notice is being provided as required by Texas law:**

COVERAGE. AMERICA'S FAVORITE CHICKEN COMPANY **DOES NOT** have workers' compensation insurance coverage to protect you from damages resulting from work-related illness or injury. However, you may have rights under the common law of Texas. Your employer is required to provide you with coverage information when you are hired or whenever the employer becomes, or ceases to be, covered by workers' compensation insurance.

SAFETY HOTLINE: The Texas Worker's Compensation Commission has established a 24 hour toll-free telephone number for reporting unsafe conditions in the workplace that may violate occupational health and safety laws. Employers are prohibited by law from suspending, terminating, or discriminating against any employee because he or she in good faith reports an alleged occupational health or safety violation. Contact the Division of Workers' Health and Safety at 1-800-452-9595.

**Your Injury Benefit Plan:** AMERICA'S FAVORITE CHICKEN COMPANY **DOES PROVIDE** to all Texas employees, without cost, the Injury Benefit Plan described in this booklet.

**Our Safety Program:** The success of our company largely depends upon you following all of our safety rules and procedures <u>and</u> **immediately notifying your restaurant manager or supervisor** <u>first</u> of any unsafe working condition or injury, no matter how minor. As mentioned above, you will not be suspended, terminated, or discriminated against because you in good faith report an unsafe condition or potential occupational health or safety violation.

# ELIGIBILITY FOR PLAN BENEFITS

You automatically become a participant in this Injury Benefit Plan if your employment with the Company is principally located within the State of Texas.

# HOW THE PLAN WORKS

### Procedure In Event Of Injury

- Notify your restaurant manager or supervisor then on duty immediately after being injured at work, <u>no matter how minor the Injury appears to be</u>. **This notice must be provided no later than the end of your workshift for the date of the Injury. If you are a driver or otherwise traveling for the Company,** and:

  - if the Injury occurs during office hours, as soon as you can reach a telephone, call your immediate supervisor, or

© Copyright 1995 PartnerSource, Inc

1

- if the Injury occurs after office hours, call your immediate supervisor as soon as possible and within 24 hours after the accident that caused the Injury.

- If necessary, your restaurant manager or supervisor then on duty will assist you in arranging for appropriate medical treatment.

- In order to receive benefits under this Plan, you must receive prompt medical care from a **Physician or Facility approved by the administrative Committee**. You may use a non-approved Physician or Facility <u>only</u> for "Emergency Care" where --

  - transportation to a Physician or Facility is not available, or a Physician or Facility is not within a reasonable distance from your location (taking into account the nature of your Injury), and

  - you provide notice to the Committee of such Emergency Care within the later of 24 hours after you receive such care or the next business day, and

  - after receiving primary Emergency Care, subsequent treatments are provided by or at the direction of a Physician or Facility.

    For purposes of this Plan, "Emergency Care" means a service or supply provided for a medical condition that arises suddenly and unexpectedly, and is so severe that in the absence of immediate medical attention could reasonably be expected to (i) result in your death, disfigurement, or permanent disability, (ii) place your health in serious jeopardy, or (iii) result in serious impairment to any of your bodily organs, parts or functions.

- Initial medical care may include alcohol and drug testing.

- You must also follow the procedures described below in the REQUESTING BENEFITS section of this booklet.

## Overview Of Benefits

The Plan provides benefits to you with respect to almost any Injury incurred in the course and scope of your employment by the Company and in furtherance of the business of the Company. Subject to the limitations and exclusions described herein, you may be entitled to receive free medical attention for the Injury. If you miss work due to the Injury, you may receive Short-Term Disability Benefits. If your Injury results in your death, your beneficiaries may receive a Death Benefit.

MUCH HIGHER LEVELS OF BENEFITS ARE PAYABLE UNDER THE PLAN IF YOU HAVE SIGNED A "VALUE DEAL AGREEMENT" IN THE FORM ATTACHED TO THIS BOOKLET AS EXHIBIT A.

## Funding

The Company currently pays the entire cost to provide your coverage under this Plan. The Company has the right, but no obligation, to obtain insurance contracts to provide funds to the Company that can be used by the Company to pay all or any portion of a benefit under the Plan.

## Excluded Injuries

Although most types of work-related injuries are covered by the Plan, benefits will **not** be payable under the Plan if:

- your employment is not principally located in the State of Texas;

- the Injury occurred while you were in a state of intoxication (which would include, but not be limited to, an alcohol concentration of 0.04 or more, or the presence of any level of a controlled substance), or had otherwise lost the normal use of your mental or physical faculties as a result of the use of a drug or alcohol;

- the Injury was caused by your willful intention or attempt to injure yourself or another person;

© Copyright 1995 PartnerSource, Inc.

2

- your horseplay, scuffling, fighting, or similar inappropriate behavior was a producing cause of the Injury;

- the Injury was incurred while you were "on suspension" or "laid off" due to misconduct;

- the Injury arose out of an act of a third person intended to injure you because of personal reasons and not directed at you as an employee or because of your employment;

- the Injury arose out of your voluntary participation in an off-duty recreational, social or athletic activity not constituting part of your work-related duties, except where these activities are expressly covered by a written decision of the President of the Company, as provided in the "Injury" definition below;

- the Injury arose out of an act of God, unless your employment exposes you to a greater risk of Injury from an act of God than ordinarily applies to the general public;

- the alleged Injury is feigned or an attempt to defraud the Company;

- it is determined that the Injury occurred, in whole or in part, in connection with your (1) violation of employment policies or safety rules (including, but not limited to, willful disregard of express direction by a immediate supervisor), or (2) failure to obtain available assistance provided for your benefit to accomplish a particular task or to properly utilize available appropriate equipment or appliances;

- the Injury occurred during commuting travel to or from work for an Employer;

- the Injury arose out of a declared or undeclared act of war, armed invasion, or aggression;

- the Injury arose out of an atomic explosion or other release of nuclear energy (except when nuclear energy is being used solely for medical treatment of an illness), whether in peacetime or at time of war, and whether intended or accidental;

- the Injury arose out of your participation in the commission of any crime;

- you receive benefits with respect to the Injury under any workers' compensation system, occupational disease, or similar law, whether or not any coverage for such benefits is actually in force;

- the Injury is a "preexisting condition" (in other words, an illness, injury, disease or other physical or mental condition which originated or existed prior to the accident);

- you have been untruthful in regard to any aspect of the required information supplied as part of the injury reporting or employment process, particularly with regard to misinformation as to physical or mental abilities to perform the essential functions of the job; or

- you are untruthful or otherwise fail to fully cooperate with the Committee or demonstrate bad faith in connection with the administration of the Plan, including, but not limited to, subrogation or coordination of benefits procedures.

## SHORT-TERM DISABILITY BENEFITS

If you miss work due to a covered Injury, this Plan provides Short-Term Disability Benefits. From the **first day (or the eighth day if you have not signed a Value Deal Agreement)** following the later of (1) the date of your Injury, or (2) the date you become Disabled, the Plan will pay Short-Term Disability Benefits equal to **85%** of your Pre-Injury Pay **(or 70% of your Pre-Injury Pay if you have not signed a Value Deal Agreement)**, minus any earnings you receive from any employer after the Injury

- Short-Term Disability Benefits are calculated on a weekly basis, and paid on regular paydays. Portions of a week will be prorated. Only your normal, scheduled workdays will be considered.

- Short-Term Disability Benefits will continue until the earliest of (1) the expiration of **104 weeks (or 26 weeks if you have not signed a Value Deal Agreement)** from the time such benefits began, (2) the date you are released by

the treating Physician to return to work, whether to the same duty as before you became Disabled or transitional duty and without regard to whether you actually return to work on that date, (3) the date that the **Combined Single Limit** is met, or (4) termination of all your employment with the Company.

Transitional duty work is those functions of your job which you are able to perform, in accordance with the America's Favorite Chicken Company Transitional Return-To-Work Program.

## DEATH BENEFITS

If you die as the direct and sole result of, and within 365 days of, an Injury, <u>and</u> **you have signed a Value Deal Agreement**, then the Plan will pay your beneficiary (as identified under the Plan) a Death Benefit equal to two times your annualized Pre-Injury Pay (such dollar amount is called the "Principal Sum"). The Principal Sum will be reduced to the extent necessary to avoid exceeding the **Combined Single Limit**. The Death Benefit will be paid to your beneficiary as follows: (i) 20% will be paid in a lump sum cash payment as soon as possible following your death; and (ii) the remainder will be paid in 59 equal monthly installments (without interest). Death Benefits will be in addition to Short-Term Disability Benefits and Medical Benefits payable with respect to any one accident; provided, however, that the **Combined Single Limit** will not be exceeded.

## MEDICAL BENEFITS

The Company is committed to providing comprehensive medical attention to help protect you against the financial hardship that may be caused by a covered Injury.

### Covered Medical Services

<u>The following medical services and supplies are covered at 100%</u>, provided that (1) you follow the "Procedure in Event of Injury" described above, and (2) such expenses do not exceed the **Combined Single Limit**. Medical benefits will cease upon the earlier of (1) **104 weeks (<u>or</u> 26 weeks if you have <u>not</u> signed a Value Deal Agreement)** from the date of your Injury, and (2) termination of all your employment with the Company <u>for Cause</u>. The first covered charge must be incurred within 30 days following the date of Injury.

- Physician visits - at a Facility, Physician's office or, in the case of home health care, at your home, including second opinion services requested by the Committee;

- Medical supplies, including the following:

  - Prescription drugs (generic unless trade name drugs are requested by a Physician);

  - Blood and other fluids (other than allergy, insulin, and similar drugs) injected into the circulatory system;

  - Oxygen and its administration;

  - Upon the written advice or prescription of a Physician, rental or purchase of a wheelchair, iron lung, or other mechanical equipment **necessary** for the treatment of respiratory paralysis, and similar internal or external durable medical equipment designed primarily for therapeutic purposes;

  - Surgical dressings, bandages, splints, casts, crutches, syringes, needles, artificial limbs and eyes, trusses, braces, prostheses, special bras and girdles dispensed by a Physician; and

  - Other items according to guidelines approved by the Committee as medically necessary;

- Outpatient services and supplies, including ambulatory day surgery, x-ray examinations, laboratory tests, diagnostic services, and nuclear medicine;

- Occupational and physical therapy provided by a Physician or a licensed occupational therapist or licensed physical therapist; provided, however, that such services (and any provider of such services) must be approved in advance and in writing by the Committee <u>and</u> recommended by the attending Physician; and provided, further, that such

CHKPDF - www.texno.com

services will be subject to case management approval regarding the number of visits and the types and amount of services provided during such visits;

- Inpatient rehabilitation services provided in an approved medical rehabilitation hospital; provided, however, that such services must be approved in advance and in writing by the Committee and recommended by the attending Physician; and provided, further, that such services will be subject to continued stay review by the Committee and case management approval regarding the types and amount of services provided;

- Room and board (semi-private) as an inpatient at a Facility;

- Home health care (with respect to physical needs only) up to 75 visits per Plan Year and up to eight hours per visit for the first two weeks of home health care and up to four hours per visit thereafter;

- Skilled nursing care, provided that a Physician monitors the progress of the participant at least once during each 30-day period of confinement;

- Blood and blood plasma (but only to the extent not available through any refund or allowance by a blood bank or similar organization);

- Anesthesia and its administration;

- Radiology and pathology, including interpretive services of a Physician;

- Ambulance services - professional ground ambulance service or, if no other means of transportation can reasonably suffice for delivery to the closest appropriate Facility, air ambulance, regularly scheduled railroad, or airlines;

- Surgery, including surgery which restores a reasonable, normal functioning, but excluding any services or supplies related to any of the following:  a prior cosmetic surgery; surgical excision or reformation of any sagging skin on any part of the body such as the eyelids, face, neck, abdomen, arms, legs, or buttocks; any services performed in connection with the enlargement, reduction, or change in appearance of a portion of the body such as the breasts, lips, jaw, chin, nose, ears, or genitals; hair transplantation; chemical face peels or abrasions of the skin;

- Services of licensed oral surgeons - services for treatment of fractures and dislocations of the jaw or the replacement of sound natural teeth (excluding temporomandibular junction dysfunction services) when treatment is sought within 72 hours after the Injury;

- Eyeglasses or contact lenses - one pair per Injury up to $125, inclusive of professional office visit charges;

- External hearing aid - up to $600 per year, inclusive of professional office visit charges;

- Orthotics, arch supports, corrective shoes, corrective appliances, or any similar item, if approved in advance and in writing  by the Committee;

- Organ and tissue transplant services, including kidney, heart, heart/lung, liver, pancreas, and bone marrow, excluding transportation costs, organ procurement costs and the live donor's surgical expenses; and

- Mental health services, but only if provided for mental or emotional damage or harm resulting from you being the victim of or witness to a crime while you are at work.  Any such services must be approved in advance and in writing by the Committee.

## Medical Services Not Covered

While the Plan provides benefits for many medical expenses, the following expenses are **not** covered by the Plan:

- Charges incurred prior to your date of participation in the Plan, or prior to your date of Injury;

© Copyright 1995 PartnerSource, Inc

5

- Charges rendered after your Medical Benefits under this Plan terminate;

- Expenses which are not medically necessary, as determined by the Committee;

- Charges incurred more than 60 days after the date of the last covered charge;

- Expenses that exceed any fee schedule adopted by the Committee or the usual, customary and reasonable charge for the same or similar services or supplies in your geographic area;

- Services or supplies payable by any government or subdivision or agency thereof;

- Services or supplies which are experimental, investigative, or for the purposes of research;

- Services or supplies performed or provided while you are not covered by the Plan;

- Services or supplies for which you are not legally obligated to pay or for which no charge would be made in the absence of the Plan;

- Services or supplies for personal comfort or convenience, such as a private room, television, telephone, radio, guest trays, and similar items;

- Fraudulent claims or claims not filed in good faith as determined by the Committee;

- Canceled appointment charges;

- Self-administered services;

- Services in which your condition is persistently nonresponsive to treatment;

- Services or supplies relating to pre-existing conditions;

- Acupuncture, behavior modification, or biofeedback;

- Services rendered primarily for training, testing, evaluation, counseling, or educational purposes, except to the extent approved in advance and in writing by the Committee;

- Chiropractic or spinal manipulation services, except to the extent approved in advance and in writing by the Committee and recommended by the treating Physician;

- Substance abuse services;

- Services and supplies provided in or out of a rest home, convalescent facility, nursing home, or other institution that only assist with activities of daily living such as bathing, dressing, walking, eating, preparing special diets, or the supervision of taking medications, no matter by whom recommended or furnished;

- Any travel or lodging expenses that are not incurred pursuant to the direction of a Physician and approved in advance and in writing by the Committee; or

- The cost of any other service or supply not specified above as a covered charge.

**Time To Request Payment Or Reimbursement**

All requests for payment or reimbursement of covered charges must be filed with the Committee or its designated representative within 30 days from the date such expenses are incurred or, if later, the date you receive an invoice for such expenses.

© Copyright 1995 PartnerSource, Inc.

6

**Second Medical Opinions**

The Plan reserves the right to require a second medical opinion from a Physician selected by the Committee. If you refuse to be examined by a Physician selected by the Committee for the second opinion, all benefits under the Plan will be suspended. The Committee will weigh the findings of the treating Physician and the Physician providing the second opinion and make a benefit determination under the Plan. However, if you disagree with the diagnosis or treatment recommended by the Physician whose opinion is accepted by the Committee (the "Committee's Physician"), then you will have the right to be examined **at your own expense** by another Physician (the "Participant's Physician"). If the diagnosis and treatment recommended by the Participant's Physician is contrary to that of the Committee's Physician, then you must be examined by another Physician selected by the Committee's Physician and the Participant's Physician. If you refuse to be so examined, all benefits under the Plan will be suspended. The diagnosis and recommended treatment of this last Physician will be controlling. Such Physician's fees and related **expenses will be shared equally by the Plan and you.**

## CONTINUING BENEFITS

Subject to the limitations and other rules and procedures described in this booklet, your benefits under this Plan will begin or continue as long as you --

- submit to any drug and alcohol testing requested by the Committee, the treating Physician or the Emergency Care provider;

- provide a complete statement, affidavit, or deposition upon request by the Committee concerning the incident that you believe resulted in an Injury;

- utilize only approved Physicians and Facilities (except in the case of Emergency Care when it is not practicable to use an approved Physician or Facility and you notify the Committee of your receipt of other medical care within 24 hours);

- follow the directions and continue to be under the care of a treating Physician;

- keep all scheduled appointments with health care providers;

- do not engage in conduct which hinders your recovery;

- report in to your restaurant manager or supervisor then on duty periodically as directed until you are able to return to work, including notice of expected recovery time after each appointment with the treating Physician;

- are not terminated from employment with the Company for Cause;

- personally pick up your check for Short-Term Disability benefits provided under the Plan; provided, that this requirement may be waived by the Committee upon a showing that you are physically or geographically unable to pick up your benefit check;

- comply with the provisions of this summary plan description, the Plan, and the rules and procedures adopted by the Committee for the administration of the Plan;

- do not fail to return to work for the Company after being released by the treating Physician, and being scheduled, to do so, and

- do not demonstrate bad faith or abuses of this Plan as determined in the discretion of the Committee.

© Copyright 1995 PartnerSource, Inc

7

# REQUESTING BENEFITS

## Notice of Injury

You (or a person acting on your behalf) must notify your restaurant manager or supervisor then on duty of an Injury **immediately**, no matter how minor the Injury appears to be. **This notice must be provided no later than the end of the workshift for the date of the Injury. If you are a driver or otherwise traveling for the Company**, and:

- if the Injury occurs during office hours, as soon as you can reach a telephone, call your immediate supervisor, or

- if the Injury occurs after office hours, call your immediate supervisor as soon as possible and within 24 hours after the accident that caused the Injury.

## Providing Required Information

You (or a person acting on your behalf) and your restaurant manager or your supervisor then on duty (or such other person as the Committee may specify) must complete such Injury report forms, file such written statements, and provide such proof and demonstrations, in such manner and within such periods, as the Committee may from time-to-time direct. **All such information must be provided (if possible) by the end of the workshift for the date of the Injury, and not later than three days following the date of the Injury.**

An immediate report to your immediate supervisor is essential so that the facts regarding your Injury can be promptly verified by the Committee and appropriate benefits can be paid. No benefits will be payable under the Plan if:

- notice is not provided as required above, unless (1) your restaurant manager or immediate supervisor then on duty has actual knowledge of the Injury, or (2) the Committee determines that good cause exists for failure to give notice in a timely manner; or

- all required information is not provided as required above, unless the Committee determines that good cause exists for failure to provide such information in a complete and timely manner.

© Copyright 1995 PartnerSource, Inc.

8

PROCESS FOR BENEFIT PAYMENT AND RETURN TO WORK

# Don't let a work injury trip you up!

Follow these steps and let the VALUE DEAL program put you back on your feet.



**Report Injury to Manager/Supervisor Immediately**

**Complete Injury Report Forms**

**Go to Approved Doctor or Hospital for Treatment**

**Claim for Injury Benefits is Reviewed**

**Follow the Doctor's Orders for Treatment**

**Doctor Releases You to Full Duty**

**Doctor Releases you to Transitional Duty**

**Welcome Back!**

AfC

© Copyright 1995 PartnerSource, Inc.

9

## Claims For Benefits And How To Appeal A Denial Of Benefits

You can make a claim for benefits under the Plan by (i) complying with the reporting requirements set forth above, and (ii) submitting to such medical examination or evaluation as may be requested by the Committee. If you believe a request for benefits has been improperly denied, a written request for the review of such denial may be submitted to the Committee or its designated representative within 60 days of the response to you on the claim for benefits. The request should state, in clear and concise terms, the reason for disagreement with the way the request for benefits was processed. When the written request for review is received, the request for benefits will be reviewed again and the results of this review will be furnished in writing to you within 60 days in most cases.

## Administrative Authority

The Committee has discretionary and final authority to interpret and implement the provisions of the Plan. Every interpretation, choice, determination, or other exercise of authority by the Committee will be binding upon all affected parties, without restriction, however, on the right of the Committee to reconsider and redetermine such action. The Committee may also adopt any rules and procedures it deems necessary or appropriate for the administration of the Plan. The Committee may deny a claim for or suspend the payment of Plan benefits otherwise payable to you if you do not comply with any provision of the Plan or the rules and procedures adopted by the Committee.

# OFFSET, REIMBURSEMENT, AND RECOVERY OF BENEFITS

## Offset For Other Benefits

Any benefits payable under this Plan will be reduced by any Social Security payments, Railroad Retirement Act benefits, workers' compensation, occupational disease, or similar benefits provided under a statutory law or government benefit program, and certain amounts paid or payable under other forms of insurance or employee benefit plans, as a result of your Injury.

## Recovery From Third Parties

If you become entitled to or receive benefits under the Plan for any Injury caused by another person or organization and become entitled to or otherwise collect any other compensation in connection with such Injury, whether by insurance, litigation, settlement or other proceeding, you must (1) reimburse the Plan out of such other compensation to the extent of any Plan benefits that you have received, and (2) execute any documents requested by the Committee to enable the Plan to recover such benefits. If you do not reimburse the Plan, then reimbursement may be obtained out of any future benefits or amounts otherwise payable to you by the Plan.

## Notice of Legal Proceedings

You must provide the Committee with prior written notice of your involvement in any lawsuit, settlement discussion or other proceeding aimed at recovering, from another person or organization, compensation related to any Injury for which you have received (or may in the future file a claim to receive) benefits under the Plan. The Plan will have the right to intervene in any such lawsuit, settlement discussion or other proceeding. If you do not seek recovery from any person or organization that has caused your Injury, the Plan will have the right to begin a lawsuit or other proceeding or do any other act that in the opinion of the Committee may be necessary or desirable to recover Plan benefits paid or to be paid in the future (including costs and expenses).

## Assignment of Rights

Upon the request of the Committee, you must assign to the Plan the right to begin or intervene in any lawsuit, settlement discussion or other proceeding described above, and to use your name for that purpose. The Plan will have all of the rights and privileges with respect to any such proceeding (such as the right to select legal counsel or pursue appeals) that you would have. You must provide all reasonable aid in any such proceeding as requested by the Committee. You must also release the Plan, the Company, the Committee and their representatives from any claims that may arise out of the pursuit or handling by the Plan of any such lawsuit, settlement discussion or other proceeding.

© Copyright 1995 PartnerSource, Inc.

## Recovery of Excess Payments

Whenever payments are made under the Plan based on fraudulent information or otherwise in excess of the amount necessary to satisfy the provisions of the Plan, the Plan may recover these excess payments out of any future benefits or amounts otherwise payable to you by the Plan.

## Right To Receive And Release Necessary Information

The Committee may, without the consent of or notice to any person or organization, release to or obtain from any person or organization, information needed to implement Plan provisions. When you request benefits, you must furnish all information requested by the Committee.

# AMENDMENT OR TERMINATION OF PLAN

The Company presently intends to continue the Plan indefinitely. However, the Company reserves the right to amend, modify, or terminate the Plan at any time. Any such amendment will be adopted pursuant to formal action of the Company's board of directors and executed by an officer authorized to act on behalf of the Company. No amendment or termination of the Plan will reduce the amount of any benefit then due and payable under the Plan to or with respect to a participant in connection with an Injury occurring prior to the date of such amendment or termination.

# DEFINITIONS

This section defines specific terms used in this booklet. These definitions should not be interpreted to extend coverage unless specifically provided for in the other sections of this booklet and the Plan document.

## Cause

The employee's gross misconduct within the meaning of Section 4980B of the Internal Revenue Code, or any successor provision of law.

## Combined Single Limit

The maximum amount of all benefits payable to you under the Plan with respect to an accident. Payments made for each form of benefit will be counted towards the Combined Single Limit amount. **If you have signed a Value Deal Agreement,** the Combined Single Limit will be $75,000. **If you have not signed a Value Deal Agreement**, the Combined Single Limit will be $25,000. However, a lesser limit may apply if more than one person is injured in the same accident.

## Committee

The committee of individuals appointed by the Company to administer the Plan.

## Company

AMERICA'S FAVORITE CHICKEN COMPANY

## Disabled or Disability

Inability, commencing within 90 days from the date of the accident causing the Injury, to attend to the material duties normally performed by you for the Company because of an Injury.

## Facility

A hospital or other medical care facility either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a participant. **No Facility is an agent of the Company. Although benefits under this Plan are conditioned on your use of only approved Physicians and Facilities, you remain entitled to seek any medical care you deem appropriate from any provider of your choice at your own expense.**

## Injury

Damage or harm to the physical structure of the body which is incurred (1) solely as the result of, a sudden, unexpected, unusual, specific event which occurs at an identifiable time and place, and independently of any other cause, (2) on or after June 1, 1995, (3) in the course and scope of employment by the Company, and (4) in the furtherance of the business of the Company. The term "Injury" also includes damage or harm incurred solely as a result of on-site participation in "Habitat For Humanity" or "Day of Dreams" programs sponsored by the Company or other program specifically covered by written decision of the President of the Company, and independently of any other cause. All Injuries resulting from or arising out of a single accident will be considered a single Injury for purposes of all benefit limitations under the Plan. The term Injury does not include:

- Any damage or harm to, or disease or infection of, the eye or musculoskeletal structure resulting from use of a video display terminal, poor or inappropriate posture, or similar circumstances prescribed by the Committee which are of a chronic nature;

- Any asbestos-related poisoning or disease;

- Except as otherwise provided under the "Covered Medical Services," any mental injury emotional distress, mental trauma or similar injury, including, without limitation, any mental or emotional damage or harm that arises primarily from a legitimate personnel action, including a transfer, promotion, demotion or termination of employment;

- Any illness or disease, howsoever acquired and whatsoever named;

- Damage or harm to the physical structure of the body, such as carpel tunnel syndrome, occurring as the result of repetitious, physically traumatic activities that occur over time;

- Ptomaine or bacterial infection, except when resulting from accidental ingestion or accidental inhalation of poisonous food substances, and except pyogenic infection which occurs with and as a result of an accidental cut or wound;

- A heart attack, stroke, or aneurysm, except in limited circumstances prescribed by the Plan; and

- Hernia, unless inguinal hernia that —

    - appeared suddenly and immediately following the Injury;

    - did not exist in any degree prior to the Injury; and

    - was accompanied by pain.

**With regard to recurring disabilities:** If you suffer a Disability due to an Injury, are certified by the treating Physician as able to return to work (whether or not you actually return to work), and again become Disabled as a result of the same Injury, then the subsequent period of Disability will be considered part of the prior period of Disability for purposes of applying any applicable limitation on benefits, unless the subsequent period of Disability results from an Injury sustained in a separate accident.

## Physician

A person duly licensed under Texas law as a Medical Doctor or Doctor of Osteopathy and either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a participant. **No Physician is an agent of the Company. Although benefits under this Plan are conditioned on your use of only approved Physicians and Facilities, you remain entitled to seek any medical care you deem appropriate from any provider of your choice at your own expense.**

## Plan

AMERICA'S FAVORITE CHICKEN COMPANY TEXAS EMPLOYEE INJURY BENEFIT PLAN

CUtePDF - www.tasite.com

### Plan Administrator

The Company is the plan administrator of the Plan. The Plan is administered on behalf of the Company by the Committee.

### Pre-Injury Pay

- For a salaried participant, regular weekly salary from the Company as of the date he or she becomes Disabled; and

- For an hourly participant, the average regular straight-time rate of pay for the four consecutive weeks immediately preceding the date the Disability begins; provided, however, that if an hourly employee has worked for the Company for fewer than four weeks immediately preceding the date the Disability begins, or if such four consecutive week period included any vacation time, sick leave, or other approved leave of absence, or if his or her earnings as of such date have not been fixed or cannot otherwise be reasonably determined (in the judgment of the Committee), such four-week average will be based upon the earnings received over such period by a similar employee of the Company.

"Pre-Injury Pay" **does not include** any bonuses, overtime, commissions, benefits or other extraordinary remuneration. "Pre-Injury Pay" **does include** amounts excludible from your gross income which are contributed by your employer, at your election, to a 401(k) arrangement or cafeteria plan.

### Value Deal Agreement

A written agreement between you and the Company, agreeing to resolve all disputes in accordance with the Value Deal Program. See Exhibit A attached hereto. Higher benefits are payable under the Plan only if such agreement is in full force and effect as of the date of the Injury and the date of benefit payment.

## GENERAL INFORMATION

### Type Of Plan

A welfare benefit plan providing short-term disability, death and medical benefits due to an Injury

### Name And Address Of Plan Sponsor

America's Favorite Chicken Company
Six Concourse Parkway, Suite 1700
Atlanta, GA 30328-5352

### Address Of Plan Administrator

Any questions you may have about the Plan may be posed to the Plan Administrator by mail, c/o Louisa McPherson, America's Favorite Chicken Company, Six Concourse Pkwy., Suite 1700, Atlanta, GA 30328-5352, or by telephone at (404) 391-9500.

### Name And Address Of Person Designated As Agent For Service Of Legal Process

Prentice-Hall Corporation
400 N. St. Paul Street
Dallas, Texas 75201

### Employer And Plan Identification Numbers

The employer identification number assigned by the Internal Revenue Service to the Company is 58-2016606. The plan number of the Plan is 502.

**Plan Year**

The Plan operates and keeps its records on the basis of the 12-month period ending each December 31.

## YOUR BENEFIT RIGHTS

As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all Plan participants shall be entitled to:

- Examine, without charge, at the Plan Administrator's office and at other specified locations (such as work sites) all Plan documents, including insurance contracts, and copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and Plan descriptions.

- Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The administrator may charge a reasonable fee for the copies.

- Receive a summary of the Plan's annual financial report, unless the Company is not required to file such a report with the Internal Revenue Service.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including the Company, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

If your claim for a benefit is denied in whole or in part you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court (unless you have signed a Value Deal Agreement, which can provide a similar final and binding resolution through arbitration). In such a case, the court (or arbitrator) may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court (unless you have signed a Value Deal Agreement, which can provide a similar final and binding resolution through arbitration). If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court (or request arbitration). The court (or arbitrator) will decide who should pay court costs and legal fees.

If you are successful, the court (or arbitrator) may order the person you have sued to pay these costs and fees. If you lose, the court (or arbitrator) may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plan, you should contact the Plan Administrator. If you have any

questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

June 1, 1995

spd.sme

© Copyright 1995 PartnerSource, Inc.

14

Case 1:01-cv-00109   Document 2   Filed in TXSD on 06/25/2001   Page 68 of 128

**Documento de Prueba A**
**ACUERDO Value Deal**

El Empleado reconoce que podrían surgir diferencias entre America's Favorite Chicken Company ("AFC") y el Empleado durante o después de su periodo de empleo en AFC, y que tales diferencias será resuelta o no estar relacionadas con el empleo. El Empleado entiende y acuerda que cualquiera tales diferencias será resuelta en conformidad con los términos de este Acuerdo Value Deal ("Acuerdo").

**OPORTUNIDAD DE RECIBIR BENEFICIOS COMPLETOS:** AFC ha establecido el Plan de Indemnización por Lesiones (el "Plan") para los Empleados de America's Favorite Chicken Company en Texas. El Plan indemniza a los empleados de AFC de Texas en caso de sufrir lesiones durante el desempeño de sus labores. Los beneficios cubiertos pueden incluir indemnización médica, por incapacidad o por muerte. El Empleado acuerda que, al suscribirse a este Acuerdo, el Empleado será elegible para recibir beneficios completos ofrecidos por este Plan. Los beneficios se explican en un Resumen Descriptivo del Plan que el Empleado admite haber recibido y leído o haber tenido la oportunidad de leer. Además, el Empleado entiende y acuerda que al celebrar este Acuerdo, el Empleado prevé que se beneficiará de un proceso rápido e imparcial en la resolución de pleitos.

**PROMESAS MUTUAS DE RESOLVER RECLAMACIONES POR ARBITRAJE OBLIGATORIO:** Al suscribirse a este Acuerdo, tanto AFC como el Empleado acuerdan que todas las reclamaciones o pleitos cubiertos en este Acuerdo, que de otro modo no pudieran resolverse en conformidad con el Manual del Empleado, deberán someterse a arbitraje obligatorio y que ese arbitraje obligatorio será el recurso único y exclusivo para resolver cualquiera de tales reclamaciones o pleitos. Esta promesa para resolver reclamaciones por arbitraje es igualmente obligatorio para AFC y para el Empleado. El Empleado reconoce y entiende que al suscribirse a este Acuerdo, está renunciando al derecho de tener un juicio por jurado para las reclamaciones cubiertas por este Acuerdo.

**RECLAMACIONES CUBIERTAS POR ESTE ACUERDO:** Las reclamaciones y pleitos cubiertos por este Acuerdo incluyen todas las reclamaciones y pleitos que el Empleado tenga actualmente o que pueda tener en el futuro en contra de AFC o sus afiliados, funcionarios, directivos, accionistas, empleados o agentes, o cualquier programa de beneficios laborales de AFC para empleados o sus fiduciarios, tanto en calidad de personas como de funcionarios, y todas las reclamaciones que AFC tenga actualmente o pueda tener en el futuro contra el Empleado, sea o no que surjan del empleo o el despido del Empleado. Las reclamaciones cubiertas por este Acuerdo incluyen, mas no se limitan a, reclamaciones por salarios u otro tipo de compensación; reclamaciones por violación de cualquier contrato, convenio o garantía (expresa o implícita); reclamaciones por perjuicios (incluidas, mas no limitadas a, reclamaciones por lesiones corporales o lesiones físicas, mentales o sicológicas, sin considerar si tal lesión fue sufrida en el transcurso y dentro de la esfera del empleo del Empleado); reclamaciones por despido injusto (incluidas, mas no limitadas a, reclamaciones por despido como represalia según el Capítulo 451 del Código Laboral de Texas), hostigamiento sexual, discriminación (incluidas, mas no limitadas a, reclamaciones de discriminación por motivos de raza, sexo, religión, nacionalidad, edad, condición médica o incapacidad); reclamaciones por beneficios estipulados en el Plan o en cualquier otro programa de beneficios laborales patrocinado por AFC (una vez agotados todos los recursos administrativos según los términos de tales programas); y reclamaciones por la violación de cualquiera de las leyes federales o estatales o cualquier otra ley, estatuto, reglamentación u ordenanza gubernamental. Este Acuerdo expresamente no cubre los siguientes asuntos: (1) toda demanda o procedimiento penal, y (2) reclamaciones de restitución del Empleado por una acción criminal de la cual el Empleado ha sido hallado culpable o se ha declarado culpable o no impugna o admite culpabilidad para concluir el proceso. El Empleado entiende y acuerda que, en conformidad con este Acuerdo, ni el Empleado ni AFC tienen que someter a arbitraje los puntos (1) y (2) mencionados anteriormente y pueden buscar y obtener asistencia del tribunal.

**NOTIFICACIÓN REQUERIDA PARA TODAS LAS RECLAMACIONES:** AFC y el Empleado acuerdan que la parte que busque arbitraje debe dar notificación por escrito sobre toda reclamación a la otra parte dentro de las limitaciones aplicables del estatuto. Toda notificación por escrito dirigida a AFC o sus afiliados, funcionarios, directivos, accionistas, empleados, agentes, programa de beneficios o fiduciarios, será enviada a America's Favorite Chicken Company, c/o Prentice-Hall Corporation, 400 N. St. Paul Street, Dallas, Texas 75201 (o a toda otra persona o dirección que pueda especificar AFC). Si AFC desea recurrir a arbitraje, se enviará notificación por escrito al Empleado a la última dirección registrada por el Departamento de Personal en el expediente del Empleado. Esta notificación será enviada a la otra parte por correo certificado o registrado, solicitando recibo de retorno.

**REPRESENTACIÓN:** Cualquiera de las partes podrá estar representada durante los procedimientos de audiencia previa (según se definen más adelante), o en la audiencia del arbitraje, por un abogado u otro representante nombrado por la parte. Si el Empleado no se presenta a la audiencia del arbitraje representado por un abogado, AFC igualmente se presentará a la audiencia sin abogado.

**RESOLUCIÓN DE PLEITOS NO OBLIGATORIA:** AFC y el Empleado acuerdan que no se recurrirá al procedimiento de arbitraje descrito en este Acuerdo a menos que la parte que busque arbitraje haya utilizado los demás recursos disponibles que estipula el Manual de Empleado.

**PROCEDIMIENTOS DE ARBITRAJE:** AFC y el Empleado acuerdan que todo arbitraje será manejado por un árbitro en conformidad con las Reglas Para Resolución de Pleitos Laborales establecidas por la Asociación Norteamericana de Arbitramentos para aquellos arbitrajes llevados ante un árbitro de la Asociación Norteamericana de Arbitramentos. El árbitro aplicará la ley substantiva (y las leyes de recursos, si aplican), vigente en el estado donde surja la reclamación, o la ley federal, o ambas, según las reclamaciones presentadas. El árbitro aplicará además las Reglas de Evidencia Federales. Si la reclamación o pleito presentada ante el árbitro se basa en un estatuto, el árbitro entregará resúmenes de determinación de hechos y conclusiones de derecho. En todos los demás casos, el árbitro dará un fallo que explique solamente la resolución final del arbitrador. Todos los fallos pronunciados por un árbitro en conformidad con este Acuerdo mantendrán un carácter confidencial.

El árbitro tendrá jurisdicción para conocer una causa y fallar en pleitos en audiencias previas y está autorizado a efectuar audiencias previas, ya sea telefónicamente o en persona, a discreción del árbitro. El árbitro tendrá la autoridad para conocer una moción para declarar sin lugar y/o una moción para pronunciar sentencia sumaria de cualquiera de las partes y al hacerlo debe aplicar las normas que regulan tales mociones en conformidad con las Reglamentaciones Federales de Enjuiciamiento Civil. El árbitro declarará sin lugar cualquier petición de arbitraje cuando la persona o parte que busque el arbitraje no haya utilizado como primera medida los procedimientos internos para reclamaciones estipulados en el Manual del Empleado.

**PROCEDIMIENTOS DE AUDIENCIAS PREVIAS:** Cada parte tendrá el derecho de tomar la declaración de un individuo y de cualquier testigo perito nombrado por la otra parte. Los derechos de citación y exhibición de pruebas especificados más adelante serán aplicables para exhibir pruebas con arreglo a este párrafo. Podrán presentarse documentos de prueba adicionales solamente donde el árbitro elegido en conformidad con este Acuerdo lo ordene, una vez demostrada necesidad real. Las partes deben intercambiar listas de testigos, incluidos todos los peritos, y copias de todos los documentos de prueba que vayan a utilizarse en el arbitraje por lo menos 30 días antes del arbitraje.

**CITACIONES:** Cada parte tendrá el derecho de citar testigos a la audiencia del arbitraje en conformidad con la Ley Federal de Arbitramentos, Sección 9 del Código de los Estados Unidos.

**HONORARIOS Y COSTOS DE ARBITRAJE:** AFC y el Empleado reconocen que, en conformidad con este Acuerdo, hay dos tipos de honorarios y costos administrativos en un arbitraje: honorarios para presentar el arbitraje ante la Asociación Norteamericana de Arbitramentos y el pago por los servicios del árbitro. Las partes acuerdan que tales honorarios y los demás gastos serán distribuidos de la siguiente manera:

(1)   AFC pagará el 80% y el Empleado pagará el 20% de los derechos de presentación del arbitraje ante la Asociación Norteamericana de Arbitramentos;

(2)   AFC y el Empleado absorberán por partes iguales los honorarios y costos del árbitro; sin embargo, no se exigirá al Empleado pagar más de $350 dólares por tales honorarios y costos. Cada parte depositará fondos o dará otra garantía del caso correspondiente a su porción de los honorarios del árbitro, por una cuantía y de una manera estipulada por el árbitro, diez días antes del primer día de la audiencia de arbitraje. Cada parte, por su propia cuenta, puede contratar y pagar el costo de un relator del tribunal que provea un acta taquigráfica del proceso.

**HONORARIOS DE ABOGADOS Y TRIBUNAL:** AFC y el Empleado además acuerdan lo siguiente:

(1) cada parte se hará responsable del pago de los honorarios de su propio abogado, si lo hubiere; sin embargo, si alguna de las partes prevaleciera en una reclamación estatutaria que permite adjudicar los honorarios del abogado a la parte ganadora, o si existiese un acuerdo por escrito que disponga el arreglo de los honorarios, el árbitro adjudicará honorarios razonables a la parte prevaleciente. El árbitro decidirá la parte prevaleciente según el significado de "parte prevaleciente" en conformidad con la Ley de Adjudicación de Honorarios de Abogados de Derechos Civiles de 1976;

(2) el árbitro asignará el pago de los honorarios de abogado a una de las partes al demostrar que la reclamación, defensa o posición de tal parte es frívola, o no es razonable, o carece de bases de hecho;

(3) si alguna de las partes procesa una reclamación cubierta en este Acuerdo por algún medio que no sea uno de los contenidos en este Acuerdo y en el Manual del Empleado, la parte demandada tendrá el derecho de declarar sin lugar tal proceso, y de recuperar todos los costos y honorarios de abogado y las pérdidas ocasionadas por tal proceso; y

(4) todas las demandas que recusen la validez o ejecutabilidad de este Acuerdo, y todas las demandas que busquen obligar a arbitraje en conformidad con este Acuerdo, serán encausadas en el Tribunal Distrital de los Estados Unidos del Distrito Norte de Texas, División de Dallas.

**COMERCIO INTERESTATAL:** El Empleado entiende y acuerda que AFC, una compañía de Minnesota con sede principal en Atlanta, Georgia, efectúa transacciones que implican comercio interestatal (es decir, compra de bienes y servicios fuera de Texas, que son enviados a Texas; operación de oficinas y restaurantes en varios estados; prestación de servicios a clientes viajando de un estado a otro) y que el empleo del Empleado incluye tal comercio. La Ley Federal de Arbitramentos, Sección 9 del Código de los Estados Unidos, regulará la interpretación, ejecución y todos los procesos judiciales en conformidad con este Acuerdo o relacionados con el mismo.

**REQUISITOS PARA MODIFICAR O REVOCAR:** Este Acuerdo de arbitraje sobrevivirá la terminación del empleo del Empleado. Sólo podrá revocarse o modificarse por mutuo consentimiento en un documento suscrito por ambas partes, que indique específicamente la intención de revocar o modificar este Acuerdo. Sin embargo, AFC se reserva el derecho de modificar, cambiar o eliminar unilateralmente cualquiera de las disposiciones del Manual del Empleado, excepto aquellas disposiciones que se refieran al arbitraje obligatorio.

**ACUERDO ÚNICO Y TOTAL:** Este Acuerdo es el acuerdo total contraído por las partes en relación con el arbitraje de pleitos. Este Acuerdo toma el lugar de todo otro convenio verbal o escrito relativo a este tema. Ninguna de las partes se basa en ninguna declaración, verbal o escrita, relativa al tema del arbitraje, o al efecto, ejecutabilidad o significado de este Acuerdo, excepto si se ha estipulado específicamente en este Acuerdo. Si se decide anular o declarar no ejecutable, de manera total o parcial, alguna de las disposiciones de este Acuerdo, tal decisión no afectará la validez del resto del Acuerdo.

**NO ES UN CONTRATO DE EMPLEO:** Este Acuerdo no es ni será interpretado como vehículo que crea un contrato de empleo, expreso o implícito. Este Acuerdo tampoco alterará de manera alguna el estatus de empleo a voluntad del Empleado con AFC.

**ACUERDO VOLUNTARIO:** EL EMPLEADO RECONOCE QUE EL EMPLEADO HA LEÍDO DETENIDAMENTE ESTE ACUERDO, QUE EL EMPLEADO ENTIENDE SUS TÉRMINOS, QUE TODOS CONVENIOS Y ACUERDOS ENTRE AFC Y EL EMPLEADO EN RELACIÓN CON LOS PUNTOS CUBIERTOS EN ESTE ACUERDO ESTÁN CONTENIDOS EN EL MISMO, Y QUE EL EMPLEADO HA CELEBRADO ESTE ACUERDO VOLUNTARIAMENTE Y SIN DEPENDER DE NINGUNA OTRA PROMESA O DISPOSICIÓN DE AFC QUE NO ESTÉ ESTIPULADA EN EL ACUERDO MISMO.

Ud. no podrá comenzar a trabajar hasta haber firmado y devuelto este Acuerdo. En caso de tener menos de 18 años de edad, sírvase hacer que uno de sus padres o su tutor lo firme.

X _____
Firma del Empleado

X _____
Firma del padre/madre o tutor si el Empleado
tiene menos de 18 años de edad

_____
Nombre del padre/madre o tutor y relación
con el Empleado (en letra imprenta)

_____          _____
Nombre del Empleado (en letra imprenta)       Fecha

_____          _____
A nombre de America's Favorite Chicken        Fecha
Company (Firma y cargo)

+---------------------------------------------+
| **DEBE COMPLETARLO SIGUIENTE:**             |
|                                             |
| Número de restaurante _____     |
|                                             |
| Número de seguridad social _____   |
+---------------------------------------------+

## Exhibit A
## VALUE DEAL AGREEMENT

Employee recognizes that differences may arise between America's Favorite Chicken Company ("AFC") and Employee during or following employment with AFC, and that those differences may or may not be related to employment. Employee understands and agrees that any such differences will be resolved by the terms of this Value Deal Agreement ("Agreement").

**OPPORTUNITY FOR INCREASED BENEFITS:** AFC has established the America's Favorite Chicken Company Texas Employee Injury Benefit Plan (the "Plan"). The Plan makes payments to AFC's Texas employees if they are injured while performing their job duties. Covered benefits can include medical, disability and death benefits. Employee agrees that, in exchange for signing this Agreement, Employee will be eligible to receive comprehensive benefits under this Plan. The benefits are explained in a Summary Plan Description which Employee acknowledges he or she has received and read or had the opportunity to read. Also, Employee understands and agrees that by entering into this Agreement, Employee anticipates gaining the benefits of a speedy, impartial dispute resolution procedure.

**MUTUAL PROMISES TO RESOLVE CLAIMS BY BINDING ARBITRATION:** In signing this Agreement, both AFC and Employee agree that all claims or disputes covered by this Agreement that cannot be otherwise resolved in accordance with the Employee Handbook must be submitted to binding arbitration and that this binding arbitration will be the sole and exclusive remedy for resolving any such claim or dispute. This promise to resolve claims by arbitration is equally binding upon AFC and Employee. Employee acknowledges and understands that by signing this Agreement, he or she is giving up the right to a jury trial on the claims covered by this Agreement.

**CLAIMS COVERED BY THIS AGREEMENT:** Claims and disputes covered by this Agreement include all claims and disputes Employee may presently have or may in the future have against AFC or against its affiliates, officers, directors, shareholders, employees or agents, or any AFC employee benefit program or its fiduciaries, in their personal or official capacity as such, and all claims that AFC may presently have or may in the future have against Employee, whether or not arising out of Employee's employment or termination. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation; claims for breach of any contract, covenant or warranty (express or implied); tort claims (including, but not limited to, claims for bodily injury or physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of Employee's employment); claims for wrongful termination (including, but not limited to, retaliatory discharge claims under Chapter 451 of the Texas Labor Code), sexual harassment, discrimination (including, but not limited to, claims based on race, sex, religion, national origin, age, medical condition or disability); claims for benefits under the Plan or any other employee benefit program sponsored by AFC (after exhausting administrative remedies under the terms of such plans); and claims for a violation of any other federal, state or other governmental law, statute, regulation or ordinance. The following matters are expressly not covered by this Agreement: (1) any criminal complaint or proceedings, and (2) claims for restitution from Employee for a criminal act for which Employee has been found guilty or has pleaded guilty or no contest or nolo contendere. Employee understands and agrees that neither Employee nor AFC has to submit items (1) and (2) above to arbitration under this Agreement and may seek and obtain relief from a court.

**REQUIRED NOTICE OF ALL CLAIMS:** AFC and Employee agree that the party seeking arbitration must give written notice of any claim to the other party within the applicable statute of limitations. Written notice to AFC or its affiliates, officers, directors, shareholders, employees, agents, benefit program or fiduciaries, will be sent to America's Favorite Chicken Company, c/o Prentice-Hall Corporation, 400 N. St. Paul Street, Dallas, Texas 75201 (or such other person or address as AFC may specify). If AFC wishes to invoke arbitration, it will give written notice to Employee at the last address recorded in Employee's personnel file. This notice shall be sent to the other party by certified or registered mail, return receipt requested.

**REPRESENTATION:** Any party may be represented during pre-hearing procedures (as defined below) or at the arbitration hearing by an attorney or other representative selected by the party. If Employee does not participate in the arbitration hearing with an attorney, AFC will also participate in such hearing without an attorney.

**NONBINDING DISPUTE RESOLUTION:** AFC and Employee agree that the arbitration procedure described in this Agreement shall not be invoked unless the party seeking arbitration has first utilized the other steps available under the Employee Handbook.

1

**ARBITRATION PROCEDURES:** AFC and Employee agree that any arbitration will be conducted by one arbitrator under the American Arbitration Association's Employment Dispute Resolution Rules for arbitrations before an arbitrator from the American Arbitration Association. The arbitrator will apply the substantive law (and the laws of remedies, if applicable), in the state in which the claim arose, or federal law, or both, depending upon the claims asserted. The arbitrator shall also apply the Federal Rules of Evidence. If the claim or dispute heard by the arbitrator is based on a statute, then the arbitrator will provide brief findings of fact and conclusions of law. In all other cases, the arbitrator will issue a decision which sets forth only the arbitrator's ultimate determination. All decisions rendered by an arbitrator under this agreement will be kept confidential.

The arbitrator will have jurisdiction to hear and rule on prehearing disputes and is authorized to hold prehearing conferences by telephone or in person as the arbitrator deems necessary. The arbitrator will have the authority to hear a motion to dismiss and/or a motion for summary judgment by any party and in doing so must apply the standards governing such motions under the Federal Rules of Civil Procedure. The arbitrator shall dismiss any claim for arbitration where the person or party seeking arbitration has not first utilized the internal claim procedures set out in the Employee Handbook.

**PRE-HEARING PROCEDURES:** Each party will have the right to take the deposition of one individual and any expert witness designated by another party. The subpoena rights specified below will be applicable to discovery pursuant to this paragraph. Additional discovery may be had only where the arbitrator selected under this Agreement so orders, upon a showing of substantial need. At least 30 days before the arbitration, the parties must exchange lists of witnesses, including any experts, and copies of all exhibits intended to be used at the arbitration.

**SUBPOENAS:** Each party will have the right to subpoena witnesses to the arbitration hearing in accordance with the Federal Arbitration Act, Title 9 of the United States Code.

**ARBITRATION FEES AND COSTS:** AFC and Employee acknowledge that there are two types of administrative fees and costs associated with an arbitration under this Agreement: a filing fee with the American Arbitration Association and payment to the arbitrator for his or her services. The parties agree that such fees and other expenses will be allocated as follows:

(1)     filing fees required by the American Arbitration Association will be paid 80% by AFC and 20% by Employee;

(2)     the fees and costs of the arbitrator shall be shared equally by AFC and Employee; provided, however, that Employee will not be required to pay more than $350 of such fees and costs. Each party will deposit funds or post other appropriate security for its share of the arbitrator's fees, in an amount and manner determined by the arbitrator, ten days before the first day of the arbitration hearing. Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of the proceedings.

**ATTORNEY'S FEES AND FORUM:** AFC and Employee further agree as follows:

(1)     each party shall be responsible for their own attorney's fees, if any; however, if any party prevails on a statutory claim which allows the winning party to be awarded attorney's fees, or if there is a written agreement providing for fees, the arbitrator shall award reasonable fees to the prevailing party. The arbitrator shall determine the prevailing party in accordance with the meaning of "prevailing party" under the Civil Rights Attorney's Fees Awards Act of 1976;

(2)     the arbitrator will assess attorney's fees against a party upon a showing that such party's claim, defense or position is frivolous, or unreasonable, or factually groundless;

(3)     if either party pursues a claim covered by this Agreement by any means other than those set forth in this Agreement and the Employee Handbook, the responding party shall be entitled to dismissal of such action, and the recovery of all costs and attorney's fees and losses related to such action; and

(4)     all suits challenging the validity or enforceability of this Agreement, and all suits seeking to compel arbitration under this Agreement, shall be brought in the United States District Court for the Northern District of Texas, Dallas Division.

**INTERSTATE COMMERCE:** Employee understands and agrees that AFC, a Minnesota corporation headquartered in Atlanta, Georgia, is involved in transactions involving interstate commerce (*e.g.*, purchasing goods and services from outside Texas which are shipped to Texas; operating offices and restaurants in multiple states; and serving customers traveling interstate) and that Employee's employment involves such commerce. The Federal Arbitration Act, Title 9 of the United States Code, will govern the interpretation, enforcement, and all judicial proceedings under and/or with respect to this Agreement.

**REQUIREMENTS FOR MODIFICATION OR REVOCATION:** This Agreement to arbitrate will survive the termination of Employee's employment. It can only be revoked or modified by mutual consent evidenced by a writing signed by both parties which specifically states an intent to revoke or modify this Agreement. However, AFC retains the right to unilaterally modify, change, or delete any of the provisions of the Employee Handbook, except for those provisions addressing binding arbitration.

**SOLE AND ENTIRE AGREEMENT:** This Agreement is the complete agreement of the parties on the subject of arbitration of disputes. This Agreement takes the place of any other verbal or written understanding on this subject. No party is relying on any statements, oral or written, on the subject of arbitration or the effect, enforceability or meaning of this Agreement, except as specifically stated in this Agreement. If any provision of this Agreement is determined to be void or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of the Agreement.

**NOT AN EMPLOYMENT AGREEMENT:** This Agreement is not and shall not be construed to create any contract of employment, expressed or implied. Nor does this Agreement in any way alter the at-will status of the Employee's employment with AFC.

**VOLUNTARY AGREEMENT:** EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, THAT EMPLOYEE UNDERSTANDS ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN AFC AND EMPLOYEE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT EMPLOYEE HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY OTHER PROMISES OR REPRESENTATION BY AFC OTHER THAN THOSE IN THE AGREEMENT ITSELF.

You cannot begin work until this agreement is signed and returned. Have your parent or guardian also sign if you are under age 18.

X _____
Employee's Signature

X _____
Signature of Parent or Guardian if Employee
Under Age 18

_____
Print Parent or Guardian's Name and
Relationship to Employee

_____      _____
Print Employee Name                    Date

| YOU MUST COMPLETE THE FOLLOWING: |
| --- |
| Restaurant Number_____ |
| Social Security Number_____ |

_____      _____
For America's Favorite Chicken Company    Date
(Signature and Title)

r:admew.ame

3

# VALUE DEAL AGREEMENT

Employee recognizes that differences may arise between America's Favorite Chicken Company ("AFC") and Employee during or following employment with AFC, and that those differences may or may not be related to employment. Employee understands and agrees that any such differences will be resolved by the terms of this Value Deal Agreement ("Agreement").

**OPPORTUNITY FOR INCREASED BENEFITS:** AFC has established the America's Favorite Chicken Company Texas Employee Injury Benefit Plan (the "Plan"). The Plan makes payments to AFC's Texas employees if they are injured while performing their job duties. Covered benefits can include medical, disability and death benefits. Employee agrees that, in exchange for signing this Agreement, Employee will be eligible to receive comprehensive benefits under this Plan. The benefits are explained in a Summary Plan Description which Employee acknowledges he or she has received and had the opportunity to read. Also, Employee understands and agrees that by entering into this Agreement, Employee anticipates gaining the benefits of a speedy, impartial dispute resolution procedure.

**MUTUAL PROMISES TO RESOLVE CLAIMS BY BINDING ARBITRATION:** In signing this Agreement, both AFC and Employee agree that all claims or disputes covered by this Agreement that cannot be otherwise resolved in accordance with the Employee Handbook must be submitted to binding arbitration and that this binding arbitration will be the sole and exclusive remedy for resolving any such claim or dispute. This promise to resolve claims by arbitration is equally binding upon AFC and Employee. Employee acknowledges and understands that by signing this Agreement, he or she is giving up the right to a jury trial on the claims covered by this Agreement.

**CLAIMS COVERED BY THIS AGREEMENT:** Claims and disputes covered by this Agreement include all claims and disputes Employee may presently have or may in the future have against AFC or against its affiliates, officers, directors, shareholders, employees or agents, or any AFC employee benefit program or its fiduciaries, in their personal or official capacity as such, and all claims that AFC may presently have or may in the future have against Employee, whether or not arising out of Employee's employment or termination. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation; claims for breach of any contract, covenant or warranty (express or implied); tort claims (including, but not limited to, claims for bodily injury or physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of Employee's employment); claims for wrongful termination (including, but not limited to, retaliatory discharge claims under Chapter 451 of the Texas Labor Code), sexual harassment, discrimination (including, but not limited to, claims based on race, sex, religion, national origin, age, medical condition or disability); claims for benefits under the Plan or any other employee benefit program sponsored by AFC (after exhausting administrative remedies under the terms of such plans); and claims for a violation of any other federal, state or other governmental law, statute, regulation or ordinance. The following matters are expressly not covered by this Agreement: (1) any criminal complaint or proceedings, and (2) claims for restitution from Employee for a criminal act for which Employee has been found guilty or has pleaded guilty or no contest or nolo contendere. Employee understands and agrees that neither Employee nor AFC has to submit items (1) and (2) above to arbitration under this Agreement and may seek and obtain relief from a court.

**REQUIRED NOTICE OF ALL CLAIMS:** AFC and Employee agree that the party seeking arbitration must give written notice of any claim to the other party within the applicable statute of limitations. Written notice to AFC or its affiliates, officers, directors, shareholders, employees, agents, benefit program or fiduciaries, will be sent to America's Favorite Chicken Company, c/o Prentice-Hall Corporation, 400 N. St. Paul Street, Dallas, Texas 75201 (or such other person or address as AFC may specify). If AFC wishes to invoke arbitration, it will give written notice to Employee at the last address recorded in Employee's personnel file. This notice shall be sent to the other party by certified or registered mail, return receipt requested.

**REPRESENTATION:** Any party may be represented during pre-hearing procedures (as defined below) or at the arbitration hearing by an attorney or other representative selected by the party. If Employee does not participate in the arbitration hearing with an attorney, AFC will also participate in such hearing without an attorney.

**NONBINDING DISPUTE RESOLUTION:** AFC and Employee agree that the arbitration procedure described in this Agreement shall not be invoked unless the party seeking arbitration has first utilized the other steps available under the Employee Handbook.

**ARBITRATION PROCEDURES:** AFC and Employee agree that any arbitration will be conducted by one arbitrator under the American Arbitration Association's Employment Dispute Resolution Rules for arbitrations before an arbitrator from the American Arbitration Association. The arbitrator will apply the substantive law (and the laws of remedies, if applicable), in the state in which the claim arose, or federal law, or both, depending upon the claims asserted. The arbitrator shall also apply the Federal Rules of Evidence. If the claim or dispute heard by the arbitrator is based on a statute, then the arbitrator will provide brief findings of fact and conclusions of law. In all other cases, the arbitrator will issue a decision which sets forth only the arbitrator's ultimate determination. All decisions rendered by an arbitrator under this agreement will be kept confidential.

The arbitrator will have jurisdiction to hear and rule on prehearing disputes and is authorized to hold prehearing conferences by telephone or in person as the arbitrator deems necessary. The arbitrator will have the authority to hear a motion to dismiss and/or a motion for summary judgment by any party and in doing so must apply the standards governing such motions under the Federal Rules of Civil Procedure. The arbitrator shall dismiss any claim for arbitration where the person or party seeking arbitration has not first utilized the internal claim procedures set out in the Employee Handbook.

**PRE-HEARING PROCEDURES:** Each party will have the right to take the deposition of one individual and any expert witness designated by another party. The subpoena rights specified below will be applicable to discovery pursuant to this paragraph. Additional discovery may be had only where the arbitrator selected under this Agreement so orders, upon a showing of substantial need. At least 30 days before the arbitration, the parties must exchange lists of witnesses, including any experts, and copies of all exhibits intended to be used at the arbitration.

**SUBPOENAS:** Each party will have the right to subpoena witnesses to the arbitration hearing in accordance with the Federal Arbitration Act, Title 9 of the United States Code.

**ARBITRATION FEES AND COSTS:** AFC and Employee acknowledge that there are two types of administrative fees and costs associated with an arbitration under this Agreement: a filing fee with the American Arbitration Association and payment to the arbitrator for his or her services. The parties agree that such fees and other expenses will be allocated as follows:

(1)    filing fees required by the American Arbitration Association will be paid 80% by AFC and 20% by Employee;

(2)    the fees and costs of the arbitrator shall be shared equally by AFC and Employee; provided, however, that Employee will not be required to pay more than $350 of such fees and costs. Each party will deposit funds or post other appropriate security for its share of the arbitrator's

© 1996 America's Favorite Chicken Company

AFC Form #70042(Aug 96)H

NEW EMPLOYEES

fees, in an amount and manner determined by the arbitrator, ten days before the first day of the arbitration hearing.  Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of the proceedings.

**ATTORNEY'S FEES AND FORUM:** AFC and Employee further agree as follows:

(1)  each party shall be responsible for their own attorney's fees, if any; however, if any party prevails on a statutory claim which allows the winning party to be awarded attorney's fees, or if there is a written agreement providing for fees, the arbitrator shall award reasonable fees to the prevailing party.  The arbitrator shall determine the prevailing party in accordance with the meaning of "prevailing party" under the Civil Rights Attorney's Fees Awards Act of 1976;

(2)  the arbitrator will assess attorney's fees against a party upon a showing that such party's claim, defense or position is frivolous, or unreasonable, or factually groundless;

(3)  if either party pursues a claim covered by this Agreement by any means other than those set forth in this Agreement and the Employee Handbook, the responding party shall be entitled to dismissal of such action, and the recovery of all costs and attorney's fees and losses related to such action; and

(4)  all suits challenging the validity or enforceability of this Agreement, and all suits seeking to compel arbitration under this Agreement, shall be brought in the United States District Court for the Northern District of Texas, Dallas Division.

**INTERSTATE COMMERCE:** Employee understands and agrees that AFC, a Minnesota corporation headquartered in Atlanta, Georgia, is involved in transactions involving interstate commerce (e.g., purchasing goods and services from outside Texas which are shipped to Texas; operating offices and restaurants in multiple states; and serving customers traveling interstate) and that Employee's employment involves such commerce.  The Federal Arbitration Act, Title 9 of the United States Code, will govern the interpretation, enforcement, and all judicial proceedings under and/or with respect to this Agreement.

**REQUIREMENTS FOR MODIFICATION OR REVOCATION:** This Agreement to arbitrate will survive the termination of Employee's employment.  It can only be revoked or modified by mutual consent evidenced by a writing signed by both parties which specifically states an intent to revoke or modify this Agreement.  However, AFC retains the right to unilaterally modify, change, or delete any of the provisions of the Employee Handbook, except for those provisions addressing binding arbitration.

**SOLE AND ENTIRE AGREEMENT:** This Agreement is the complete agreement of the parties on the subject of arbitration of disputes.  This Agreement takes the place of any other verbal or written understanding on this subject.  No party is relying on any statements, oral or written, on the subject of arbitration or the effect, enforceability or meaning of this Agreement, except as specifically stated in this Agreement.  If any provision of this Agreement is determined to be void or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of the Agreement.  Both AFC and Employee agree that this Agreement binds and benefits their successors, assigns, beneficiaries, and heirs.

**NOT AN EMPLOYMENT AGREEMENT:** This Agreement is not and shall not be construed to create any contract of employment, expressed or implied.  Nor does this Agreement in any way alter the at-will status of the Employee's employment with AFC.

**VOLUNTARY AGREEMENT:** EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, THAT EMPLOYEE UNDERSTANDS ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN AFC AND EMPLOYEE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT EMPLOYEE HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY OTHER PROMISES OR REPRESENTATION BY AFC OTHER THAN THOSE IN THE AGREEMENT ITSELF

You cannot begin work until this agreement is signed and returned.  Have your parent or guardian also sign if you are unmarried and under age 18.

X _____
Employee's Signature

X _____
Signature of Parent or Guardian if Employee
Unmarried and Under Age 18

_____
Print Parent or Guardian's Name and
Relationship to Employee

*America Patricia Cantu*   9-30-98
Print Employee Name                     Date

**YOU MUST COMPLETE THE FOLLOWING:**

District # 1140

Area # 1142

Restaurant # 1536

New Hire's
Social Security
# 632 58 8324

*240 F.3d 1074; 2000 U.S. App. LEXIS 33039,* *

**Strawn** v. AFC Enterprises Inc

99-41384

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

240 F.3d 1074; 2000 U.S. App. LEXIS 33039

November 29, 2000, Decided

**NOTICE: [*1]** DECISION WITHOUT PUBLISHED OPINION

**PRIOR HISTORY:** United States District Court for the Southern District of Texas. G-99-CV-241.

**OPINION:** Vacated

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2001 LEXIS-NEXIS Group.  All rights reserved.

CVISPDF – www.fastio.com

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
FILED

No. 99-41384

NOV 2 9 2000

CHARLES R. FULBRUGE III
CLERK

BARBARA STRAWN,

Plaintiff-Appellee,

versus

AFC ENTERPRISES INC.,
doing business as Churchs Chicken,

Defendant-Appellant.

- - - - - - - - - -

Appeal from the United States District Court
for the Southern District of Texas
G-99-CV-241

- - - - - - - - - -

Before REAVLEY, BENAVIDES and DENNIS, Circuit Judges.

PER CURIAM:*

The instant appeal is from the denial of a motion to compel
arbitration. Concluding that the district court erred in reaching
the issue of arbitrability, we vacate the district court's order
and remand with instructions to refer the case to arbitration and
stay the proceedings pending arbitration.

I.   FACTUAL AND PROCEDURAL HISTORY

This diversity case arose when plaintiff Barbara Strawn was
injured in a slip and fall accident within the course and scope of

---

*   Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

her employment at defendant AFC's Churchs Chicken Restaurant (AFC) in Alvin, Texas. AFC is a non-subscriber to the Texas Workers' Compensation Act (TWCA). Instead, AFC provides its employees defined injury benefits on a no-fault basis in exchange for their agreement to arbitrate any work-related dispute. Signing that agreement was a "condition precedent" for Strawn's employment with AFC, which began in 1997. The agreement does not waive or limit the causes of action, remedies, or damages that may be pursued in the arbitration proceeding. Additionally, AFC, as an employer that does not subscribe to the TWCA, cannot assert the defenses of contributory negligence, assumption of risk, or negligence of a fellow employee when an employee attempts to recover damages for personal injuries or death.[1] *See Cupit v. Walts,* 90 F.3d 107, 109 (5th Cir. 1996) (citing § 406.033 of the TWCA).

Some sixteen months after Strawn commenced working for AFC, she was injured at work and then began to receive benefit payments from the AFC plan. When her AFC benefits were nearing exhaustion, Strawn brought a negligence suit against AFC in Texas state court.[2] AFC removed to federal court based on diversity jurisdiction.

AFC moved to stay, or to dismiss, and compel arbitration. The district court denied the motion, stating that "where employers

---

[1] The TWCA discourages employers from choosing non-subscriber status by abolishing all the traditional common law defenses.

[2] As of August 1999, the AFC plan had paid Strawn $22,459 in wage-replacement benefits and $24,246.78 in medical benefits.

2

offer minimal benefits and unilaterally impose an arbitral forum on their injured employees, such a forum is sufficiently dissimilar to a judicial forum as to undermine Texas public policy with respect to the workers' compensation system." *Strawn v. AFC Enterprises,* 70 F. Supp. 2d 717, 725-26 (S.D. Tex. 1999). Thus, the district court concluded that AFC's plan was void as against Texas public policy.

AFC filed an interlocutory appeal from the district court's denial of its motion to compel and moved to stay proceedings pending appeal. The district court granted the motion to stay. AFC now argues that the district court's order denying its motion to compel arbitration should be reversed and remanded with instructions to send all Strawn's claims to binding arbitration and stay all proceedings pending arbitration.

II.  ANALYSIS

AFC contends that the district court erred when it adjudicated Strawn's state-law public policy attack on AFC's arbitration agreement and benefit plan. Instead, AFC argues, the district court should have referred the claim to arbitration in the first instance. This Court reviews the denial of a motion to compel arbitration *de novo. Snap-On Tools Corp. v. Mason,* 18 F.3d 1261 (5th Cir. 1994).

The Supreme Court has made clear that the Federal Arbitration Act "establishes that, as a matter of federal law, any doubts

3

concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction*, 460 U.S. 1, 25-26, 103 S.Ct. 927, 941 (1983).   When determining a motion to compel arbitration under the Federal Arbitration Act, courts usually conduct a two-step inquiry. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996).   The first step is to decide whether the parties agreed to arbitrate the dispute at issue. *Id.* at 258. This decision involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute is within the scope of that arbitration agreement. *Id.* In making this decision, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Id.* (citation and internal quotation marks omitted). "In applying state law, however, `due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration.'" *Id.* Once a court determines that the parties agreed to arbitrate, the second step is "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3355

4

(1985)).

With respect to the first step of the *Webb* analysis, Strawn apparently recognizes that the dispute falls within the arbitration provision as written; however, she contends that the agreement was not valid.

As a threshold issue, AFC, relying on the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* contends that the district court erred by not referring to arbitration the *arbitrability* of Strawn's state-law public policy attack on AFC's arbitration agreement and benefit plan.  388 U.S. 395, 87 S.Ct. 1801 (1967).  In *Prima Paint,* the Supreme Court addressed the question whether arbitration or the federal district court was the proper forum in which to resolve a claim of fraud in the inducement under a contract that included an arbitration provision.  The Court pointed out that 9 U.S.C. § 4 directs a federal court to order arbitration to proceed if satisfied that "the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue."  The Court explained that "if the claim is fraud in the inducement of the arbitration clause itself--an issue which goes to the `making' of the agreement to arbitrate--the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."  *Prima Paint,* 388 U.S. at 403-04, 87 S.Ct. at 1806.  The Supreme

5

Court thus held that a federal district court may consider only issues relating to the making and performance of the agreement to arbitrate. *Id.* The arbitrator was to resolve any other claims.

Restated, the rule enunciated in *Prima Paint* is that if the complaint relates only to the arbitration clause itself, the court should adjudicate the claim. If, however, the complaint relates to the entire agreement, then it must be referred to the arbitrator for decision.

Our opinion in *Lawrence v. Comprehensive Business Serv. Co.,* provides some guidance with respect to this issue. 833 F.2d 1159 (5th Cir. 1987). In *Lawrence*, the plaintiffs argued that the agreement violated the Texas Public Accountancy Act of 1979 and that ordering arbitration pursuant to an arbitration clause in an illegal contract was improper. Applying the rule in *Prima Paint,* we rejected that argument, explaining that previously we had applied *Prima Paint* to enforce an arbitration clause in spite of a claim that the gas sales contract containing it was void from its inception because of the parties' failure to comply with a state statute regulating the sale of the state's gas. 833 F.2d at 1162 (discussing *Mesa Oper. Limited Partnership v. Louisiana Intrastate Gas Corp.,* 797 F.2d 238, 244 (5th Cir. 1986).[3]

---

[3]   In *Bhatia v. Johnston,* 818 F.2d 418, 421 (5th Cir. 1987), this Court held that an investor's claim that a contract was invalid must be referred to arbitration because the investor's complaint alleged misrepresentations with respect to the entire contract, not just the arbitration clause.

6

The plaintiffs in *Lawrence* also argued that enforcing the arbitration provision of an illegal contract would contravene Texas law and is thus improper. We likewise rejected this argument, explaining that the "argument forgets that the arbitrability of an issue under the Federal Arbitration Act is a matter of federal law." *Lawrence,* 833 F.2d at 1162. *See also Perry v. Thomas,* 482 U.S. 482, 492 n.9, 107 S.Ct. 2520, 2527 n.9 (1987) (courts may not "rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot").

In the instant case, Strawn's complaint relates to the entire agreement. Indeed, the district court explicitly understood Strawn "to be arguing that the combination of a unilaterally imposed arbitration agreement with a benefit plan significantly inferior to that available under the Workers' Compensation Act is void as against Texas public policy." *Strawn,* 70 F. Supp. 2d at 722.

Although the district court acknowledged the holding in *Prima Paint,* it concluded that the holding applied only to step one of the previously-cited *Webb* analysis, not step two. The district court believed the rule in *Prima Paint* was not implicated in this case because its own "analysis turn[ed] on the second step of the *Webb* inquiry." *Strawn,* 70 F. Supp. 2d at 727. In Strawn's appellate brief, however, she admits that she challenges the "AFC

arbitration demand under both Step 1 and Step 2 [of the *Webb*] analysis[.]" More importantly, regardless of whether the district court's analysis turns on the second step, we are constrained to apply the Supreme Court's rule in *Prima Paint* when determining the threshold issue of arbitrability.

The district court, in the alternative, stated that if the rule in *Prima Paint* did apply, it construed Strawn to be attacking the arbitration agreement in isolation. We are not persuaded. As previously stated, it is clear that Strawn's complaint related to the entire agreement--both the benefit plan and the arbitration agreement.

Standing alone, neither the benefit plan nor the arbitration clause violate Texas law or public policy. AFC is not required to participate in the statutory workers' compensation plan. *Cupit,* 90 F.3d at 109. Participation is voluntary in that an employer may refrain from becoming a subscriber under the TWCA. *Id.* With respect to the arbitration clause itself, Strawn was not required to limit or waive any cause of action; she simply was required to bring any claims to arbitration rather than to court. As such, the only possible claim Strawn has is that the *entire* agreement, *i.e.,* the combination of the benefit plan and the arbitration agreement, violate Texas public policy.

Under these circumstances, the district court erred in determining the issue of arbitrability. Instead, pursuant to *Prima*

8

CSUPDF - www.fasoo.com

*Paint,* the district court should have referred Strawn's claim to arbitration. Accordingly, the district court's order denying the motion to compel is vacated and remanded with instructions to refer the case to arbitration and stay the proceedings pending arbitration.

VACATED AND REMANDED

Judge Dennis concurs in the judgment only.

9

7TH CASE of Level 1 printed in FULL format.

MARIA BUSTOS, Plaintiff, vs. INTEX AVIATION SERVICES, INC., ROLAND GARCIA,
PHILADELPHIA AMERICAN LIFE INSURANCE COMPANY, and RUSTY MUELLER, Defendants.

3:95-CV-1264-R

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS
DIVISION

1996 U.S. Dist. LEXIS 14475

August 26, 1996, Decided

August 29, 1996, FILED; August 30, 1996, ENTERED

DISPOSITION: [*1] Defendant's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED. Any state law claims that remain pending against defendant Garcia are REMANDED to the 14th Judicial District Court of Dallas County, Texas.

COUNSEL: For MARIA BUSTOS, plaintiff: John Fred Bass, Attorney at Law, Bass & Martin, Dallas, TX USA. Richard D Faulkner, Attorney at Law, Law Office of Richard D Faulkner, Dallas, TX USA.

For INTEX AVIATION SERVICES, INC., defendant: Bennett Wilson Cervin, Attorney at Law, Mia M Martin, Attorney at Law, Thompson & Knight, Dallas, TX USA. For PHILADELPHIA AMERICAN LIFE INSURANCE COMPANY, defendant: Thomas Lee Woodman, Attorney at Law, Winstead Sechrest & Minick, Dallas, TX USA. For RUSTY MUELLER, defendant: Thomas Lee Woodman, Attorney at Law, Craig Harris, Winstead Sechrest & Minick, Dallas, TX USA.

LOUIS J WEBER, ADR Provider, [PRO SE], Preston Commons West, Dallas, TX USA.

JUDGES: JERRY BUCHMEYER, CHIEF JUDGE, UNITED STATES DISTRICT COURT

OPINIONBY: JERRY BUCHMEYER

OPINION: MEMORANDUM OPINION AND ORDER

Now before the Court are the Motion for Summary Judgment filed by Defendant Intex Aviation Services, Inc. ("Intex" or "Defendant") and [*2] the Motion

for Summary Judgment filed by Plaintiff Maria Bustos ("Bustos" or "Plaintiff"). n1 Both motions were filed on March 26, 1996. Plaintiff brings this action to recover for injuries sustained during the course of her employment at Intex. For the reasons discussed below, Intex's motion is GRANTED, and Plaintiff's motion is DENIED.

n1 Also before the Court are the Motion for Partial Summary Judgment filed by Defendant Philadelphia American Life Insurance Company ("PAL"), and the motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment filed by Defendant Rusty Mueller ("Mueller"). Plaintiff has not responded to either of these motions, and, although neither PAL nor Mueller have been formally dismissed from this case, subsequent pleadings indicate that Intex is the sole remaining defendant. The Court therefore does not consider the motions of PAL and Mueller. In any event, today's ruling on in~ motion for summary judgment disposes of all against PAL and Mueller.

[*3]

BACKGROUND FACTS

Intex is in the business of clean~ craft on a contract basis. On or a' Plaintiff began her employme~ craft cleaner at Dallas-Fort V ("DFW"). Several months' Intex established the Vo' Plan (the "Plan") for : under the Texas Wor' The Plan provide~

7TH CASE of Level 1 printed in FULL format.

MARIA BUSTOS, Plaintiff, vs. INTEX AVIATION SERVICES, INC., ROLAND GARCIA,
PHILADELPHIA AMERICAN LIFE INSURANCE COMPANY, and RUSTY MUELLER, Defendants.

3:95-CV-1264-R

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS
DIVISION

1996 U.S. Dist. LEXIS 14475

August 26, 1996, Decided

August 29, 1996, FILED; August 30, 1996, ENTERED

DISPOSITION: [*1] Defendant's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED. Any state law claims that remain pending against defendant Garcia are REMANDED to the 14th Judicial District Court of Dallas County, Texas.

COUNSEL: For MARIA BUSTOS, plaintiff: John Fred Bass, Attorney at Law, Bass & Martin, Dallas, TX USA. Richard D Faulkner, Attorney at Law, Law Office of Richard D Faulkner, Dallas, TX USA.

For INTEX AVIATION SERVICES, INC., defendant: Bennett Wilson Cervin, Attorney at Law, Mia M Martin, Attorney at Law, Thompson & Knight, Dallas, TX USA. For PHILADELPHIA AMERICAN LIFE INSURANCE COMPANY, defendant: Thomas Lee Woodman, Attorney at Law, Winstead Sechrest & Minick, Dallas, TX USA. For RUSTY MUELLER, defendant: Thomas Lee Woodman, Attorney at Law, Craig Harris, Winstead Sechrest & Minick, Dallas, TX USA.

LOUIS J WEBER, ADR Provider, [PRO SE], Preston Commons West, Dallas, TX USA.

JUDGES: JERRY BUCHMEYER, CHIEF JUDGE, UNITED STATES DISTRICT COURT

OPINIONBY: JERRY BUCHMEYER

OPINION: MEMORANDUM OPINION AND ORDER

Now before the Court are the Motion for Summary Judgment filed by Defendant Intex Aviation Services, Inc. ("Intex" or "Defendant") and [*2] the Motion for Summary Judgment filed by Plaintiff Maria Bustos ("Bustos" or "Plaintiff"). n1 Both motions were filed on March 26, 1996. Plaintiff brings this action to recover for injuries sustained during the course of her employment at Intex. For the reasons discussed below, Intex's motion is GRANTED, and Plaintiff's motion is DENIED.

n1 Also before the Court are the Motion for Partial Summary Judgment filed by Defendant Philadelphia American Life Insurance Company ("PAL"), and the motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment filed by Defendant Rusty Mueller ("Mueller"). Plaintiff has not responded to either of these motions, and, although neither PAL nor Mueller have been formally dismissed from this case, subsequent pleadings indicate that Intex is the sole remaining defendant. This Court therefore does not consider the motions of PAL and Mueller. In any event, today's ruling on intex's motion for summary judgment disposes of all claims against PAL and Mueller.

[*3]

BACKGROUND FACTS

Intex is in the business of cleaning commercial aircraft on a contract basis. On or about October 6, 1992, Plaintiff began her employment with Intex as an aircraft cleaner at Dallas-Fort Worth International Airport ("DFW"). Several months before Plaintiff's date of hire, Intex established the Voluntary Occupational Insurance Plan (the "Plan") for its employees, in lieu of coverage under the Texas Workers' Compensation Act ("TWCA"). The Plan provides insurance benefits to employees for

Case 1:01-cv-00109   Document 2   Filed in TXSD on 06/25/2001   Page 90 of 128

work-related accidents, illnesses, or injuries without proof of negligence on the part of Intex and without regard to their own negligence.

While participation in the Plan is voluntary, an employee who elects to participate in the Plan must sign an Enrollment and Waiver Form ("Waiver"). At or around the time she was hired, Plaintiff participated in an orientation during which she received information about the Plan. Plaintiff elected to participate by signing the Enrollment and Waiver Form on October 7, 1992. When Intex amended the Plan in early 1993, Plaintiff again elected to participate by signing the Waiver. The Waiver signed by Plaintiff in 1993 states:

I hereby [*4] elect to participate in the Plan. I understand that by electing to enroll in the plan I WAIVE any right to bring any action against the Company or anyone affiliated with it as a result of any injury or death which I suffer in the course and scope of my employment and that benefits payable to me under the Plan will be my exclusive remedy for such injury.

...

I acknowledge that I have received and had an opportunity to review the Summary Plan Description pertaining to the Plan and that I have executed this enrollment and Waiver Election Form voluntarily. I fully understand both the terms of the Plan and this election.

In addition, the waiver form states that an employee who chooses not to participate in the Plan has the right to bring a lawsuit against Intex for negligence or the violation of any law by Intex, and that Intex would not be able to assert common law defenses in such a negligence action.

Plaintiff alleges that on or about September 24, 1993, she was assaulted by Rolando Garcia, a coworker, while cleaning airplanes in the course and scope of her employment. Plaintiff alleges that the assault followed numerous incidents of harassment by Garcia which Plaintiff [*5] reported to her supervisors. Plaintiff has received at least $ 2,949.35 in medical benefits under the Plan for treatment of injuries allegedly sustained as a result of the attack.

Plaintiff filed this action on May 18, 1995, in the 14th Judicial District Court of Dallas County, Texas. Plaintiff brings causes of action against Intex for negligence gross negligence, violations of the Texas Deceptive Trade Practices Act ("DTPA"), violations of certain provisions of the Texas Insurance Code, breach of the common law duty of good faith and fair dealing, and breach of contract. Plaintiff also alleges that Intex is liable for

Garcia's alleged intentional tort under a theory of ratification and respondeat superior. Intex removed the action to this Court on June 22, 1995, on the ground that several of Plaintiff's claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., and thus give rise to federal question jurisdiction.

Intex now urges this Court to grant summary judgment on all claims, based in part on ERISA preemption and in part on the Waiver signed by Plaintiff as well Plaintiff's ratification of the Waiver. Plaintiff moves [*6] for partial summary judgment on the issues of ERISA preemption and the validity of the Waiver.

ANALYSIS

A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure allows summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). All reasonable doubts and inferences must be decided in light most favorable to the party opposing the motion, *Thornbrough v. Columbus and Greenville R.R. Co., 760 F.2d 633, 640 (5th Cir. 1985)*, and as long as there appears to be some evidentiary support for the disputed allegations, the motion must be denied. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Coke v. General Adjustment Bureau, 640 F.2d 584, 595 (5th Cir. 1981 (en banc))*.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, [*7] 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Where the nonmovant bears the burden of proof on a claim upon which summary judgment is sought, the movant may discharge its summary judgment burden by showing that there is an absence of evidence to support the nonmovant's case. *Id. at 325*. Once the movant satisfies this burden, the nonmovant may then oppose the motion by going beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories, and admissions on file designate specific facts showing a genuine issue for trial. *Id. at 324*. Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id. at 322*.

CSMPDF.com • www.texas.com

## B. ERISA Preemption

Defendant argues that Plaintiff's claims for violations of the DTPA and Articles 21.21, 21.20, 21.21-2 and 21.55 of the Texas Insurance Code, and for breach of contract and breach of the duty of good faith and fair dealing (collectively, "insurance claims") are preempted by ERISA. Plaintiff responds by arguing that the existence of an ERISA plan [*8] does not deprive employees of their right to bring negligence claims against their employer. Because Defendant has not argued that Plaintiff's negligence claims are preempted by ERISA, and because the Court agrees with Plaintiff that Fifth Circuit law clearly holds that such claims are not preempted, see *Hook v. Morrison Milling Co., 38 F.3d 776 (5th Cir. 1994)*, the Court does not consider this argument of Plaintiff.

Plaintiff states that her motion for summary judgment raises three issues of law: (1) whether an employee's state law claims are preempted by ERISA where an employer has opted out of the state's workers' compensation scheme; (2) whether Plaintiff's assault and common law claims relate to the ERISA plan; and (3) whether public policy permits an employer to use ERISA to "evade" workers' compensation laws. Excluding Plaintiff's claims for assault and negligence, which Defendant has never asserted are preempted by ERISA, Plaintiff's first two issues overlap with those raised by Defendant's motion and are discussed jointly in this section. The scope of Plaintiff's third issue is unclear. To the extent that Plaintiff is arguing that public policy prohibits opting out [*9] of the state's workers' compensation scheme, her argument conflicts with the express provisions of the TWCA. See TEX. LAB. CODE ANN. § 406.002 (West 1995). To the extent that Plaintiff is arguing that any preemption of state law claims by ERISA is against public policy, this argument conflicts with the express language of ERISA as well as judicial interpretations of ERISA, as discussed herein. See *29 U.S.C. § 1144*(a); *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987)* ("The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."). The bulk of Plaintiff's briefing on this issue, however, focuses on the validity of the Waiver in light of certain provisions of the TWCA. These arguments are addressed in the discussion of waiver below.

Section 514(a) of ERISA, *29 U.S.C. § 1144*(a), expressly provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described [*10] in section 1003(a) of this title and not exempt under section 1003(b) of this title." The Supreme Court has established that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to the plan." *Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983)*. More recently, the Court has stated that its interpretation of "relates to" "gives effect to the 'deliberately expansive' language chosen by Congress." *District of Columbia v. Greater Washington Bd. of Trade, 506 U.S. 125, 129, 121 L. Ed. 2d 513, 113 S. Ct. 580 (1992)* (quoting *Pilot Life, 481 U.S. at 46*). The Fifth Circuit has developed a two-prong test for preemption. A state law claim is preempted by ERISA if: "(1) the claim addresses areas of exclusive federal concern, such as the Might to receive benefits under the terms of an ERISA plan, and (2) the claim directly affects the relationship among the traditional ERISA entities (i.e., plan administrators/fiduciaries and plan participants/beneficiaries)." *Hook, 38 F.3d at 781*.

The Plan established by Intex was an "employee benefit plan" within the meaning of ERISA. [*11] ERISA defines an "employee benefit plan" to include an "employee welfare benefit plan," *29 U.S.C. § 1002*(3), which in turn is defined as:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

*29 U.S.C. § 1002*(1). Intex established and maintained the Plan for the purpose of providing to its participants medical benefits and wage replacement benefits for work-related injuries. Intex paid wage replacement benefits directly to eligible employees, and purchased an insurance policy from Philadelphia American Life Insurance Company ("PAL") to provide medical benefits under the Plan that was in effect in 1993. New employees received information on the Plan before beginning work. The Director of Personnel at Intex acts as the Plan administrator [*12] and maintains the benefit records of all employees. Plaintiff does not appear to dispute that the Plan is governed by ERISA.

Plaintiff's insurance claims all relate to the refusal of PAL and/or Intex to authorize certain medical treatment allegedly required as a result of the incident on

September 24, 1993. Inasmuch as these claims allege improper administration of Intex's employee benefit plan, including both denial and misrepresentation of benefits, they meet both prongs of the test for preemption by ERISA. See, e.g., *Hogan v. Kraft Foods, 969 F.2d 142, 144-45 (5th Cir. 1992)* (state law claims for breach of contract, breach of duty of good faith and fair dealing, violations of Article 21.21 of the Texas Insurance Code, and violations of the DTPA based on refusal of insurance company to pay benefits are all preempted by ERISA); *Boren v. N.L. Indus., Inc., 889 F.2d 1463, 1465-66 (5th Cir. 1989),* cert. denied, *497 U.S. 1029, 111 L. Ed. 2d 792, 110 S. Ct. 3283 (1990)* (claims for breach of contract, negligent termination of benefits, and violations of the DTPA and Texas Insurance Code all preempted by ERISA); *Hermann Hospital v. MEBA Medical & Benefits Plan, 845 F.2d 1286, 1290 [\*13] (5th Cir. 1988)* (claims for breach of fiduciary duty, negligence, equitable estoppel, breach of contract, and fraud brought by beneficiary alleging failure to pay benefits preempted by ERISA).

The summary judgment evidence demonstrates both that the Plan is an employee benefit plan as defined by ERISA and that Plaintiffs claims for violations of the DTPA and Texas Insurance Code, breach of the duty of good faith and fair dealing, and breach of contract "relate to" the Plan. Accordingly, summary judgment is granted with respect to these claims as they are preempted by ERISA.

## C. Waiver

Defendant argues that Plaintiff's negligence claims against Intex are barred because: (1) Plaintiff agreed to waive such claims when she enrolled in the Plan and signed the Waiver; and (2) Plaintiff ratified the Waiver by accepting Plan benefits and has neither returned nor offered to return such benefits. As Defendant notes in its response to Plaintiff's motion for summary judgment, these arguments apply equally to Plaintiff's assault claim against Intex, since the Waiver applies to "any action" against Intex. Plaintiff argues in response and in her motion for summary judgment [\*14] that the Waiver violates the TWCA, TEX. LAB. CODE ANN. §§ 406.035, 408.021 (West 1995), n2 that it is void as against public policy, that she did not understand the terms of the Waiver because of her limited English proficiency, and that the Waiver was not voluntarily executed.

n2 Plaintiff cites to TEX. REV. CIV. STAT. ANN. art. 8308--3.09, which has been recodified at TEX. LAB. CODE ANN. § 406.035. The recodification

of the Texas Workers' Compensation Act became effective September 1, 1993, before the incident made the basis of this suit. This Court therefore cites to the statute as recently recodified.

The validity and effect of the Waiver are issues to be resolved under state law. See *Texas Health Enterprises, Inc. v. Reece, 44 F.3d 243, 244 (5th Cir. 1994); Hook, 38 F.3d at 779 n. 4.* Under Texas law, Intex's waiver defense contains three elements: (1) the existence of a right held by the waiving party; (2) knowledge, actual or constructive, by that party of its existence; and (3) an actual intent [\*15] by that party to relinquish the right, which can be inferred from conduct. *Vessels v. Anschutz Corp., 823 S.W.2d 762, 765 (Tex. App.--Texarkana 1992, writ denied); Federal Deposit Ins. Corp. v. Attayi, 745 S.W.2d 939, 946 (Tex. App.--Houston [1st Dist.] 1988, no writ).* Intex has established each of these elements by competent summary judgment evidence -- Plaintiff had the right to bring common law causes of action against Intex for work-related injuries, Plaintiff received notice of this right in the Waiver, and Plaintiff signed the Waiver, thereby demonstrating intent to waive that right. See *Brito v. Intex Aviation Services, Inc., 879 F. Supp. 650 653-54 (N.D. Tex. 1995)* (upholding similar waiver). Plaintiff neither raises a genuine issue of fact with respect to any of these elements nor demonstrates that Defendant is not entitled to judgment as a matter of law.

Plaintiff's contention that the Waiver violates certain provisions of the TWCA is without melt. This Court has squarely rejected the argument that Texas Labor Code section 406.035 prohibits a nonsubscriber under the TWCA from conditioning enrollment in a no-fault insurance plan for work-related injuries upon [\*16] waiver of the right to bring legal action against the company for such injuries. *Brito, 879 F. Supp. at 654.* Section 406.035 renders void an agreement by an employee to waive her right to compensation under the TWCA, which is not a right held by an employee of a nonsubscriber. Similarly, Texas Labor Code section 408.021 prohibits the limitation of an insurance carrier's liability for "medical benefits" by agreement or settlement. "Medical benefit" is defined under the TWCA as "payment for health care reasonably required by the nature of a compensable injury," TEX. LAB. CODE ANN. § 401.011(31). "Compensable injury" is in turn defined as "an injury that arises out of and in the course and scope of employment for which compensation is payable under this subtitle," TEX. LAB. CODE ANN. § 401.011(10). The Waiver signed by Plaintiff did not limit medical benefits within the meaning of the TWCA because any benefits payable under Defendant's Plan do not constitute com-

Case 1:01-cv-00109  Document 2  Filed in TXSD on 06/25/2001  Page 93 of 128

pensation under the statutory scheme.

Plaintiff's public policy argument likewise falters. Plaintiff cites *Southwestern Bell Tel. Co. v. Gravitt, 551 S.W.2d 421* (Tex. Civ. App.--San Antonio 1976, writ ref'd n.r.e.), [*17] n3 for the proposition that a benefit plan conditioned upon waiver of tort liability is void as against public policy. Plaintiff's reliance on Gravitt ignores the distinction between a voluntary occupational insurance plan and a pension, disability, and death benefit plan that constitutes part of the contract of employment. The court in Gravitt held that provisions of the employer's pension, death and disability plan providing that benefits were not payable if the employee or his estate filed any other claim against the employer because of the employee's death or disability were unenforceable as against public policy. The court expressly recognized that the plan at issue was "a mode of employee compensation." *Gravitt, 551 S.W.2d at 422-23* (citing *Lee v. Lee, 112 Tex. 392, 247 S.W. 828 (1923)*, in which the court recognized that a death benefit is an essential part of the contract of employment, and constitutes consideration for a certain number of years of service). The court further stated that "given the present judicial attitude toward pension plans and the nature of the rights and obligations created by such plans, it cannot be argued that such plans are not a part [*18] of the contract of employment." *Gravitt, 551 S.W.2d at 426*. Plaintiff's reliance on Gravitt is inapposite because the Intex Plan was not part of the contract of employment, but was offered to employees as an optional no-fault insurance plan in which they could enroll in consideration for waiving their right to sue. See *Brito, 879 F. Supp. at 654* (finding that waiver in similar Intex plan was not part of any agreement controlling plaintiff's employment).

n3 Plaintiff actually cites to "*Southwestern Bell Telephone Co. vs. Braddock, 551 S.W.2d 421.*" No such case exists, and it is clear from Plaintiff's discussion that she intends to cite Gravitt.

Plaintiff also cites *Hook, supra,* for the proposition that "the use by either the employer or by the ERISA Plan of any waiver purporting to deprive employees of their common law and statutory rights to bring negligence claims against their employer is invalid." Hook stands for no such proposition. In determining that a claim for negligence does [*19] not relate to and hence is not preempted by ERISA, the court in Hook did not consider the issue of whether the waiver signed by the Plaintiff was void under *Texas law. 38 F.3d at 779 n.4*.

This Court has specifically upheld the validity of a waiver of right to sue as a condition of enrollment in a voluntary insurance plan for work-related injuries. *Brito, 879 F. Supp. at 653-54*; see also *Collier v. Allstate Insurance Co., 395 F.2d 719, 720 (5th Cir. 1968)* (holding that voluntary workers' compensation plan containing waiver provision prohibited plaintiff from pursuing hot federal court action for benefits under the plan and state court action for common law damages); *Tigrett v. Heritage Bldg. Co., 533 S.W.2d 65* (Tex. Civ. App.--Texarkana 1976, writ ref'd n.r.e.) (upholding implied-in-fact contract under which employee waived rights to additional recovery by agreeing to accept benefits measured by provisions of workers' compensation laws). This is consistent with Texas law which holds that "voluntary workmen's compensation is purely a matter of contract and the rights and obligations of the parties are measured by the contract," *United States Fidelity & Guaranty [*20] Co. Valdez, 390 S.W.2d 485, 489* (Tex. Civ. App.--1965, writ ref'd n.r.e.); *Employers Mut. Casualty Co. v. Poorman, 428 S.W.2d 698, 700* (Tex. Civ. App.--San Antonio 1968, writ ref'd n.r.e.), and with the purpose of the TWCA to protect and benefit the employee. See *Brito, 879 F. Supp. at 654 n.4*. Plaintiff argues that "if uninsured employers could successfully pressure . . . their employees into signing waivers of their common law rights to sue for negligence, then they would enjoy greater rights than employers that chose to comply with the Act and provide insurance." Plaintiff ignores the fact that Intex, through its voluntary plan, does offer no-fault insurance coverage to employees in consideration of the waiver of right to sue, in much the same way that employers who subscribe to the TWCA provide no-fault coverage as an exclusive remedy to employees. TEX. LAB. CODE ANN. §§ 406.031(a), 408.001(a).

Plaintiff next attempts to invalidate the Waiver by claiming that she did not understand its terms because of her limited command of English. This argument fails as a matter of law. Lack of understanding, even when genuine, is not sufficient under Texas law to avoid the consequences [*21] of a contract. "A party who signs a contract is charged with notice of its contents as a matter of law." *Estate of Degley v. Vega, 797 S.W.2d 299, 304* (Tex. App.--Corpus Christi 1990, no writ).

Finally, Plaintiff contends that she executed the Waiver under duress. Plaintiff states in her affidavit that she was required to sign the second waiver in order to receive her paycheck for hours already worked, and that she was told she would be fired if she did not. However, even assuming that Plaintiff has presented competent summary judgment evidence sufficient to create a genuine issue of material fact on the issue of duress, the existence of duress would render the Waiver voidable, not void, *Country Cupboard, Inc. v. Texstar Corp., 570 S.W.2d 70, 74* (Tex. Civ. App.--Dallas 1978, writ ref'd n.r.e.),

Case 1:01-cv-00109   Document 2   Filed in TXSD on 06/25/2001   Page 94 of 128

and therefore subject to ratification. See, e.g., *Wamsley v. Champlin Refining and Chemicals, Inc., 11 F.3d 534, 538 (5th Cir. 1993); First Texas Savings Association of Dallas v. Dicker Center, Inc., 631 S.W.2d 179, 186* (Tex. App.--Tyler 1982, no writ).

The uncontroverted summary judgment evidence shows that Plaintiff has ratified the Waiver by accepting and retaining nearly [*22] $ 3,000 in Plan benefits. Under Texas law, a party can become bound by the provisions of a contract, even a voidable contract, if that party subsequently accepts benefits under the contract. See, e.g., *Grillet v. Sears, Roebuck & Co., 927 F.2d 217, 220 (5th Cir. 1991)* ("A party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligations imposed by the contract."); *Wamsley, 11 F.3d at 540* ("When Appellants chose to retain and not tender back to Champlin the benefits paid them in consideration for their promise not to sue Champlin, they manifested their intention to be bound by the waivers and thus, made a new promise to abide by their terms."). Accordingly, this Court finds that the Waiver signed by Plaintiff is enforceable and bars Plaintiff is common law claims against Intex.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED. Any state law claims that remain pending against defendant Garcia are REMANDED to the 14th Judicial District Court of Dallas County, Texas.

SIGNED THIS 26 DAY OF August [*23] , 1996

JERRY BUCHMEYER, CHIEF JUDGE

UNITED STATES DISTRICT COURT

ORDER

For the reasons stated in this Court's Memorandum Opinion and Order, Defendant's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED. Any state law claims that remain pending against defendant Garcia are REMANDED to the 14th Judicial District Court of Dallas County, Texas.

SIGNED THIS 26 DAY OF August, 1996

JERRY BUCHMEYER, CHIEF JUDGE

UNITED STATES DISTRICT COURT

CIMPDF - www.texis.com



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV - 9 1995

NANCY DOHERTY, CLERK
BY _____
Deputy

MARIA D. DURAN,
*Plaintiff,*

§
§
§
§

vs.

§
§
§

CA 3:95-CV-0403-R

INTEX AVIATION SERVICES, INC.,
*Defendant.*

§
§
§
§

ENTERED ON DOCKET
NOV 0 9 1995 PURSUANT
TO F. R. C. P. RULES
58 AND 79a

## MEMORANDUM OPINION AND ORDER

Now before this Court is the Motion for Summary Judgment filed by the Defendant Intex

Aviation Services, Inc., ("Intex" or "Defendant"). Plaintiff Maria D. Duran ("Duran" or

"Plaintiff") asserts claims of negligence and gross negligence against Defendant for injuries

sustained during the course her employment. For the reasons stated below, Defendant's Motion

is GRANTED.

## BACKGROUND FACTS

Defendant is in the business of cleaning commercial aircraft on a contract basis, and has

employed Plaintiff since on or about October 6, 1992. Prior to that date, Intex had established a

Voluntary Occupational Insurance Plan (the "Plan") for its employees, in lieu of providing

coverage under the Texas Workers' Compensation Act. The Plan provides no fault insurance

benefits for illnesses and injuries incurred while on the job, and satisfies the terms required by the

MEMORANDUM OPINION AND ORDER – Page 1

Employee Retirement Income Security Act ("ERISA"). If an employee elects to participate in the Plan, he or she is required to sign an Enrollment Form coupled with a Waiver. By signing the Waiver, the employee agrees to forego any other legal action or form of recovery for occupational injuries and accept payment under the Plan as an exclusive remedy. Enrollment in the Plan is on a voluntary basis only.

Shortly after Plaintiff became employed with Defendant, she elected to participate in the program by signing the Enrollment and Waiver Forms. While Plaintiff allegedly cannot read, speak or understand the English language, the Plan was explained to her in Spanish and she chose to sign the forms. When the Plan was amended in February 1993, she again signed both forms.

On March 1, 1993, Plaintiff alleges that, in the scope of her employment, she was riding in the back of Defendant's truck being driven by an employee of Defendant. The back of the truck was stocked with cases of food and beverages and, allegedly due to reckless driving by Defendant's employee, cases of beverages fell on top of her, causing serious bodily injuries. As a result of this accident, Plaintiff filed a claim under the Plan and received approximately $10,961 in medical payments and $3,458 in lost wage benefits.

Apparently not satisfied with the payments, Plaintiff commenced this action against Defendant to recover damages arising from the same injury. Defendant has now moved for summary judgment, arguing that Plaintiff's claim must fail because she waived her right to sue, and furthermore that she has ratified the release by accepting payments and is therefore estopped from asserting any claims.

MEMORANDUM OPINION AND ORDER – Page 2

# ANALYSIS

## A. Summary Judgment Standard

Summary judgment is appropriate only when no issues of material fact exist and the movant is entitled to judgment as a matter of law.[1] A court must draw all reasonable inferences of fact in favor of the party opposing the motion.[2] As long as there appears to be some evidentiary support for the disputed allegations, the motion must be denied.[3] The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.[4] However, once the movant satisfies this burden, federal law allows summary judgment to be granted against " a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that will bear the burden of proof at trial."[5]

## B. Waiver of Negligence Claim

Plaintiff does not contest the fact that she enrolled in the Plan and signed the voluntary

---

[1] *Walker v. Sears Roebuck,* 853 F.2d 355, 358-59 ( 5th Cir. 1988).

[2] *Id.* At 358; *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986).

[3] *Anderson v. Liberty Lobby, Inc.,*477 U.S. 242 (1986); *Coke v. General Adjustments Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir. 1981)(en banc).

[4] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

[5] *Id.* At 322.

MEMORANDUM OPINION AND ORDER – Page 3

Waiver form, thus agreeing to waive any form of legal action or source of recovery in case of an injury sustained at work.  Plaintiff also does not challenge the validity of the Plan under Texas law; similar benefit plans have been upheld as enforceable by Texas courts.[6]  In fact, a recent decision in this District held that the identical Plan initiated by the same Defendant was valid under Texas law.[7]  The Brito case held as a matter of law that an employee could waive such rights to sue by freely electing to enroll in the benefits plan, without contravening the purposes behind the Texas Worker's Compensation Act.[8]  Therefore, because Plaintiff admits to signing a Waiver form which is legally enforceable, she appears to be barred from asserting any claims of negligence for which the Plan provides coverage.

Plaintiff attempts to invalidate the force and effect of the Waiver in two respects.  First, Plaintiff emphasizes that she is unable to read, speak, or understand English.  As a result, she argues, she had no knowledge of what she was signing and therefore did not truly consent to waive her legal claims.  While for purposes of this motion the Court will assume that Plaintiff did not understand what she was signing, that fact does not allow her to avoid the ensuing consequences.  Texas courts have consistently held that one is charged with knowing and understanding the contents of what one signs.[9]  In Brito, the Plaintiff made a similar claim that he

_____

[6] See, e.g., Collier v. Allstate Ins. Co., 395 F.2d 719, 720 (5th Cir. 1968); Tigrett v. Heritage Bldg. Co., 533 S.W. 2d 65 (Tex. Civ. App.--Texarkana 1976, writ ref'd n.r.e.).

[7] Brito v. Intex Aviation Services, Inc., 879 F.Supp. 650 (N.D. Tex 1995)(J. McBryde).

[8] Id. at 654 n.4.

[9] See, e.g., Estate of Degley v. Vega, 797 S.W.2d 299, 304 (Tex. App--Corpus Christi 1990, no writ)("a party who signs a contract is charged with knowledge of its contents as a matter of law."); Nguyen Ngoc Giao v. Smith & Lamm P.C., 714 S.W.2d 144, 146-47 (Tex. 1986).

MEMORANDUM OPINION AND ORDER -- Page 4

did not understand the nature of the Waiver and its implications when he signed it.[10] The Court held that this did not relieve Brito of his obligations under the Waiver, and despite his claim of confusion, he was bound by the conditions of a document signed voluntarily.[11] In addition, Plaintiff had the forms explained to her and signed the Waiver a second time nearly a year later. Therefore, because under Texas law Plaintiff is charged with knowing and understanding the contents of the forms she signed, her position that she did not freely consent to its terms must fail.

Plaintiff further tries to challenge the validity of the Waiver by arguing that she was threatened into signing the form because she was told that she would lose her job if she refused. Thus, Plaintiff asserts, she was coerced into signing the Waiver under a theory of economic duress, which would invalidate the voluntary consent necessary for a binding contract. In order to establish duress, Plaintiff must show: 1) a threat to do some act that the threatening party has no legal right to do; 2) some illegal exaction, fraud, or deception; and 3) "the restraint must be so imminent as to destroy a party's free agency without present means of protection."[12]

Plaintiff bears the burden of proving the existence of duress, and has failed to substantiate this claim with sufficient evidence. The evidence presented by Plaintiff consists of three affidavits, including her own, submitted by former Intex employees. Each employee states that she was told by a manager not to return to work the next day if she refused to sign the Forms.[13] However, the manager is not identified, and there are no corresponding affidavits from Intex Management

---

[10] *Brito* at 654.

[11] *Id.*

[12] *Rosas v. U.S. Small Business Admin.*, 964 F.2d 351, 357 (5th Cir. 1992).

[13] See Duran Affidavit at p. 2; Mejia Affidavit at p. 1; and Munoz Affidavit at p. 1.

MEMORANDUM OPINION AND ORDER – Page 5

confirming that this was a condition of employment or that anyone personally told the employees not to return to work if the Waiver was not signed. Without more, the statements made by the manager and contained in the affidavits are hearsay, and would clearly be inadmissable at trial.[14] Plaintiff has not presented any admissible evidence from which a jury could reasonably conclude the existence of duress. In addition, Plaintiff was hired as an at-will employee, and Intex had latitude to impose certain conditions upon her employment had it chosen to do so. However, Plaintiff has simply failed to convince this court that the signing of the Waiver was anything but voluntary.

### B. Plaintiff's Claim Barred Through Ratification

Although this Court finds that Plaintiff's claims are barred by the Waiver as a matter of law, the Court further concludes that Plaintiff lost any rights to legal action she may have asserted by ratifying her enrollment in the Plan. Plaintiff accepted payments under the Plan totaling over $14,000, and never made any attempt to return the money or disclaim her right to payment. Under Texas law, a party can become bound by the obligations of a contract, even if the agreement was potentially voidable, if by subsequent action such party accepts benefits under the same contract.[15] Now, two years later, Plaintiff brings this claim for negligence and argues that the Plan is invalid, even though she received and retained compensation under the very same Plan. While the Court sympathizes with Plaintiff's financial condition, it suggests that perhaps more appropriate action would be to file an additional claim under the Plan for any unpaid or

---

[14] Fed. R. Evid. 801(c) and 802.

[15] See, e.g., Grillet v. Sears, Roebuck & Co., 927 F.2d 217, 220 (5th Cir. 1991).

MEMORANDUM OPINION AND ORDER – Page 6

outstanding medical expenses.

## CONCLUSION

For the reasons stated above in this Memorandum Opinion, the Motion for Summary

Judgment is **GRANTED**.   It is so **ORDERED**.

SIGNED THIS __8__ DAY OF _____Novemaer_____, 1995.

_____

UNITED STATES DISTRICT COURT
CHIEF JUDGE JERRY BUCHMEYER

MEMORANDUM OPINION AND ORDER -- Page 7

Case 1:01-cv-00109   Document 2   Filed in TXSD on 06/25/2001   Page 102 of 128

98 F.3d 1339 (Table)
(Cite as: 98 F.3d 1339)

Duran

v.

Intex Aviation Services [FN*]

NO. 95-11180

United States Court of Appeals,
Fifth Circuit.

Sept 13, 1996

Appeal From: N.D.Tex., No. 3:95-CV-403-R

AFFIRMED.

FN* Fed.R.App.P. 34(a); 5th Cir.R. 34.2.

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. The Fifth Circuit by rule sets forth criteria for publication, provides for affirmance without opinion in certain circumstances, and directs that if an unpublished opinion is cited, a copy shall be attached to each copy of the brief. Fifth Circuit Rules, Rule 47.5, 28 U.S.C.A.)

END OF DOCUMENT

Copr. © West 1997 No Claim to Orig. U.S. Govt. Works

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
FILED

SEP 13 1996

CHARLES R. FULBRUGE III
CLERK

No. 95-11180
Summary Calendar

MARIA D DURAN

Plaintiff - Appellant

v.

INTEX AVIATION SERVICES, INC

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
3:95-CV-403-R)

Before KING, WIENER and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Maria D. Duran appeals the district court's granting of
summary judgment in favor of her employer, Intex Aviation
Services, Inc. ("Intex"), in her lawsuit alleging negligence
against Intex. We affirm.

I. BACKGROUND

Intex, a South Carolina corporation, is in the business of
cleaning commercial aircraft on a contract basis. On October 6,

_____

[*]     Pursuant to Local Rule 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in Local Rule
47.5.4.

1992, Intex hired Duran, a native of El Salvador with no formal
education. According to Duran, she can neither write nor speak
English. On the day that she was hired, Duran signed an
Enrollment and Waiver Election Form indicating that she wished to
participate in Intex's Voluntary Occupational Insurance Plan (the
"Plan"). The Plan is maintained in accordance with the
requirements of the Employee Retirement Income Security Act
(ERISA). For those Intex employees who elect to participate, the
Plan provides certain benefits for occupational injuries and
illnesses. Intex rejected coverage under the Texas Workers'
Compensation Act ("TWCA"). In February 1993, Intex amended the
Plan. Duran again opted to participate in the Plan, signing
another Enrollment and Waiver Election Form on February 12,
1993.[1]

---

[1]    The Enrollment and Waiver Election Form provides in
pertinent part:

> As a condition to your participation in the Plan,
> you must agree to waive any right to bring an action
> against the Company or anyone affiliated with it under
> the Texas Workers Compensation Act or any other statute,
> case law or administrative ruling, whether for negligence
> or otherwise, to recover damages or other relief from the
> Company and/or its employees, officers, directors or
> other agents for any injuries which you sustain in the
> course of your employment, including but not limited to
> death.  This means that the benefits payable to you under
> the Plan will be the exclusive remedy for any injuries or
> death which you suffer during the course and scope of
> your employment.

The election portion of the Enrollment and Waiver Election Form
contains the following language:

> I hereby elect to participate in the Plan.  I understand
> that by electing to enroll in the Plan I WAIVE any right
> to  bring  an  action  against  the  Company  or  anyone

2

Duran alleges that on March 1, 1993, in the scope of her employment, she was riding in the back of an Intex truck driven by an Intex employee. The truck was stocked with cases of food and beverages and, allegedly due to reckless driving by the Intex employee, cases of beverages fell on top of her, causing serious bodily injuries. As a result of this accident, Duran filed a claim under the Plan and received medical and wage continuation benefits.[2]  Duran brought suit against Intex for negligence in Texas state court. Intex removed the case to the United States District Court for the Northern District of Texas and moved for summary judgment. On November 9, 1995, the district court granted Intex's motion and dismissed the action, finding that by enrolling in the Plan, Duran waived any form of legal action and finding that she ratified her enrollment by accepting payments under the Plan. Duran timely filed a notice of appeal.

## II. ANALYSIS

We review the granting of summary judgment de novo, applying the same criteria used by the district court in the first instance. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994); *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994).

---

affiliated with it as a result of any injury or death which I suffer in the course and scope of my employment and that benefits payable to me under the Plan will be my exclusive remedy for such injury.

[2]     According to Intex, at the time the case was removed to federal court, Duran had received $10,961.78 in medical benefits and $3,458 in wage benefits under the Plan.

3

First, we consult the applicable law to ascertain the material
factual issues. *King v. Chide*, 974 F.2d 653, 655-56 (5th Cir.
1992). We then review the evidence bearing on those issues,
viewing the facts and inferences to be drawn therefrom in the
light most favorable to the nonmoving party. *Lemelle v.
Universal Mfg. Corp.*, 18 F.3d 1268, 1272 (5th Cir. 1994); *FDIC v.
Dawson*, 4 F.3d 1303, 1306 (5th Cir. 1993), *cert. denied*, 114 S.
Ct. 2673 (1994). Summary judgment is proper "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). Where the evidence is such that a reasonable jury could
return a verdict for the nonmoving party, a dispute about a
material fact is "genuine." *Meadowbriar Home for Children, Inc.
v. Gunn*, 81 F.3d 521, 533 (5th Cir. 1996) (citing *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *Amburgey v.
Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir. 1991).
There is no genuine issue for trial, however, if "the record--
taken as a whole--could not lead a rational trier of fact to find
for the nonmoving party." *Davis v. Chevron U.S.A., Inc.*, 14 F.3d
1082, 1084 (5th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The arguments that Duran raises on appeal may be summarized
as follows: she did not waive her rights under the TWCA because
she did not understand the effect of the Enrollment and Waiver

4

Election Form that she signed; and the waiver is voidable because she signed the form under duress. Additionally, Duran argues that such a waiver is void as against public policy. Because Duran failed to raise this final argument to the district court,[3] we need not consider it. *See Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 n.10 (5th Cir.) (parties may not advance new theories or raise new issues to secure reversal of summary judgment), *cert. denied*, 506 U.S. 825 (1992). We address Duran's two remaining arguments in turn.

Duran testified by affidavit that she does not speak, read, or write English and that she did not understand the meaning of the papers she signed. Despite the fact that she signed the waiver twice, once on the day she was hired and again four months later, Duran contends that she did "not understand the nature or effect of the waiver, nor .. . . her right not to waive those substantive rights [provided by the TWCA]." Under Texas law, this argument is unavailing. As the district court pointed out, Texas courts have consistently held that individuals are charged with knowing and understanding the contents of what they sign. *See, e.g., Eubank v. First Nat'l Bank*, 814 S.W.2d 130, 134 (Tex.

---

[3]    After noting that Duran did "not challenge the validity of the Plan under Texas law," the district court went on to explain that "similar plans have been upheld as enforceable by Texas courts. [*See, e.g., Collier v. Allstate Ins. Co.*, 395 F.2d 719, 720 (5th Cir. 1968); *Tigrett v. Heritage Bldg. Co.*, 533 S.W.2d 65 (Tex. Civ. App.--Texarkana 1976, writ ref'd n.r.e.).] In fact, a recent decision in this District held that the identical Plan initiated by the same Defendant was valid under Texas law. [*Brito v. Intex Aviation Servs., Inc.*, 879 F. Supp. 650 (N.D. Tex. 1995)]."

5

App.--Corpus Christi 1991, no writ) (holding that individuals have "an obligation to protect themselves by reading documents before signing them"); *see also Estate of Degley v. Vega*, 797 S.W.2d 299 (Tex. App.--Corpus Christi 1990, no writ) (finding contract enforceable despite appellant's limited understanding of English). Where the enforceability of a contract was challenged on the ground that the appellant could not speak, read, or write the English language, one Texas court pointed out that "[i]t is well-settled that illiteracy will not relieve a party of the consequences of his contract. . . . Therefore, if a person is unable to read the contract, he must have it read to him." *Nguyen Ngoc Giao v. Smith & Lamm P.C.*, 714 S.W.2d 144 (Tex. App.--Houston [1st Dist.] 1986, no writ) (citations omitted).

Recently this issue was addressed in a decision involving the same defendant and the same occupational insurance plan involved in this case. *Brito v. Intex Aviation Servs., Inc.*, 879 F. Supp. 650 (N.D. Tex. 1995). As in the case at bar, an employee submitted affidavit testimony that he did not understand the "meaning and consequences" of the waiver he signed. *Id.* at 654. In *Brito*, the court granted summary judgment in favor of Intex. *Id.* at 655. Noting that "[a]bsent fraud, duress, or mental incompetence, a party who intentionally signs a document is bound by its contents," the *Brito* court held that the employee's claims against Intex were barred as a matter of law. *Id.* at 654. In the instant case, notwithstanding Duran's affidavit testimony that she did not understand the "nature or

6

effect" of the waiver, we find that the district court did not
err in granting summary judgment in favor of Intex; the waiver is
enforceable as a matter of law.

Duran's second argument on appeal is that summary judgment
was improper because a fact issue was raised as to duress.  Duran
contends that she was led to believe that she would lose her job
if she refused to sign the Enrollment and Waiver Election Form.
Under Texas law, however, the acts alleged by Duran do not
constitute duress.  There can be no duress "unless, (1) there is
a threat to do some act that the party threatening has no legal
right to do, (2) there is some illegal exaction or some fraud or
deception, and (3) the restraint must be so imminent as to
destroy a party's free agency without present means of
protection."  *Rosas v. United States Small Business Admin.*, 964
F.2d 351, 356 (5th Cir. 1992).  Even if it is true that Intex
required Duran to participate in the Plan as a condition of
employment, imposing such a condition on an at-will employee is
not illegal.  *See Federal Express Corp. v. Dutschmann*, 846 S.W.2d
282, 283 (Tex. 1993) ("The long-standing rule in Texas provides
for employment at will, terminable at any time by either party,
with or without cause, absent an express agreement to the
contrary." (citations omitted)); *Hathaway v. General Mills, Inc.*,
711 S.W.2d 227, 229 (Tex. 1986) ("In employment at will
situations, either party may impose modifications to the
employment terms as a condition of continued employment.").  If
Intex required participation in the Plan, Duran was confronted

7

with two validly imposed alternatives -- to sign up for the Plan
and join the staff of Intex, or not.  In *Van Arsdel v. Texas A&M
Univ.*, 628 F.2d 344 (5th Cir. 1980), we held that duress was
absent as a matter of law where an appellee made a reasoned
choice between two such alternatives.  *Id.* at 346  "We disagree
with the [] conclusion that duress is present whenever a party is
confronted with a dilemma."  *Id.* at 345-46.  Regarding the
affirmative defense of duress, we conclude, as with Duran's first
argument, that it was not error for the district court to grant
Intex's motion for summary judgment.  Duran's claims are barred
as a matter of law by her waiver.[4]

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's
granting of summary judgment in favor of Intex.

---

[4]    In addition to finding that Duran's claims against Intex
were barred by the waiver as a matter of law, the district court
further concluded that Duran lost any rights to legal action by
accepting payments under the Plan and thereby ratifying her
enrollment in the Plan.  Because Duran's appeal fails for the
reasons stated above, we need not address the issue of
ratification.

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

NOV 2 7 1996

NANCY DOHERTY, CLERK

By _____
Deputy

JIM GOFF,
      Plaintiff-Appellant,

VS.

HOWMET CORPORATION,
      Defendant-Appellee.

§
§
§
§
§
§
§

CIVIL ACTION NO. 7:94-CV-90-X

## ORDER AFFIRMING DECISION OF MAGISTRATE JUDGE

Before the Court is Jim Goff's ("Goff") appeal, under the authority of 28 U.S.C. § 636(c), from the Magistrate Judge's decision to grant Howmet Corporation ("Howmet") summary judgment. Having reconsidered the record and the Magistrate Judge's decision de novo, Folks v. Kirby Forest Ind. Inc., 10 F.3d 1173 (5th Cir. 1994), the Court hereby **AFFIRMS** his decision, albeit for partially different reasons.

### Background

Goff brought this civil action seeking monetary damages for personal injuries sustained during his employment with Howmet allegedly as a result of Howmet's negligence and/or gross negligence. Goff, an at-will employee, was a production worker at Howmet's casting facility in Wichita Falls, Texas, which manufactures and refurbishes aircraft engine parts such as blades and vanes for gas turbine engines. (Goff Aff. at page one; Wood Dec. at page 2) Goff alleges that he lost breathing capacity due to continuous exposure to harmful chemicals, infiltrates and other particles in the working environment. Prior to Goff's injury, on

November 1, 1991, Howmet elected to become a "nonsubscriber" under the Texas Workers Compensation Act ("the Act")[1] and simultaneously established a voluntary occupational insurance plan ("the Plan") in which Howmet employees could enroll by executing an Occupational Injury Benefit Plan Enrollment and Waiver ("the Waiver"). (Ex. 3 to Wood Dec.) On October 22, 1991, Goff signed the Waiver, thereby agreeing to waive his rights under the Act or any other statute or common law for personal injury damages arising from his employment with Howmet. At that time, Goff agreed that all amounts payable to him under the Plan in the future would be his exclusive remedy for any personal injury or death. By enrolling in the Plan, Goff also agreed that if he were dissatisfied with a decision by the Committee that administered the Plan as to a claim for benefits, or "any other matter which relates to the Plan," his "sole recourse was to submit that dispute to arbitration.

By its Motion for Summary Judgment, Howmet sought a determination that Goff's claims against it for his work-related breathing capacity injury are barred by the above-mentioned Waiver. Goff argues that (1) the Waiver is void because it violates Texas' express negligence doctrine; (2) the Waiver is void under Texas statutes or common law as against public policy; (3) the Waiver is void since it was signed under duress; and (4) that the arbitration clause contained in the Enrollment and Waiver form was not broad enough to encompass arbitrating the issue of whether the Enrollment and Waiver form was obtained under duress. On March 28, 1995, the

---

[1] Tex. Lab. Code Ann. § 406.002, .004, .005, .007.

2

Magistrate Judge determined that the Waiver executed by Goff satisfied the express negligence doctrine required under Texas law since it stated with sufficient specificity Goff's intent to waive his future statutory and common law claims resulting from Howmet's negligence. Thus, the Magistrate Judge granted Howmet's Motion for Summary Judgment.

## Discussion

### I.

Goff first argues that the Waiver he signed is void because it violates Texas' express negligence doctrine. The express negligence doctrine requires contracts that attempt to excuse or shift the burden of damages caused by a party's own negligence to contain language that expresses that intent "in so many word." Ethyl Corp. v. Daniel Const., 725 S.W.2d 705, 708 (Tex. 1987). In 1993, the Texas Supreme Court extended the applicability of the express negligence doctrine from indemnity agreements to releases as well. Dresser Indus. v. Page Petroleum, 853 S.W.2d 505 (Tex. 1993).

For the express negligence doctrine to apply, the waiver or release must purport "to relieve a party in advance for responsibility for its own negligence." Dresser, 853 S.W.2d at 506. Goff asserts that the Waiver he signed, which was drafted and relied upon by Howmet, operates as a release and, therefore, it must satisfy the express negligence doctrine. (Brief for Appellant at page four, paragraph 3) The Court disagrees. The express

3

negligence doctrine does not apply in this case because paragraph three of the Waiver does not in any way release any of Goff's substantive rights.  The Enrollment and Waiver that Goff signed does not wholesale relieve Howmet in advance for responsibility for its own negligence: it merely substitutes a different, but sufficiently similar, remedial scheme.

By electing to enroll in the Plan, Goff did not give up any substantive rights by "releasing" Howmet of any responsibility for its own negligence; he merely agreed not to sue Howmet at common law but instead to seek release only under the Plan with ultimate recourse to binding arbitration.  Accordingly, Howmet was not relieved in advance of responsibility for its own negligence since it was still obligated to pay benefits under the Plan.  Howmet no more relieved itself from responsibility for workplace injuries than any employer who subscribes to the Texas Workers Compensation Act.  Goff's election of one remedy -- Plan benefits and arbitration -- for another -- a suit at common law -- by definition and common sense, is not a release for purposes of the express negligence doctrine.  As Chief Judge Buchmeyer has recently stated when faced with the same issue, "Plaintiff does not forego [sic] 'substantive rights' when compelled to arbitrate under a more limited remedial scheme. . . "  Kinnebrew v. Gulf Ins. Co., No. 3:94-CV-1517-R, 67 Fair Empl. Prac. Cas. (BNA) 189 (N.D.Tex. Nov. 28, 1994)

The Court can find no Texas case applying the express negligence doctrine to a waiver which substitutes, with the

4

employee's agreement, an alternative remedy in exchange for the release or waiver, much less a remedy like the Plan in this case which is sufficiently comparable to the Texas workers compensation remedial scheme.    Likewise, the Court can find no Texas case applying the express negligence doctrine to arbitration agreements. Accordingly, the express negligence doctrine does not apply to the Waiver in this case.    Consequently, the Court does not reach the issue of whether paragraph three of the Enrollment and Waiver satisfies the exacting express negligence doctrine.

## II.

Goff's argument that the Waiver is void because it violates the Texas Workers Compensation Act and/or public policy, is flat wrong.    The public policy underlying the Act is to protect and benefit the employee. <u>Hazelwood v. Mandrell Indus. Co.</u>, 596 S.W.2d 204, 206 (Tex. Civ. App. -- Houston [1st Dist.] 1980, writ ref'd n.r.e.).    "Compensation," as defined by the Act, is any "benefit" which is based upon a "compensable injury," i.e., one that arises out of and in the course and scope of employment for which compensation is payable under the Act.[2]   Since Goff's Waiver did not affect Goff's right to "compensation" under the Act[3], the public policy underlying the Act is in no way violated.

---

[2]   Tex. Lab. Code Ann. § 401.011(5), (10), (11) (Vernon 1994).

[3]   Tex. Lab. Code Ann. §406.035 (Vernon 1995).

5

CSMPDF - www.texlio.com

III.

Goff's contention that his Waiver was obtained by duress is similarly unavailing. The Court finds as a matter of law that it was not obtained by duress. Aside from Goff's vague statements regarding his concerns about losing his job if he did not sign the Waiver, Goff adduces no evidence that he or anyone on his behalf attempted to promptly cancel, change, refute, or otherwise object to the Waiver after he signed it on October 21, 1991. In fact, Goff did not challenge the Waiver's validity until two and one-half years later when his lawyer commenced this lawsuit in May 1994. Accordingly, the Court finds that Goff, by his inaction and apparent lack of concern about being strongarmed into signing a document that purported to govern his future employment relationship, ratified and affirmed the Waiver by his subsequent acts, e.g., Goff applied for Plan benefits for an unrelated injury over a year after the Waiver was signed. Since failure to repudiate a voidable agreement within a reasonable time and accepting consideration for that agreement amount to a ratification of the agreement, the Court finds Goff's argument concerning duress as a basis for avoiding the Waiver, without merit.

IV.

Finally, Goff argues that the arbitration clause contained in the Enrollment and Waiver form is not broad enough to encompass arbitrating the issue of whether the Waiver was obtained by duress. In light of the Court's finding as a matter of law that Goff

6

ratified the Waiver, and that the Waiver was not obtained by duress, this argument by Goff is moot.

* * *

The Court concludes that Howmet is entitled to summary judgment on all claims asserted by Goff pursuant to Fed.R.Civ.P. 56(c) since no genuine issues of material fact exist and since Howmet is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Therefore, the Magistrate Judge's decision to grant Howmet's Motion for Summary Judgment is hereby **AFFIRMED**.

**SO ORDERED** this 27th day of November, 1995.

_Joe Kendall_
JOE KENDALL
UNITED STATES DISTRICT JUDGE

ORIGINAL

IN THE UNITED STATES DISTRICT COURT       NOV 27 1995
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

JIM GOFF,                         §
    Plaintiff-Appellant,      §
                              §
VS.                               §    CIVIL ACTION NO. 7:94-CV-90-X
                              §
HOWMET CORPORATION,               §
    Defendant-Appellee.       §

ENTERED ON DOCKET
_____ PURSUANT
TO F.R.C.P. RULES
58 AND 79A

**FINAL JUDGMENT**

    In accordance with the Court's affirmance of the Magistrate
Judge's Decision to grant Defendant's Motion for Summary Judgment,
which was entered this same day, the Court hereby **ORDERS and
ADJUDGES** that judgment be entered in the above-styled and -numbered
cause of action in favor of Defendant-Appellee Howmet Corporation
and that Plaintiff-Appellant Jim Goff take nothing.

    The Clerk of Court is instructed to close this case.

    **SO ORDERED** this _27_ day of November, 1995.

_____
JOE KENDALL
UNITED STATES DISTRICT JUDGE

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

FILED

NANCY DOHERTY, CLERK

By _____
　　　　Deputy

| | | |
|---|---|---|
| JIM GOFF | § | |
| | | |
| v. | § | CIV. NO. 7:94CV-090-39KA |
| | | |
| HOWMET CORPORATION | § | |

## MEMORANDUM OPINION AND ORDER

By Order of Reassignment dated November 29, 1994, the above entitled and numbered cause was reassigned to the undersigned Magistrate Judge for hearing, trial and entry of judgment pursuant to the written Consent of the parties in accordance with 28 USC 636(c).

### Nature of Suit

Plaintiff, Jim Goff ("Goff"), brought his original action against Howmet Corporation ("Howmet") in the District Court of Wichita County, Texas, seeking monetary damages for personal injuries allegedly sustained while Goff was employed by Howmet and as a result of negligence and/or gross negligence of Howmet. Howmet removed the state court action on the grounds of diversity and ERISA pre-emption. Goff has not challenged removal.

### Goff's Claims

By his Original Petition in the state court action, Goff asserted a claim against Howmet for recovery of money damages for injuries he alleges he sustained while working for Howmet at its manufacturing facility in Wichita Falls, which refurbishes aircraft engine parts. Goff claims that he lost breathing capability due to injury to his lungs from continuous exposure to harmful chemicals, infiltrates and other particles in the working environment, and that his injury was caused by the negligence and gross negligence of his employer, Howmet. *Plaintiff's Original Petition, pp. 1-3.*

## Howmet's Motion for Summary Judgment

After general denial in state court Howmet asserted affirmative defenses as follows:

a) pre-emption by Employee Retirement Income Security Act of 1974 ("ERISA");
b) agreement to binding arbitration;
c) right to have action dismissed or stayed pending arbitration;
d) waiver;
e) estoppel;
f) ratification;
g) election of remedies;
h) sole proximate cause by acts or omissions of others;
i) Plaintiff's failure to mitigate, and
j) offset.

Promptly following removal, Howmet filed a Motion for Summary Judgment alleging that while Goff was employed, and prior to Goff's alleged injury, Howmet elected to become a non-subscriber under the Texas Workers' Compensation Act ("the Act"); that Howmet had established a voluntary occupational insurance plan ("the Plan") in which employees of Howmet could enroll by executing an Occupational Injury Benefit Plan Enrollment and Waiver ("the Waiver"); that by the Waiver each employee agreed to waive all of the employee's rights under the Act, any other statute or common law to bring any legal action or recover judgment against Howmet for any damages arising from any personal injury incurred during the course of the employee's employment with Howmet, that by the Waiver each employee agreed that by enrolling in the Plan all amounts payable under the Plan would be the exclusive remedy for the employee and his beneficiaries for any personal injury or death; and that Goff signed such a Waiver. *Exhibit 3, Motion*

## Howmet's Positions

Howmet claims that Goff signed the Waiver on October 22, 1991 and that he claimed benefits under the Plan by filing a claim in November 1992 for an injury unrelated to the injury

asserted in this lawsuit. *SJM pp. 2-4*  Howmet asserts that summary judgment is appropriate because:

(1)    Goff's claims against Howmet for his work related breathing capacity injury are barred by written waiver *p. 6*;

(2)    Goff ratified the Waiver by electing to file a claim under the Plan for an unrelated injury; and, alternatively,

(3)    by enrolling in the Plan Goff agreed to binding arbitration which the Court should enforce by dismissal or, alternatively, by abating this action pending arbitration decision. *Id. at pp. 6-12*

### Goff's Positions

In his responses, Goff asserts that the Waive is unenforceable under Texas law because it contravenes the Act, that it is void under Texas Lab Code ANN §406.034 prohibiting waivers of employees' rights to compensation, and that the Waiver was executed by Goff under duress and, hence, is void. Additionally, by Supplemental Reply Brief Goff asserts that under the Texas cases establishing the doctrine of "express negligence," the Waiver is unenforceable with respect to Goff's negligence action since the Waiver fails to expressly and conspicuously refer to his common law actions for negligence.

In its Reply and Supplemental Reply, Howmet distinguishes the Waiver from the releases and indemnity agreements interpreted by the Texas courts with respect to the applicability of the "express negligence" doctrine and further asserts that if the Waiver is unenforceable for such purpose or because of duress (which Howmet strenuously denies), Goff has ratified the Waiver by making a claim under the Plan.

## Summary Judgment Principles

The applicable summary judgment principles have been summarized by the District Courts

on repeated occasions, including the Hon. John McBryde's most recent decision of March 20, 1995

in Cause No. 4.94-CV-660-A styled *Raul Brito v. Intex Aviation Services et al.* which is hereinafter

referred to as *Brito* case

## Analysis

The relevant summary judgment evidence establishes that

1. Goff was an at-will employee of Howmet working as a production worker in Howmet's Wichita Falls casting facility which manufactures blades and vanes for gas turbine engines. *Goff Affidavit, p. 1; Wood Declaration, p. 2* [1]

2. In October 1991 Howmet notified its Wichita Falls casting facility employees and the Texas Workers Compensation Commission that effective November 1, 1991 Howmet would no longer carry workers compensation insurance. *Wood Declaration, p. 2 and Exhibits 1 and 2*

3. Cotemporaneous with its election to become a non-subscriber under the Texas workers compensation law, Howmet established an occupational injury benefit plan (the Plan) to become effective November 1, 1991, at the same time its non-subscriber status became effective. *Wood Declaration, p. 2, and Exhibits 4, 5 & 6*

---

[1]In support of and attached to its Motion for Summary Judgment, Howmet attached the "Declarations" of Lee L. Wood, Jr. and Stephen F. Fink. The Declarations were essentially declarations made under penalty of perjury stating that the Declarations were true and correct but lacked the jurat or acknowledgement before a notary public or other official. No objection was levied to the format or form of the Declarations and, hence, they will be deemed to be "affidavits" for the purposes of summary judgment evidence under Rule 56.

4. Having decided to become a non-subscriber under the Act and to establish and maintain a private company-sponsored and administered injury benefit plan, each to become effective November 1, 1991, Howmet commenced having workers' meetings during which management personnel presented to the employees certain of the documents describing and reflecting the termination of workers compensation coverage and the commencement of the company Plan. *Goff Affidavit, p. 2; Wood Declaration, pp. 2-3*

5. On October 22, 1991 at the beginning of Goff's shift which began at 11:00 p.m., Goff attended a meeting conducted by management personnel of the Wichita Falls Howmet facility and during which he saw and signed the "Important Notice" and the "Enrollment and Waiver." The parties are in dispute with respect to what other documents were furnished or made available or reviewed at the meeting, who else was present, and what else transpired at the meeting.[2] However, it is reasonably inferable from the uncontroverted facts that the other employees of the Howmet facility were called into similar meetings and presented with the notice and enrollment and waiver forms.

6. A little over a year later, in November 1992, Goff filed a claim for benefits under the Plan for an unrelated injury and the Plan committee approved Goff's claim.[3]

---

[2]While there is a factual dispute between Goff and Howmet whether Goff received or reviewed all five of the implementing documents, Goff's signature appears upon and Goff does not dispute having seen two of the documents, that is: "Important Notice" and "Occupational Injury Benefit Plan Enrollment and Waiver" (*Exhibits 2 and 3 to Wood Declaration*).

[3]The summary judgment evidence presented by Howmet and Goff fail to reflect whether the benefits were paid or received on the unrelated claim.

*MEMORANDUM OPINION AND ORDER*                                                    *Page 5*

7. Goff signed the Enrollment and Waiver form on October 22, 1991.  *Wood Declaration,*

*Exhibit 3.*  A complete copy of the Waiver form will be attached to this Memorandum.  Section 3

recites in pertinent part as follows:

> In consideration of my election to enroll in, and thus become eligible to receive
> payments under, the Plan, I hereby waive my rights under the Act, any other statute,
> or common law to bring legal action and recover judgment against the Company. .
> for any damages arising from any personal injury incurred (i) in the course of my
> employment by the Company..

8.  In May 1994, Goff's attorney gave a written notice of his engagement by Goff with regard

to an injury Goff claimed he sustained from exposure to chemicals in his working environment and

gave notice of Goff's intention to pursue a claim associated with his job injury and requesting

referral of the matter to Howmet's workers compensation carrier.  Howmet's attorneys promptly

replied by letter notifying Goff's attorney that Howmet was non-subscriber but maintained its own

private Plan and that Goff has "waived" any right to pursue other actions against Howmet for work

related injuries.

### Validity of Waiver

Goff's argument that the Waiver is invalid, void and unenforceable because it violates the

Texas Workers Compensation Act and/or public policy, is wrong.  The two cases cited by Goff in

support of the proposition that the Waiver is void, *Texas Health Enterprises v. Kirkgard,* 882 SW2d

630 (Tex.App.-Beaumont, 1994, writ ref'd) and *Hazelwood v. Mandrell Industries Company,* 596

SW2d 204 (Tex.Civ.App.-Houston, 1st Dist. 1980, writ ref'd n.r e.) are distinguishable.  The

Honorable John McBryde has ruled in the *Brito* case (supra., p. 4, opinion as yet unpublished) that

the Waiver is not void or unenforceable  because the Waiver does not affect the right of

"compensation" that Brito had no right to receive anyway.  Goff counters, however, that the Waiver

*MEMORANDUM OPINION AND ORDER*                                                    *Page 6*

is unenforceable under Texas law because of the application of the "express negligence" doctrine ennunciated by the Texas Supreme Court in *Ethyl Corporation v. Daniel Construction Co.*, 725 SW2d 705 (Tex. 1987) and *Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 SW2d 505 (Tex. 1993). The express negligence doctrine was established originally in the context of indemnification agreements and has been applied by the Texas Supreme Court to releases. In *Dresser* the Supreme Court concluded that the express negligence doctrine applied to releases, as well as to indemnity agreements when the effect of both is to relieve a party in advance of responsibility for its own negligence.

Howmet argues that the express negligence doctrine does not apply to the Waiver in this case because the Waiver is "not a release" and does not "have the purpose or effect of relieving Howmet in advance of responsibility for its own negligence." Howmet's argument is specious. Whether characterized as an agreement "not to sue" or as an agreement discharging liability, the language of the Waiver evidences the intent to relieve Howmet of responsibility, or of enforcing Goff's agreement to hold Howmet without responsibility, for damages caused by its negligence. This is the very essence of the definition of a release cited by the Supreme Court of Texas in the *Dresser* case. Indeed, it is this very purpose of the Waiver that Howmet is seeking to enforce by its Motion for Summary Judgment - that is, to bar Goff from pursuing Howmet for alleged damages from its alleged negligence.

The application of the "express negligence" doctrine does not require, however, that the term "negligence" be used in the very same operative sentence as the term "waiver" or "release." Rather, the test is whether the instrument as a whole (within its four corners, *Ethyl*) specifically states that the waiver or release of "negligence" is intended. The Waiver form tendered by Howmet is

*MEMORANDUM OPINION AND ORDER*                                          *Page 7*

structured so that in the first section the employee is informed that since Howmet does not have workers compensation insurance under the Act, the employee has the right to bring "legal action" against his employer for job related injury and that he must "prove negligence," but contributory negligence and assumption of risk are not defenses, but the employer may defend on the grounds of willfulness or intoxication of the employee. The second sentence recites the benefits Howmet believes accrue as a result of its Plan, touting the benefits of the Plan. It is the third section where the waiver language is contained. Reviewing the form as a whole, it appears that the subject matter of the Waiver itself relates to common law actions for negligence, that the recitation of its applicability to negligence is in reasonable proximity to the waiver language itself and that the waiver is conspicuous. Accordingly, I find that as a matter of law the Waiver form specifically states the intent to waive any claims resulting from Howmet's negligence and thus complies with the express negligence doctrine requirements.

I conclude that the Waiver is not unenforceable because of any violation of the Act, violation of public policy, or violation of the express negligence doctrine.

Goff claims finally that the Waiver is unenforceable because it was secured under "economic duress." Summary judgment evidence submitted by Howmet and by Goff are diametrically opposed with respect to the circumstances and events that transpired and the knowledge and understanding of the participants, including Goff, during the October 22, 1991 plant meeting. However, from the date of that meeting until May 1994, two and one-half years later, when Goff's attorney gave notice to Howmet of his engagement by Goff with regard to his lung capacity injury, there is no evidence of any attempt by Goff to challenge, question or otherwise assert the invalidity of his Waiver. The Waiver recites on its face:

> I acknowledge that I knowingly and voluntarily enter into this Enrollment and Waiver, and that I fully understand the meaning and effect of my action in executing it.

Other than vague statements with regard to his concerns about losing his job if he did not sign the agreement, Goff presents no other evidence of any attempt by him or anyone on his behalf to cancel, refute, change, modify, alter, amend or object to the Waiver. Furthermore, he made application for benefits under the Plan for an unrelated injury at least a year after the Waiver was signed. I find as a matter of law that by failing to promptly repudiate the Waiver and by asserting rights or seeking benefits under the Plan, Goff ratified the Waiver and now is barred from repudiating the same on the grounds of duress. A voidable release may be ratified and affirmed by subsequent acts or declarations of the releasor. Acceptance and retention of consideration given for a release may amount to a ratification. Finally, failure to repudiate a voidable release within a reasonable time will be regarded as a ratification. *See 64 Tex. Jur III*, Release, Sec. 21 and cases cited.

Inasmuch as the Court finds that Goff's claims against Howmet are barred by the Waiver as a matter of law, there is no need to address Howmet's arguments concerning arbitration under the Plan.

## O R D E R

THEREFORE, the Court orders that Howmet's Motion for Summary Judgment be, and is hereby, **GRANTED**, and that the claims and causes of action of Goff against Howmet be, and they are hereby, **DISMISSED**.

The Court finds that there is no just reason for delay in, and hereby directs, entry of final judgment as to the dismissal of the claims of Goff against Howmet. **IT IS SO ORDERED.**

*MEMORANDUM OPINION AND ORDER*                                                    *Page 9*

The parties are hereby notified of their right to appeal to the Judge of the District Court in accordance with 28 USC § 636(c)(4) and in accordance with the Consent to Proceed before U.S. Magistrate Judge executed by the parties on November 14, 1994, by filing with the Clerk of the District Court a notice of appeal within 30 days from the date of entry of this Order.

SIGNED this 28th day of March, 1995

_____
U.S. MAGISTRATE JUDGE